# EXHIBIT B

**EXECUTION COPY**

EQUITY PURCHASE AGREEMENT

Between

FRC ACQUISITIONS LLC

On Behalf of Itself and the other Buyers Named Herein

and

INGERSOLL-RAND COMPANY LIMITED

On Behalf of Itself and the other Sellers Named Herein

dated as of

August 25, 2004

# TABLE OF CONTENTS

Page

**ARTICLE I PURCHASE AND SALE OF INTERESTS**
1.1    Transfers by Sellers of the Acquired Interests.................................1
1.2    Consideration....................................................................2
1.3    The Closing......................................................................3
1.4    Post-Closing Purchase Price Adjustment..........................................6
1.5    Pre-Closing Inventory..........................................................10
1.6    Further Assurances.............................................................10
1.7    Purchase Price Allocation......................................................11
1.8    AIM Program Payment............................................................12

**ARTICLE II REPRESENTATIONS AND WARRANTIES OF SELLERS**
2.1    Organization of Certain Sellers................................................13
2.2    Subsidiaries...................................................................14
2.3    Ownership of Acquired Interests................................................15
2.4    Authorization, Etc.............................................................15
2.5    Financial Statements...........................................................15
2.6    Absence of Undisclosed Liabilities.............................................16
2.7    No Approvals or Conflicts......................................................16
2.8    Compliance with Law; Governmental Authorizations...............................17
2.9    Litigation.....................................................................17
2.10   Personal Property Assets.......................................................17
2.11   Absence of Certain Changes.....................................................18
2.12   Tax Matters....................................................................19
2.13   Employee Benefits..............................................................21
2.14   Labor Relations................................................................23
2.15   Intellectual Property..........................................................23
2.16   Contracts......................................................................24
2.17   Environmental Matters..........................................................26
2.18   Insurance......................................................................28
2.19   Real Property..................................................................28
2.20   Product Liability and Product Warranty.........................................29
2.21   No Brokers' or Other Fees......................................................30
2.22   Relations with Governments.....................................................30
2.23   No Other Representations or Warranties.........................................30

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF BUYERS**
3.1    Organization...................................................................30
3.2    Authorization, Etc.............................................................31
3.3    No Approvals or Conflicts......................................................31
3.4    Financing......................................................................31
3.5    No Brokers' or Other Fees......................................................32
3.6    Unregistered Equity............................................................32
3.7    No Other Representations or Warranties.........................................32

ARTICLE IV CONDITIONS TO SELLERS' OBLIGATION

4.1    Representations and Warranties................................................33
4.2    Performance..............................................................................33
4.3    Officer's Certificate ................................................................33
4.4    Consents and Approvals ..........................................................33
4.5    Injunctions................................................................................33
4.6    Guarantees................................................................................34

ARTICLE V CONDITIONS TO BUYERS' OBLIGATION

5.1    Representations and Warranties................................................34
5.2    Performance..............................................................................34
5.3    Officer's Certificate ................................................................34
5.4    Consents and Approvals ..........................................................34
5.5    Injunctions................................................................................34
5.6    Satisfaction and Release of Encumbrances..............................35
5.7    Material Adverse Effect............................................................35
5.8    French Offer Letter ..................................................................35
5.9    Interim Financials ....................................................................35

ARTICLE VI COVENANTS AND AGREEMENTS

6.1    Conduct of Business by Dresser-Rand Group ..........................35
6.2    Access to Books and Records; Cooperation ............................37
6.3    Filings and Consents ................................................................38
6.4    Tax Matters; Cooperation; Preparation of Returns; Tax Elections............39
6.5    Tax Indemnity ..........................................................................41
6.6    Procedures Relating to Indemnification for Taxes ..................44
6.7    Refunds and Tax Benefits........................................................45
6.8    Employees; Benefit Plans ........................................................45
6.9    Labor Matters............................................................................53
6.10   Covenant to Satisfy Conditions ..............................................53
6.11   Contact With Customers and Suppliers ..................................53
6.12   Projections................................................................................53
6.13   No Hire......................................................................................53
6.14   Use of Names............................................................................54
6.15   Environmental Rights and Responsibilities After Execution of
       Agreement................................................................................55
6.16   Intercompany Debt....................................................................62
6.17   Substitute Guarantees................................................................62
6.18   Plaintiff Actions........................................................................62
6.19   Financing....................................................................................63
6.20   Pending Insurance Claim ........................................................64
6.21   Transfers of Non-U.S. Interests ..............................................65
6.22   Real Property Deeds ................................................................66
6.23   Estimated Customer Prepayments Statement ..........................66
6.24   Currency Conversion ................................................................66
6.25   Insurance....................................................................................67

ii

ARTICLE VII TERMINATION
    7.1    Termination............................................................67
    7.2    Procedure and Effect of Termination...................................68

ARTICLE VIII INDEMNIFICATION
    8.1    Indemnification.......................................................68

ARTICLE IX MISCELLANEOUS
    9.1    Fees and Expenses; Transfer Taxes.....................................74
    9.2    Governing Law........................................................74
    9.3    Amendment............................................................74
    9.4    No Assignment........................................................74
    9.5    Waiver...............................................................74
    9.6    Notices..............................................................75
    9.7    Complete Agreement...................................................76
    9.8    Counterparts.........................................................76
    9.9    Publicity............................................................76
    9.10   Certain Definitions..................................................76
    9.11   Headings.............................................................78
    9.12   Severability.........................................................78
    9.13   Third Parties........................................................78
    9.14   CONSENT TO JURISDICTION..............................................78
    9.15   WAIVER OF JURY TRIAL.................................................78
    9.16   Specific Enforcement.................................................79
    9.17   Guarantee of Seller Obligations......................................79

EXHIBITS

| Exhibit A | - | Buyers and Sellers |
| Exhibit B | - | Dresser-Rand Restructuring Steps |
| Exhibit C | - | Form of Transition Services Agreement |
| Exhibit D | - | Form of License Agreement |
| Exhibit E | - | Environmental Reporting Procedures |

475503.23-New York Server 5A - MSW

## EQUITY PURCHASE AGREEMENT

This Equity Purchase Agreement (this "Agreement"), dated as of August 25, 2004, is entered into by and among FRC Acquisitions LLC, Delaware limited liability company ("FRC"), on behalf of itself and the other buyers set forth on Exhibit A hereto (collectively with FRC, the "Buyers") and Ingersoll-Rand Company Limited, a company organized under the laws of Bermuda ("IR"), on behalf of itself and the other sellers set forth on Exhibit A hereto (collectively with IR, the "Sellers").

WHEREAS, IR indirectly owns all of the issued and outstanding capital stock or partnership interests of each other Seller;

WHEREAS, the Sellers (other than IR) directly own capital stock or other equity interests (the "Acquired Interests") in the entities which are not at the time of the Closing a subsidiary of another member of the Dresser-Rand Group (as defined in Section 2.2), including as set forth on Exhibit A hereto;

WHEREAS, the Dresser-Rand Group is in the business of, among other things, the design, manufacture, sale, maintenance and repair of gas and steam compression equipment (including centrifugal and reciprocating compressors and steam and gas turbines), all as currently conducted by the Dresser-Rand Group (the "Business"; provided that, the "Business" shall not include IR and its subsidiaries' high-capacity hoists and winch business); and

WHEREAS, the Sellers wish to sell, and the Buyers wish to buy, the Acquired Interests, upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants contained herein, the parties hereto agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF INTERESTS

1.1 Transfers by Sellers of the Acquired Interests.  On the Closing Date (as defined in Section 1.3) and subject to the terms and conditions set forth in this Agreement, the Sellers shall sell, assign and transfer to Buyers all of the Sellers' right, title and interest in and to the Acquired Interests in accordance with the restructuring steps and others transactions set forth on Exhibit B hereto, free and clear of all options, pledges, mortgages, security interests, liens, restrictions on voting or transfer, or other encumbrances of any nature (collectively, "Encumbrances"), other than such as may be created by or on behalf of the Buyers; provided, however, that with respect to entities in the Dresser-Rand Group incorporated or organized under the laws of any jurisdiction outside of the United States ("Non-U.S. Acquired Interests"), the purchase and sale thereof shall be effected in accordance with Section 6.21 to the extent the parties so agree.

No transfer of partnership interests pursuant to the terms of this Agreement shall cause such partnership to dissolve or terminate.

### 1.2 Consideration.

(a) On the Closing Date and subject to the terms and conditions set forth in this Agreement, in consideration of the sale, assignment and transfer of the Acquired Interests, FRC, on behalf of the Buyers, will pay to the Sellers cash in the amount of (A) One Billion Two Hundred Million dollars ($1,200,000,000), plus (B) the Estimated Net Cash Amount (as defined in Section 1.2(b)), minus (C) the EBITDA Adjustment Amount (as defined in Section 1.2(d)) (the "Initial Purchase Price", and as further adjusted pursuant to the provisions of this Agreement, the "Purchase Price"). The parties hereto agree that the Initial Purchase Price in respect of particular Non-U.S. Acquired Interests may be paid by the applicable Buyer to the applicable Seller under a Local Transfer Agreement (as defined in Section 6.21(b)), if applicable.

(b) As of a date reasonably proximate (which is intended to be the third (3rd) business day preceding the anticipated Closing Date) to the Closing Date, IR shall provide Buyers a schedule setting forth reasonably estimated Cash (as defined in Section 1.4(f)) of the Dresser-Rand Group by entity as of the Closing. No later than three (3) business days prior to the anticipated Closing Date, IR shall prepare, or cause to be prepared, a statement (the "Estimated Net Cash Statement") containing IR's good faith estimate of the Net Cash Amount (the "Estimated Net Cash Amount"), which shall be prepared in accordance with the definition of Net Cash Amount in Section 1.4(f) and the methodologies set forth in Section 1.2(b) of the disclosure schedule being delivered by the Sellers to the Buyers simultaneously with the execution of this Agreement and forming a part of this Agreement (the "Disclosure Schedule"). IR shall provide the Buyers and their accountants' reasonable access to all relevant books, records, facilities and employees of the Dresser-Rand Group and to any other information reasonably necessary to review and understand the Estimated Net Cash Statement. The Estimated Net Cash Statement prepared in accordance with this Section 1.2(b) shall be final and not subject to objection from Buyers for purposes of calculating the Initial Purchase Price at the Closing.

(c) The Buyers shall, following written notice to Sellers, who shall have an opportunity to review and understand such notice, (i) withhold and deduct from the Purchase Price or any other payment made by the Buyers pursuant to this Agreement any and all amounts required to be withheld and paid over to any Taxing Authority (as defined in Section 2.12(a)) as a result of the transactions contemplated by this Agreement, (ii) pay over to the applicable Taxing Authority any amounts required to be so withheld and (iii) promptly deliver to the Sellers any withheld amounts remaining thereafter in Buyer's custody (including, without limitation, any withheld amounts subsequently refunded to Buyer). Such notice shall set forth in reasonable detail the basis for such withholding or deduction. Any amounts withheld and paid over to any applicable Taxing Authority in accordance with the first sentence above (other than Transfer Taxes, which shall be governed by Section 9.1(b)) shall be treated as having been received by Sellers

2

for all purposes of this Agreement.  Notwithstanding the foregoing, if Buyers determine that they are required to withhold and deduct any amounts under this Section 1.2(c) from payments made under this Agreement, Buyers shall reasonably cooperate with Sellers to consider and implement alternative structures that would permit such payments to be made without such withholding or deduction and otherwise would not, in Buyers' reasonable judgment, alter the economics or practicability of the transactions contemplated by this Agreement.  If such withholding or deduction is nonetheless required, Buyers shall use reasonable best efforts to provide Sellers certified copies of receipts (or other evidence reasonably satisfactory to Sellers) evidencing payment of such withheld amounts as soon as reasonably possible after making such payments.

(d) For purposes of this Agreement, the following terms shall have the following meanings:

"Business EBITDA" shall mean operating income plus depreciation and amortization of the Dresser-Rand Group and the Business for the twelve months ended June 30, 2004, as set forth in the applicable financial statements of the Dresser-Rand Group and the Business, calculated in accordance with the methodology set forth in Section 1.2(d) of the Disclosure Schedule.

"EBITDA Adjustment Amount" shall mean an amount, if any, equal to eight times the EBITDA Deficiency.

"EBITDA Deficiency" shall mean, only if a positive number, (1) Business EBITDA calculated based on the financial statements, as set forth in Section 1.2(d) of the Disclosure Schedule, minus (2) Business EBITDA calculated based on the SAS Financial Statements and Audited Financial Statements, minus (3) $6.6 million.

1.3 The Closing.

(a) Closing.  Unless this Agreement shall have been terminated and the transactions contemplated herein shall have been abandoned pursuant to Article VII, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom, 4 Times Square, New York, NY 10036, on the third business day following the satisfaction or waiver of all of the conditions set forth in Articles IV and V hereof (the "Closing Date"), or at such other place and time as may be agreed upon by the Sellers and the Buyers, and shall be effective as of 11:59 P.M. local time on the Closing Date.  The parties will use commercially reasonable efforts to schedule the Closing to occur effective as of 11:59 P.M. local time on October 31, 2004.

(b) Deliveries by the Sellers.  At the Closing, the Sellers shall deliver or cause to be delivered to the Buyers the following:

(i)    stock certificates (or local legal equivalent) evidencing those Acquired Interests that are certificated securities, duly

3

endorsed in blank, or accompanied by stock powers duly executed in blank and with any required stock transfer tax stamps affixed;

(ii) a receipt from IR, on behalf of itself and the other Sellers, for the Initial Purchase Price paid to the Sellers;

(iii) IR shall pay by wire transfer of immediately available funds to an account or accounts, which are designated by Buyers to IR not less than two (2) business days prior to the Closing, cash in the amount equal to the sum of the following (the "Closing Payment"): (A) the Estimated Customer Prepayments Amount (as defined in Section 6.23) as set forth on the Estimated Customer Prepayments Statement (as defined in Section 6.23), plus (B) $17,000,000;

(iv) the Transaction Agreements (as defined below) to which each Seller is a party, duly executed by each relevant Seller;

(v) copies of the resolutions (or local equivalent) of the boards of directors and, where required, the stockholders of each Seller, authorizing and approving this Agreement and the Transaction Agreements and the transactions contemplated hereby and thereby, certified by the respective corporate secretaries (or local equivalent) of the applicable Sellers to be true and complete and in full force and effect and unmodified as of the Closing Date;

(vi) the Consents listed in Section 2.7 of the Disclosure Schedule;

(vii) a duly executed certificate of non-foreign status (a "FIRPTA Certificate") from each of the Sellers in a form and manner that complies with Section 1445 of the Code and the Treasury Regulations promulgated thereunder, provided, however, that if a FIRPTA Certificate is unable to be furnished by a Seller, then such Seller may instead provide a certificate (an "Alternate Certificate") pursuant to which such Seller certifies under penalties of perjury that it is not disposing of any United States real property interest (as defined in Section 897(c) of the Code and the Treasury Regulations promulgated thereunder). Notwithstanding anything to the contrary contained herein, if any Seller fails to provide to Buyer a FIRPTA Certificate or Alternate Certificate, Buyer shall be entitled to withhold from the Purchase Price or any other payment made pursuant to this Agreement the amount required to be withheld pursuant to Section 1445 of the Code and the Treasury Regulations promulgated thereunder;

(viii) the certificate required by Section 5.3 hereof;

4

(ix)   written resignations, effective as of the Closing Date, of the directors, officers and the foreign equivalents of members of the Dresser-Rand Group that are employed by IR following the Closing; and

(x)   such other documents and certificates duly executed as may be reasonably required to be delivered by the Sellers pursuant to the terms of this Agreement or as may be reasonably requested by Buyers prior to the Closing Date.

For purposes of this Agreement, "Transaction Agreements" shall mean (a) with respect to the Acquired Interests, such instruments of sale, conveyance, transfer and assignment, and such other agreements or documents, if any, in each case in form and substance reasonably satisfactory to IR and the Buyers, as shall be necessary in order to transfer all right, title and interest of the applicable Sellers in such Acquired Interests in accordance with the terms hereof, (b) the Transition Services Agreement substantially in the form attached as Exhibit C hereto (the "Transition Services Agreement"), (c) the License Agreement substantially in the form attached as Exhibit D hereto (the "License Agreement"), (d) the French Offer Letter and (e) any Local Transfer Agreements.

(c)   Deliveries by the Buyers.  At the Closing, the Buyers shall deliver or cause to be delivered to or for the benefit of the Sellers the following:

(i)   the Initial Purchase Price by wire transfer of immediately available funds to an account or accounts, which are designated by IR to the Buyers not less than two (2) business days prior to the Closing;

(ii)   a receipt from FRC, on behalf of itself and the other Buyers, evidencing receipt of the Acquired Interests and the Closing Payment;

(iii)   copies of the resolutions of the board of directors (or comparable governing body) of each Buyer authorizing and approving this Agreement and the Transaction Agreements and the transactions and agreements contemplated hereby and thereby, certified by the corporate secretary of each Buyer to be true and complete and in full force and effect and unmodified as of the Closing Date;

(iv)   the Transaction Agreements to which each Buyer is a party, duly executed by such Buyer;

(v)   the Consents listed in Section 2.7 of the Disclosure Schedule;

(vi)   the certificate required by Section 4.3 hereof;

5

(vii)   the Guarantees (as defined in Section 4.6) described in Section 4.6 hereof; and

(viii)   such other documents and certificates duly executed as may be reasonably required to be delivered by the Buyers pursuant to the terms of this Agreement or as may be reasonably requested by Sellers prior to the Closing Date.

(d)  All instruments and documents executed and delivered to the Buyers pursuant hereto shall be in form and substance, and shall be executed in a manner, reasonably satisfactory to the Buyers.  All instruments and documents executed and delivered to the Sellers pursuant hereto shall be in form and substance, and shall be executed in a manner, reasonably satisfactory to the Sellers.

1.4  Post-Closing Purchase Price Adjustment.

(a)  Within ninety (90) days after the Closing Date, Sellers will prepare, or cause to be prepared, (i) a statement (the "Closing Working Capital Statement") containing calculations of the net working capital of the Dresser-Rand Group as of 11:59 P.M. local time on the Closing Date (the "Closing Net Working Capital Amount"); (ii) a statement (the "Closing Net Cash Statement") containing a calculation of the Net Cash Amount (the "Closing Net Cash Amount"), which shall be prepared in accordance with the definition of Net Cash Amount in Section 1.4(f) and the methodologies set forth in Section 1.2(b) of the Disclosure Schedule; and (iii) a statement (the "Closing Customer Prepayments Statement" and, together with the Closing Working Capital Statement and the Closing Net Cash Statement, the "Closing Statements") containing a calculation of the Customer Prepayments Amount (as defined in Section 6.23) (the "Closing Customer Prepayments Amount"), which shall be prepared in accordance with the methodologies set forth on Section 6.23 of the Disclosure Schedule. The Closing Working Capital Statement shall be prepared on a combined basis in conformity with accounting principles generally accepted in the United States of America ("GAAP"), applied on a basis consistent with the Audited Financial Statements, and shall be prepared on a basis consistent with, and reflecting all adjustments reflected on, the statement of net working capital of the Dresser-Rand Group as set forth in Section 1.4(a) of the Disclosure Schedule (the "Benchmark Net Working Capital Statement").  Buyers will assist and cooperate fully with the Sellers in the preparation of the Closing Statements, including by providing the Sellers and their accountants reasonable access to all relevant books, records, facilities and employees of the Dresser-Rand Group and to any other information reasonably necessary to prepare the Closing Statements.

(b)  The Buyers shall, within thirty (30) days after the delivery by the Sellers of the Closing Statements, complete their review of such statements and the calculation of the Closing Net Working Capital Amount, the Closing Net Cash Amount and the Closing Customer Prepayments Amount.  In the event that the Buyers determine that the Closing Net Working Capital Amount, the Closing Net Cash Amount or the Closing Customer Prepayments Amount have not been determined on a basis consistent

6

with the requirements of Section 1.4(a), on or before the last day of such 30-day period Buyers shall inform the Sellers in writing (the "Objection"), setting forth a specific description of the basis of the Objection, the adjustments to the Closing Net Working Capital Amount, the Closing Net Cash Amount and the Closing Customer Prepayments Amount which Buyers believe should be made, and Buyers' calculation of the Closing Net Working Capital Amount, the Closing Net Cash Amount and the Closing Customer Prepayments Amount. Buyers shall be deemed to have accepted any items in the Closing Working Capital Statement, the Closing Net Cash Statement and the Closing Customer Prepayments Statement and the calculation of the Closing Net Working Capital Amount, the Closing Net Cash Amount and the Closing Customer Prepayments Amount not specifically disputed in the Objection. For the avoidance of doubt, any dispute shall be limited to the dollar amounts of the Closing Net Working Capital Amount, the Closing Net Cash Amount and the Closing Customer Prepayments Amount identified in the Objection as a subject of dispute. Failure to deliver to the Sellers a timely written Objection satisfying the requirements of this Section 1.4(b) shall constitute acceptance and approval of the Sellers' calculation of the Closing Net Working Capital Amount, the Closing Net Cash Amount and the Closing Customer Prepayments Amount.

(c) The Sellers shall have thirty (30) days from the date they receive the Objection to review and respond to the Objection. If the Sellers and Buyers are unable to resolve all of their disagreements with respect to the determination of the disputed items within thirty (30) days following the completion of the Sellers' review of the Objection, after having used their good faith efforts to reach a resolution, they shall refer their remaining differences to Deloitte & Touche LLP or another internationally recognized firm of independent public accountants as to which the Sellers and Buyers mutually agree (the "CPA Firm"), who shall, acting as experts in accounting and not as arbitrators, determine on a basis consistent with the requirements of Section 1.4(a), and only with respect to the specific remaining accounting related differences so submitted, whether and to what extent, if any, the Closing Net Working Capital Amount, the Closing Net Cash Amount or the Closing Customer Prepayments Amount require adjustment. In resolving any remaining accounting related differences, the CPA Firm may not assign a value to any disputed item greater than the greatest value for such item claimed by either party or less than the lowest value for such item claimed by either party. The Sellers and Buyers shall request the CPA Firm to use its best efforts to render its determination within 45 days. The CPA Firm's determination shall be conclusive and binding upon the Sellers and Buyers. The Sellers and Buyers shall make reasonably available to the CPA Firm all relevant books and records, any work papers (including those of the parties' respective accountants, subject to any customary agreements or documentation required by such accounting firms) and supporting documentation relating to the Closing Statements, the calculation of the Closing Net Working Capital Amount, the calculation of the Closing Net Cash Amount, the calculation of the Closing Customer Prepayments Amount and all other items reasonably requested by the CPA Firm. The "Final Net Working Capital Amount" shall ultimately be equal to (i) the Closing Net Working Capital Amount as shown on the Closing Working Capital Statement in the event that (x) no Objection is delivered to the Sellers during the initial 30-day period specified above, (y) the Objection delivered to the Sellers does not set forth any dispute with respect to the

7

Closing Net Working Capital Amount or (z) the Sellers and Buyers so agree, (ii) the Closing Net Working Capital Amount as adjusted in accordance with the Objection, in the event that (x) the Sellers do not respond to the Objection within the specified 30-day period following receipt by the Sellers of the Objection or (y) the Sellers and Buyers so agree, or (iii) the Closing Net Working Capital Amount as adjusted by either (x) the agreement of the Sellers and Buyers or (y) the CPA Firm.  The "Final Net Cash Amount" shall ultimately be equal to (i) the Closing Net Cash Amount as shown on the Closing Net Cash Statement in the event that (x) no Objection is delivered to the Sellers during the initial 30-day period specified above, (y) the Objection delivered to the Sellers does not set forth any dispute with respect to the Closing Net Cash Amount or (z) the Sellers and Buyers so agree, (ii) the Closing Net Cash Amount as adjusted in accordance with the Objection, in the event that (x) the Sellers do not respond to the Objection within the specified 30-day period following receipt by the Sellers of the Objection or (y) the Sellers and Buyers so agree, or (iii) the Closing Net Cash Amount as adjusted by either (x) the agreement of the Sellers and Buyers or (y) the CPA Firm.  The "Final Customer Prepayments Amount" shall ultimately be equal to (i) the Closing Customer Prepayments Amount as shown on the Closing Customer Prepayments Statement in the event that (x) no Objection is delivered to the Sellers during the initial 30-day period specified above, (y) the Objection delivered to the Sellers does not set forth any dispute with respect to the Closing Customer Prepayments Amount or (z) the Sellers and Buyers so agree, (ii) the Closing Customer Prepayments Amount as adjusted in accordance with the Objection, in the event that (x) the Sellers do not respond to the Objection within the specified 30-day period following receipt by the Sellers of the Objection or (y) the Sellers and Buyers so agree, or (iii) the Closing Customer Prepayments Amount as adjusted by either (x) the agreement of the Sellers and Buyers or (y) the CPA Firm.  All fees and disbursements of the CPA Firm, if any, shall be shared equally by the Sellers, on the one hand, and the Buyers, on the other hand.

(d) (i)  If the Final Net Working Capital Amount is less than One Hundred Forty-Nine Million Six Hundred Seventy-Seven Thousand dollars ($149,677,000) (the "Base Amount"), the Sellers shall pay an amount equal to (x) the amount of such deficiency, plus (y) interest computed at the Prime Rate (as defined in Section 1.4(f)) for the period from the Closing Date to the date of such payment of such deficiency amount.  Such payment shall be made in immediately available funds to the Buyers within three (3) business days after the ultimate determination of the Final Net Working Capital Amount as provided in this Section 1.4.  If the Final Net Working Capital Amount is greater than the Base Amount, the Buyers shall pay to the Sellers an amount equal to (x) the amount of such excess, plus (y) interest computed at the Prime Rate for the period from the Closing Date to the date of such payment of such excess amount.  Such payment shall be made in immediately available funds to the Sellers within three (3) business days after the ultimate determination of the Final Net Working Capital Amount as provided in this Section 1.4.

(ii)  If the Final Net Cash Amount is greater than the Estimated Net Cash Amount, the Buyers shall pay to the Sellers an amount equal to (x) the amount of such excess, plus (y) interest computed

8

at the Prime Rate for the period from the Closing Date to the date of such payment of such excess amount. Such payment shall be made in immediately available funds to the Sellers within three (3) business days after the ultimate determination of the Final Net Cash Amount as provided in this Section 1.4. If the Final Net Cash Amount is less than the Estimated Net Cash Amount, the Sellers shall pay to the Buyers an amount equal to (x) the amount of such deficiency, plus (y) interest computed at the Prime Rate for the period from the Closing Date to the date of such payment of such deficiency amount. Such payment shall be made in immediately available funds to the Buyers within three (3) business days after the ultimate determination of the Final Net Cash Amount as provided in this Section 1.4.

(iii)   If the Final Customer Prepayments Amount is less than the Estimated Customer Prepayments Amount, the Buyers shall pay to the Sellers an amount equal to (x) the amount of such deficiency, plus (y) interest computed at the Prime Rate for the period from the Closing Date to the date of such payment of such deficiency amount. Such payment shall be made in immediately available funds to the Sellers within three (3) business days after the ultimate determination of the Final Customer Prepayments Amount as provided in this Section 1.4. If the Final Customer Prepayments Amount is greater than the Estimated Customer Prepayments Amount, the Sellers shall pay to the Buyers an amount equal to (x) the amount of such excess, plus (y) interest computed at the Prime Rate for the period from the Closing Date to the date of such payment of such excess amount. Such payment shall be made in immediately available funds to the Buyers within three (3) business days after the ultimate determination of the Final Customer Prepayments Amount as provided in this Section 1.4.

(e)  Any amount paid pursuant to this Section 1.4, Section 1.3, Section 1.8, or Section 6.8(n)(ii) shall be deemed to be an adjustment to the Purchase Price.

(f)  For purposes of this Agreement, the following terms shall have the following meanings:

"Cash" shall mean the sum of cash, cash equivalents and liquid investments, plus all deposited but uncleared bank deposits and less all outstanding checks of the Dresser-Rand Group, in each case with foreign currency converted in accordance with the Currency Conversion Rules.

"Debt Obligations" shall, as applied to any Person, mean, without duplication, (a) all indebtedness for borrowed money, (b) all obligations evidenced by a note, bond, debenture or similar instrument, (c) that portion of obligations with respect to capital leases that is properly classified as a liability on a balance sheet in conformity

9

with GAAP, applied on a consistent basis with the Audited Financial Statements and (d) any obligation owed for all or any part of the deferred purchase price for the purchase of a business, in each case with foreign currency converted in accordance with the Currency Conversion Rules. For clarification, it is understood that letters of credit and similar credit support obligations shall not constitute "Debt Obligations" hereunder.

"Net Cash Amount" shall mean an amount, positive or negative, equal to (A) Cash minus (B) the sum of (x) aggregate Debt Obligations and (y) $20,000,000, in each case as of 11:59 P.M. local time on the Closing Date, determined on a combined basis in accordance with GAAP, applied on a basis consistent with the Audited Financial Statements (except that foreign currency will be converted in accordance with the Currency Conversion Rules).

"Prime Rate" means the rate of interest declared from time to time by JP Morgan Chase Bank as its "base rate."

1.5 Pre-Closing Inventory. Within thirty (30) calendar days prior to the Closing Date, unless the Buyers and Sellers agree otherwise, representatives of the Buyers and the Sellers shall jointly conduct a physical count of the inventory of the Dresser-Rand Group (such physical count to be performed on a basis consistent with the past practices of the Dresser-Rand Group).

1.6 Further Assurances.

(a) After the Closing, each party hereto shall from time to time, at the request of another party, execute and deliver such other instruments of conveyance and transfer and take such other actions as such other party may reasonably request in order to more effectively consummate the transactions contemplated hereby and to vest in the Buyers good and valid title to the Acquired Interests.

(b) Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to sell, convey, assign, sublease or transfer any asset, contract or agreement if any attempted sale, conveyance, assignment, sublease or transfer of such asset, contract or agreement, without the Consent of another Person to such transfer, would constitute a breach by the Sellers or the Buyers with respect to such asset. Except with respect to the Consents required to be delivered at the Closing pursuant to Section 1.3(b)(vi), in the event that any required Consent is not obtained on or prior to the Closing, IR and the applicable Seller will use their commercially reasonable efforts to (i) provide to the applicable Buyer the benefits of the applicable asset, contract or agreement, (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to the applicable Buyer and (iii) enforce at the request of the applicable Buyer and for the account of the applicable Buyer any rights of the applicable Seller arising from any such contract or agreement (including the right to elect to terminate such contract or agreement in accordance with the terms thereof upon the request of the applicable Buyer).

10

1.7 Purchase Price Allocation.

(a) The Buyers and the Sellers agree that the portion of the total consideration (including, for all purposes of this Section 1.7, any liabilities that are treated as having been assumed for Tax purposes) that is attributable to the Acquired Interests in any acquired entity shall not be less than the book value represented by such Acquired Interests as of June 30, 2004 (to be adjusted as appropriate to reflect any substantial changes in book value prior to Closing). The portion of the total consideration allocated to Dresser Rand S.A. is set forth on Section 1.7 of the Disclosure Schedule.

(b) The Buyers and the Sellers shall endeavor in good faith to agree, prior to the Closing, on an allocation of the total consideration among the Acquired Interests of each acquired entity, which allocation shall incorporate, reflect and be consistent with Section 1.7(a) (the "Entity-Level Purchase Price Allocation"). If the Buyers and the Sellers are unable to agree on such Entity-Level Purchase Price Allocation by September 30, 2004, the matter shall be submitted to the CPA Firm whose determination shall be binding on the parties. The costs of such arbitration shall be shared equally.

(c) With respect to the Acquired Interests in each acquired entity that is disregarded for U.S. federal income Tax purposes or for which an election is made pursuant to Section 338(h)(10) of the Code or any subsidiary of such an acquired entity that is subject to similar treatment for Tax purposes, the Buyers and the Sellers shall endeavor in good faith to agree, prior to the Closing, to the extent possible, and in any event within 75 days after the Closing Date (or, if longer, within 75 days after the CPA Firm determines the Entity-Level Purchase Price Allocation), on a further allocation among the assets held by such entity, which allocation shall incorporate, reflect and be consistent with Section 1.7(a) and the Entity-Level Purchase Price Allocation (the "Asset-Level Purchase Price Allocation"). If the Buyers and the Sellers are unable to agree on such Asset-Level Purchase Price Allocation within such time period, the matter shall be submitted to the CPA Firm whose determination shall be binding on the parties. The costs of such arbitration shall be shared equally.

(d) In the event the total consideration is adjusted hereunder subsequent to the Closing, the Buyers and the Sellers agree to allocate the adjustment in the revised Entity-Level Purchase Price Allocation and the Asset-Level Purchase Price Allocation (collectively, the "Purchase Price Allocation") based upon the item or entity to which such adjustment is attributable, and, to the extent consistent with Sections 338 and 1060 of the Code and the rules and Treasury Regulations promulgated thereunder, any adjustment that is not identified as attributable to a particular item or entity shall be allocated entirely among the Acquired Interests of entities incorporated or organized under the laws of the United States or any state thereof or the District of Columbia.

(e) The Buyers and the Sellers shall report the Tax consequences of the transactions contemplated by this Agreement in a manner consistent with the

11

Purchase Price Allocation, as may be revised from time to time in accordance with Section 1.7(d), and shall not take any position inconsistent therewith in preparing any Tax Returns, IRS Forms 8594 and any other Tax forms or filings, as well as in preparing any published financial statements in accordance with GAAP, applied on a consistent basis with the Audited Financial Statements, and neither the Buyers nor the Sellers shall take any position inconsistent therewith upon examination of any Tax Return, in any Tax refund claim, or in any Tax litigation, investigation or other proceeding, without the prior written consent of the other party or unless required to do so pursuant to a determination (as defined in Section 1313(a) of the Code or any corresponding or similar provision of state, local or foreign law).

(f) The Buyers and the Sellers shall promptly inform one another of any challenge by any Taxing Authority to any allocation made pursuant to this Section 1.7 and agree to consult and keep one another informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

1.8 AIM Program Payment. No later than 60 days after the Closing Date, IR shall prepare, or cause to be prepared, a statement (the "AIM Calculations Statement") containing IR's determination of (A) the amount (the "AIM Program Payment Amount") equal to the pro rata portion as of 11:59 P.M. local time on the Closing Date of the annual bonuses payable to Dresser-Rand Group Employees (as defined in Section 2.13(a)) pursuant to the Annual Incentive Management Program for the calendar year 2004 as in effect on the date hereof (the "AIM Program"), determined in accordance with the terms of the AIM Program and based upon financial performance and/or results determined by IR and employee performance determined by the Dresser-Rand Group (which information Buyer will cause the Dresser-Rand Group to provide as soon as practicable after the Closing Date) and (B) the federal, state, local and foreign payroll and other similar Taxes other than Social Security Taxes payable by the Buyers and the members of the Dresser-Rand Group as a result of the payment to Dresser-Rand Group Employees of bonuses under the AIM Program in the amount of AIM Program Payment Amount (the "Payroll Tax Amount"). In determining the AIM Program Payment Amount, the employee performance portion provided by the Dresser-Rand Group shall be subject to review and approval by IR, which shall not be unreasonably withheld. IR and FRC shall each provide the other party and their accountants reasonable access to all relevant books, records, facilities and employees of the Dresser-Rand Group and to any other information reasonably necessary to prepare, review and understand the AIM Calculations Statement (subject to reasonable restrictions imposed by IR or FRC, as the case may be, based on confidentiality concerns). Buyer shall have 15 days from receipt to review and comment upon the calculations set forth in the AIM Calculations Statement. In the event that Buyers, upon completion of their review of the AIM Calculations Statement, determine that the AIM Program Payment Amount or the Payroll Tax Amount have not been accurately calculated or have not been determined on a basis consistent with this Section 1.8, Buyers and IR shall cooperate in good faith to resolve such dispute. In the event that Buyers and IR are unable to resolve such dispute, the CPA Firm dispute resolution provisions of Section 1.4(c) hereof shall apply to resolve such dispute. Upon final determination of the AIM Program Payment Amount and the Payroll Tax Amount

12

pursuant to this Section 1.8, but in no event more than three (3) business days thereafter, IR shall pay by wire transfer of immediately available funds to an account or accounts which are designated by Buyers to IR not more than two (2) business days following final determination thereof, cash in an amount equal to: (a) the AIM Program Payment Amount plus (b) the Payroll Tax Amount.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLERS

The Sellers, jointly and severally, hereby represent and warrant to the Buyers, as of the date of this Agreement, as follows:

### 2.1 Organization of Certain Sellers.

(a) IR is a company duly organized, validly existing and in good standing under the laws of Bermuda.  IR has all requisite corporate power and authority to own its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except jurisdictions in which the failure to be so qualified or licensed would not have or reasonably be expected to have, individually or in the aggregate, a material adverse effect on the abilities of the Sellers to consummate the transactions contemplated by this Agreement and the Transaction Agreements to which such Seller is a party.

(b) DR Holding Corp. ("DR Holding") is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware. DR Holding has all requisite corporate power and authority to own its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except jurisdictions in which the failure to be so qualified or licensed would not have or reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of the Sellers to consummate the transactions contemplated by this Agreement and the Transaction Agreements to which such Seller is a party.

(c) Ingersoll-Rand Company ("IRNJ") is a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey. IRNJ has all requisite corporate power and authority to own its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except jurisdictions in which the failure to be so qualified or licensed would not have or reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of the Sellers to consummate the transactions contemplated by this Agreement and the Transaction Agreements to which such Seller is a party.

13

2.2 Subsidiaries. Section 2.2(a) of the Disclosure Schedule sets forth for Dresser-Rand Company, a New York general partnership (the "Partnership"), Dresser-Rand Canada, Inc., a corporation organized under the laws of Canada ("D-R Canada") and each direct and indirect subsidiary of the Partnership (together with the Partnership, D-R Canada and each entity contemplated to be formed in accordance with Exhibit B as and when formed, the "Subsidiaries"; and all of the Subsidiaries sometimes being referred to collectively as the "Dresser-Rand Group"; for clarification, for purposes of this Article II and Section 6.1, the Dresser-Rand Group shall not include the entities in which the Dresser-Rand Group has an equity interest that are set forth in Section 2.2(b) of the Disclosure Schedule (the "Minority Interests")) and for each Minority Interest (i) its structure (i.e., corporation, partnership, limited liability company, etc.), name and jurisdiction of incorporation, formation or organization, as applicable, (ii) the number of authorized, issued and outstanding shares of each class of its capital stock or other authorized, issued and outstanding equity interests, as applicable, the names of the holders thereof, and the number of shares or percentage interests, as applicable, held by each such holder and (iii) its entity classification for United States federal income Tax purposes. Except as set forth in Section 2.2(a) of the Disclosure Schedule, the members of the Dresser-Rand Group do not own any shares of any class of capital stock of any corporation or ownership or other equity interest in any other Person (other than their Subsidiaries and Minority Interests and other than immaterial investments). Each Subsidiary is duly formed or organized, validly existing and, where applicable, in good standing under the laws of its jurisdiction of incorporation, formation or organization, as applicable, has the requisite corporate or similar power and authority to own its assets and to carry on its business as now being conducted, and where applicable, is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except jurisdictions in which the failure to be so qualified or licensed would not have or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (as defined below). For purposes of this Agreement, a "Material Adverse Effect" shall mean any change, occurrence or development that has a materially adverse effect on the business, operations, results of operations, assets, liabilities (except to the extent assumed or retained by the Sellers hereunder) or condition (financial or otherwise) of the Business, taken as a whole, except that a "Material Adverse Effect" does not include any effect caused by a change, occurrence or development in (i) events affecting the United States, European or global economy or capital or financial markets generally, (ii) conditions in the industries in which the Dresser-Rand Group conducts business, except to the extent such changes, occurrences or developments impact the Business in a materially disproportionate fashion, (iii) laws, regulations or GAAP, or in the authoritative interpretations thereof or in regulatory guidance related thereto, (iv) earthquakes or similar catastrophes, or acts of war, sabotage, terrorism, hostilities, military action or any escalation or worsening thereof (other than actual damage or casualty loss to any member of the Dresser-Rand Group or their properties or assets) or (v) this Agreement, the announcement thereof and the consummation of the transactions contemplated by this Agreement. All the outstanding shares of capital stock or other equity interests of such Subsidiaries are duly authorized and validly issued and

14

outstanding, fully paid and nonassessable (where applicable), were issued free of any pre-emptive rights and owned by the Persons set forth in Section 2.2(a) of the Disclosure Schedule, free and clear of all Encumbrances. Except as set forth in Section 2.2(a) of the Disclosure Schedule, there are no options, subscriptions, warrants, calls, commitments, agreements, contracts, understandings, restrictions, pre-emptive rights, arrangements or rights of any character with respect to the securities of the Subsidiaries or the issuance of additional securities of the Subsidiaries or the conversion or exchange of any security into, or equity security of, any Subsidiary. Complete and correct copies of the charter documents (or equivalent organizational documents) and all amendments thereto and the minute books of each of the Subsidiaries have been made available to the Buyers on or prior to the date of this Agreement.

2.3 <u>Ownership of Acquired Interests</u>. Each Seller is the legal and beneficial owner of, and has good and marketable title to, the Acquired Interests being sold by such Seller hereunder, as set forth in Section 2.2 of the Disclosure Schedule, free and clear of all Encumbrances, and such good and marketable title may be transferred to the Buyers on the Closing Date free and clear of all Encumbrances, other than such as may be caused by or on behalf of any of the Buyers.

2.4 <u>Authorization, Etc</u>. Each Seller has full corporate or partnership power and authority to execute and deliver this Agreement and the Transaction Agreements to which it is a party and to carry out and consummate the transactions contemplated hereby to be carried out and consummated by it. This Agreement has been duly and validly authorized and no other corporate action or proceeding is necessary to authorize the execution, delivery and performance of this Agreement by IR or any Seller. This Agreement has been duly and validly executed by IR and, assuming this Agreement constitutes the legal, valid and binding agreement of FRC, constitutes a legal, valid and binding agreement of IR, enforceable against IR in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

2.5 <u>Financial Statements</u>. Section 2.5 of the Disclosure Schedule sets forth (i) the audited combined balance sheet of the Dresser-Rand Group and the Business at December 31, 2003 (the "<u>2003 Balance Sheet</u>") and the related combined statements of income and cash flows, in each case, including notes thereto for the year ended December 31, 2003 (collectively, the "<u>Audited Financial Statements</u>") and (ii) the unaudited combined balance sheet of the Dresser-Rand Group and the Business as of June 30, 2004 (the "<u>Interim Balance Sheet</u>") and the related unaudited combined statements of income and cash flows for the six month period ended June 30, 2004 (collectively, the "<u>Interim Financial Statements</u>"). Such financial statements have been prepared from the books and records of the Dresser-Rand Group and the Business in conformity with GAAP, applied on a consistent basis, as in effect during the periods indicated, subject in the case of the Interim Financial Statements to the absence of notes and normal year end adjustments. The foregoing income statements and statements of cash flows, including

15

notes in respect of the Audited Financial Statements, present fairly in all material respects the combined results of operations and cash flows of the Dresser-Rand Group and the Business for the respective periods covered, and the balance sheets, including notes in respect of the Audited Financial Statements, present fairly in all material respects the combined financial position of the Dresser-Rand Group and the Business, as of their respective dates, prepared in conformity with GAAP, applied on a consistent basis, as in effect during the periods indicated.

2.6 <u>Absence of Undisclosed Liabilities</u>.  To the Knowledge of the Sellers, the Dresser-Rand Group is not subject to any liabilities or obligations of any kind whatsoever (whether absolute, accrued, contingent or otherwise, and whether due or to become due), other than liabilities and obligations (i) reflected in the 2003 Balance Sheet (or disclosed in the notes thereto) or the Interim Balance Sheet; (ii) arising after June 30, 2004, in the ordinary course of business and consistent with past practices, (iii) which would not have or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (iv) obligations and liabilities otherwise expressly disclosed in Section 2.6(a) of the Disclosure Schedule or recognizable as a potential liability and disclosed in any other section of the Disclosure Schedule attached hereto.  To the actual knowledge (without any duty of inquiry) of the individuals listed in Section 9.10(e) of the Disclosure Schedule, (A) except as set forth in Section 2.6(b) of the Disclosure Schedule, there are no material Proceedings pending against any of the Minority Interests, (B) no change, occurrence or development in respect of the Minority Interests exists which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (C) none of the Minority Interests are subject to any liabilities or obligations of any kind whatsoever (whether absolute, accrued, contingent or otherwise, and whether due or to become due), other than liabilities and obligations which would not have or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

2.7 <u>No Approvals or Conflicts</u>.  Except as set forth in Section 2.7 of the Disclosure Schedule, the execution, delivery and performance by the Sellers of this Agreement and the consummation by the Sellers of the transactions contemplated hereby will not (i) violate, conflict with or result in a breach by any Seller or Subsidiary of any provision of any partnership agreement, charter, bylaws or equivalent formation or governance document of such Seller or Subsidiary, (ii) violate, conflict with or result in a breach of any provision of, or constitute a default by any Seller or Subsidiary (or create an event which, with notice or lapse of time or both, would constitute such a default) or give rise to any right of termination, cancellation or acceleration under, or result in the creation of any Encumbrance upon any of the properties of any Subsidiary under, any material note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument or understanding to which any Seller, any Subsidiary or any of their respective properties may be bound, (iii) violate or result in a breach, in any material respect, of any order, injunction, judgment, ruling, constitution, treaty, statute, law, rule or regulation (each, and collectively, "<u>Law</u>") of any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory

16

or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states (each, and collectively, "Governmental Authority") applicable to any Seller, any Subsidiary or any of their respective properties or (iv) except for applicable requirements of the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and any other Law that is designed or intended to prohibit, restrict or regulate (a) foreign investment or (b) antitrust, monopolization, restraint of trade or competition ("Competition/Investment Law") and in each case as set forth in Section 2.7 of the Disclosure Schedule, require any material order, consent, clearance, approval or authorization of, or notice to, or declaration, filing, application, qualification or registration with, any Governmental Authority.

2.8 Compliance with Law; Governmental Authorizations. Except as set forth in Section 2.8 of the Disclosure Schedule, to the Knowledge of the Sellers, the Business has been conducted since January 1, 2001 in all material respects in compliance with all Laws. Except as set forth in Section 2.8 of the Disclosure Schedule, to the Knowledge of the Sellers, no member of the Dresser-Rand Group is in violation of any order, injunction, judgment, ruling, Law or regulation of any court or Governmental Authority applicable to the property of the Dresser-Rand Group or the Business. Each member of the Dresser-Rand Group has all licenses, Consents, permits and other governmental authorizations ("Permits") necessary to conduct its business as currently conducted (all of which are valid and in full force and effect), except where the failure to have such Permits would not have or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

2.9 Litigation. Except as set forth in Section 2.9 of the Disclosure Schedule, there are no material suits, actions, proceedings or investigations (collectively, "Proceedings") pending or, to the Knowledge of the Sellers, threatened against any Seller or any member of the Dresser-Rand Group before any arbitrator, court or Governmental Authority. Except as set forth in Section 2.9 of the Disclosure Schedule, the Sellers have not received any notice that any Seller or any member of the Dresser-Rand Group or any of their respective assets are subject to any decree, order or judgment which would have or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or a material adverse effect on the ability of the Sellers to consummate the transactions contemplated by this Agreement or the Transaction Agreements or materially delay the consummation of the transactions contemplated hereby or thereby.

2.10 Personal Property Assets. Except as set forth in Section 2.10 of the Disclosure Schedule, on June 30, 2004, the Dresser-Rand Group had and, except with respect to personal property assets disposed of or acquired in the ordinary course of business consistent with past practice since such date, the Dresser-Rand Group now has, good and valid title to, or holds by valid and existing lease or license, all the personal property assets reflected as assets of the Dresser-Rand Group on the Interim Balance Sheet or which would have been reflected on the Interim Balance Sheet if acquired prior to such date, free and clear of all Encumbrances, except for (i) Encumbrances which secure indebtedness or obligations which are properly reflected on the Interim Balance

17

Sheet; (ii) liens for Taxes (as defined in Section 2.12) not yet payable or being contested in good faith by appropriate proceedings; (iii) immaterial liens arising as a matter of law in the ordinary course of business, provided that the obligations secured by such liens are not delinquent or are being contested in good faith; and (iv) other Encumbrances which do not adversely affect the use of the applicable asset as currently used (collectively, "Permitted Encumbrances"). Except as set forth in Section 2.10 of the Disclosure Schedule, the tangible personal property assets owned by or leased by the Dresser-Rand Group, together with the rights under the Transaction Agreements, constitute, all material tangible personal property assets used by the Dresser-Rand Group in the operation or the conduct of the Business, as currently conducted, and all such assets are in reasonably good maintenance, operating condition and repair, normal wear and tear excepted, other than machinery and equipment under repair or out of service in the ordinary course of business.

      2.11   Absence of Certain Changes. Except as set forth in Section 2.11 of the Disclosure Schedule or as otherwise specifically provided herein, since December 31, 2003, (i) the Business has been conducted only in the ordinary course of business consistent with past practice in all material respects, and (ii) there has not been any event, occurrence or development of a state of circumstances or facts which has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Without limiting the generality of the foregoing, except as set forth in Section 2.11 of the Disclosure Schedule or as otherwise specifically provided herein, and except for the transactions contemplated hereby, from June 30, 2004 through the date of this Agreement, there has not been:

      (a) any damage, destruction or loss (whether or not covered by insurance) materially affecting the operation of the Business;

      (b) any option, sale, purchase, subscription, warrant, call, commitment contracts, understandings, restrictions, arrangements, rights or agreement of any character granted or made by any member of the Dresser-Rand Group in respect of its capital stock or other equity interests;

      (c) any issuance, declaration, setting aside or payment of any dividend or other distribution of cash or property on any of the capital stock or other equity interests of any member of the Dresser-Rand Group (excluding distributions by Subsidiaries to other Subsidiaries), or any direct or indirect redemption, purchase or other acquisition of any shares of capital stock or other equity interests of any member of the Dresser-Rand Group;

      (d) any strikes, work stoppages or other material labor disputes involving employees of the Dresser-Rand Group;

      (e) any amendment, termination, waiver or cancellation of any material term of any Material Contract (as defined in Section 2.16), or of any material right or claim of any member of the Dresser-Rand Group under any Material Contract;

(f)  any sale, transfer or other disposition of assets of the Dresser-Rand Group having an aggregate value exceeding two million dollars ($2,000,000), excluding sales of assets in the ordinary course of business consistent with past practice;

(g)  any (i) general increase in the compensation of employees of the Dresser-Rand Group other than in the ordinary course of business consistent with past practice, (ii) increase in any compensation (other than salary compensation) payable to any officer or other member of senior management of the Dresser-Rand Group, whether or not in the ordinary course of business consistent with past practice or (iii) loan or commitment therefor made by any member of the Dresser-Rand Group to any officer or other member of senior management of the Dresser-Rand Group or to any of the Sellers or any of their officers, directors or Affiliates (other than the Dresser-Rand Group);

(h)  any material change in the accounting methods or practices followed by any member of the Dresser-Rand Group (other than such as have been required by applicable law or GAAP);

(i)  in each case, with respect to any member of the Dresser-Rand Group, (i) any material adoption or change in any election relating to Taxes, (ii) any material adoption or change in any accounting period or any accounting method relating to Taxes, (iii) any entering into a material closing agreement, (iv) any settling of any material Tax claim or assessment or (v) any other similar action relating to Taxes;  or

(j)  any agreement or commitment by or on behalf of the Dresser-Rand Group to do any of the foregoing.

2.12   Tax Matters.

(a)  For purposes of this Agreement, the following terms shall have the following meanings:

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Tax" or "Taxes" shall mean (x) any taxes of any kind, including but not limited to those on or measured by or referred to as income, gross receipts, capital, sales, use, ad valorem, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, escheat, value added, property or windfall profits taxes, customs, duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any governmental authority, domestic or foreign; (y) any liability for the payment of any amounts described in (x) as a result of being a member of an affiliated, consolidated, combined, unitary or similar group or as a result of transferor or successor liability, and (z) any liability for the payment of any amounts as a result of being a party to any tax-allocation or tax-sharing agreement or as a result of any express or implied obligation to indemnify any other Person with respect to the payment of any amounts of the type described in clause (x) or (y).

19

"Taxing Authority" shall mean, with respect to any Tax, the government entity or political subdivision thereof that imposes such Tax and the agency (if any) charged with the collection of such Tax for such entity or subdivision.

"Tax Return" shall mean any return, report or statement required to be filed with any governmental authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"Treasury Regulations" shall mean the Treasury Regulations promulgated under the Code.

(b) Except as set forth in Section 2.12 of the Disclosure Schedule:

(i)  All material Tax Returns required to be filed prior to or on the Closing Date by or on behalf of any member of the Dresser-Rand Group (separately or as part of an affiliated, consolidated, combined or unitary group) (A) have been or shall be timely filed (subject to permitted extensions applicable to such filing) and (B) are true, correct and complete in all material respects; and all Taxes of the members of the Dresser-Rand Group shown as due or payable on such Tax Returns have been or shall be paid within the prescribed period or any extension thereof, other than Taxes that are being contested in good faith for which adequate reserves have been established.

(ii)  No claim for unpaid Taxes has become a lien against the assets or any property of any member of the Dresser-Rand Group or is being asserted against any member of the Dresser-Rand Group except for liens for Taxes not yet due and payable for which adequate reserves have been established.

(iii)  There are no (w) examinations, audits, actions, proceedings, investigations or disputes pending, (x) claims asserted in writing for Taxes, (y) waivers or extensions of statutes of limitation with respect to Taxes currently in effect or (z) closing agreements, or similar agreements entered into or issued by any Taxing Authority, in each case, with respect to any member of the Dresser-Rand Group that may, in each case, increase any material Taxes of any member of the Dresser-Rand Group.

(iv)  No member of the Dresser-Rand Group has been a member of an affiliated, consolidated, combined or unitary group as set forth in Section 1504 of the Code or any corresponding or similar provision of state, local or foreign law other than a group the common parent of which is IRNJ, DR Holding or Dresser-Rand Company.  No member of the Dresser-Rand Group is liable for Taxes of any taxpayer other than IR and its Affiliates under Treasury Regulation Section 1.1502-

20

6 (or any corresponding or similar provision of state, local or foreign law), as a transferee or successor, by contract, or otherwise.

(v)   No member of the Dresser-Rand Group (A) is a party to any material tax-allocation or tax-sharing agreement or (B) to the Knowledge of the Sellers, is a party to any other tax-allocation or tax-sharing agreement.

(vi)   No member of the Dresser-Rand Group has reported any "reportable transaction" as defined in Treasury Regulation 1.6011-4 or any transaction that is required to be reported to any Taxing Authority pursuant to any corresponding or similar provision of state, local or foreign law.

(vii)   No member of the Dresser-Rand Group has been a "distributing corporation" or a "controlled corporation" in a transaction pursuant to Section 355 of the Code within the last three years.

2.13   Employee Benefits.

(a)   Section 2.13(a) of the Disclosure Schedule sets forth a list of each material "employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), and each severance, change in control or employment plan, program or agreement, and vacation, incentive, bonus, stock option, stock purchase, and restricted stock plan or policy sponsored or maintained by each member of the Dresser-Rand Group or by IRNJ in which present or former employees of any member of the Dresser-Rand Group (the "Dresser-Rand Group Employees") participate (excluding any IRNJ plan or policy under which no Dresser-Rand Group Employee is currently accruing or has any right to accrue benefits) (collectively, the "Dresser-Rand Group Plans").  Dresser-Rand Group Plans which are sponsored or maintained by IRNJ or members of the Dresser-Rand Group that are domiciled in the United States of America shall hereinafter be referred to as "U.S. Dresser-Rand Group Plans" and Dresser-Rand Group Plans which are not U.S. Dresser-Rand Group Plans shall hereinafter be referred to as "Non-U.S. Dresser-Rand Group Plans".

(b)   The Dresser-Rand Group Plans are in compliance in all material respects with their terms and applicable requirements of ERISA, the Code, and other applicable laws.  Each U.S. Dresser-Rand Group Plan which is intended to be qualified within the meaning of Section 401 of the Code has received a favorable determination letter as to its qualification, and to the Knowledge of the Sellers, nothing has occurred that could reasonably be expected to affect such qualification.

(c)   No liability under Title IV of ERISA or Section 412 of the Code (including any liability relating to an "accumulated funding deficiency") has been incurred by any member of the Dresser-Rand Group or by any other trade or business,

21

whether or not incorporated, that together with any member of the Dresser-Rand Group would be deemed a "single employer" for purposes of Sections 414(b), (c), (m) or (o) of the Code (a "Dresser-Rand ERISA Affiliate"), that, if due and payable, has not been satisfied in full, and, to the Knowledge of the Sellers, as of the Closing Date no member of the Dresser-Rand Group is reasonably likely to incur material liability on or after the Closing Date under Title IV of ERISA or Section 412 of the Code for the Dresser-Rand Group Plans or, by reason of their membership in a controlled group under Section 414 (b), (c), (m) or (o) of the Code, for the plans of any Dresser-Rand ERISA Affiliate, in any case, other than liability for premiums due to the Pension Benefit Guaranty Corporation.

(d) No member of the Dresser-Rand Group has incurred, directly or indirectly, any liability in respect of any multiemployer plan (as defined in Section 3(37) of ERISA or Section 414(f) of the Code (a "Multiemployer Plan")) on account of any "withdrawal", "partial withdrawal", "Reorganization" or "Insolvency" (all such terms within the meaning of Title IV of ERISA), which remain unsatisfied and would have, or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. With respect to all Dresser-Rand Group Plans that are Multiemployer Plans to which the Dresser-Rand Group makes contributions, the aggregate withdrawal liability of the Dresser-Rand Group computed as if a complete withdrawal by all members of the Dresser-Rand Group had occurred under each such Multiemployer Plans on the date hereof, would not have, or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e) Except as set forth in Section 2.13(e) of the Disclosure Schedule, no Dresser-Rand Group Employee is a party to, or entitled to the benefit of, any U.S. Dresser-Rand Group Plan which would provide such employee any payment or benefit (or accelerated payment or vesting thereof) upon the consummation of the transactions contemplated hereby or, following such consummation, upon the occurrence of some other event, whether or not subject to Section 280G of the Code. The transactions contemplated by this Agreement constitute a transfer of less than one-third of the total gross fair market value of all of the assets of Sellers and all members of Seller's affiliated group (as defined in Section 1504 of the Code, determined without regard to Section 1504(b) of the Code), immediately prior to the Closing.

(f) There are no pending or, to the Knowledge of the Sellers, threatened claims or litigations with respect to any U.S. Dresser-Rand Group Plans, other than claims for benefits by participants and beneficiaries, except as set forth in Section 2.13(f) of the Disclosure Schedule.

(g) With respect to each Dresser-Rand Group Plan, the Sellers have made available to the Buyers (to the extent applicable, and with respect to the Non-U.S. Dresser-Rand Group Plans to the Knowledge of the Sellers) (i) a complete and accurate copy of each such plan (including the most recent summary plan description prepared with respect to such plan); (ii) the most recent copy of the annual report form (Form 5500 Series) of each such plan for which such form is required (including any

22

schedules thereto); (iii) the most recent actuarial report for each such plan, and (iv) the most recent copy of its favorable determination letter.

(h) To the Knowledge of the Sellers, (i) each of the Non-U.S. Dresser-Rand Group Plans has been granted a Tax-favorable status by the applicable Taxing Authority, to the extent required under local Law, (ii) such Tax treatment to the extent granted has not been withdrawn by the applicable Taxing Authority, and (iii) no fact exists that would reasonably be expected to result in the withdrawal of such Tax treatment.

2.14    Labor Relations.  Except as set forth in Section 2.14 of the Disclosure Schedule, (i) no member of the Dresser-Rand Group is a party to any collective bargaining agreement, work rules or practices, or any other labor-related agreements or arrangements with any labor union, labor organization or works council applicable to employees of any member of the Dresser-Rand Group, nor is any such contract or work rules or practices, or any other labor related agreement presently being negotiated; (ii) there is no unfair labor practice charge or complaint pending or, to the Knowledge of the Sellers, threatened against or otherwise affecting any member of the Dresser-Rand Group; (iii) there is no material grievance, arbitration hearing, or arbitration award pending or, to the Knowledge of the Sellers, threatened against or otherwise affecting any member of the Dresser-Rand Group; (iv) to the Knowledge of the Sellers, none of the members of the Dresser-Rand Group is in breach of any collective bargaining agreement; (v) there is no labor strike, slowdown, work stoppage, or lockout in effect, or, to the Knowledge of the Sellers, threatened against or otherwise affecting any member of the Dresser-Rand Group, and no member of the Dresser-Rand Group has experienced any such labor controversy within the past three years; (vi) no member of the Dresser-Rand Group is a party to, or otherwise bound by, any consent decree with, or citation by, any governmental authority relating to employees or employment practices; and (vii) each member of the Dresser-Rand Group is in compliance with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 ("WARN Act"), and all other notification and bargaining obligations arising under any collective bargaining agreement, statute or otherwise.  To the Knowledge of the Sellers, there is no effort to organize employees of any member of the Dresser-Rand Group which is pending or threatened.

2.15    Intellectual Property.  "Intellectual Property" shall mean all (i) patents; (ii) inventions, discoveries, technology, processes, formulae, designs, models, industrial designs, know-how, confidential information, proprietary information and trade secrets, whether or not patented or patentable; (iii) trademarks, service marks, trade names, brand names, trade dress, slogans, logos and internet domain names; (iv) copyrights and other copyrightable works and works in progress, data, databases and software; (v) all other intellectual property rights and foreign equivalent or counterpart rights and forms of protection of a similar or analogous nature or having similar effect in any jurisdiction throughout the world; (vi) any renewals, extensions, continuations, divisionals, reexaminations or reissues or equivalent or counterpart of any of the foregoing in any jurisdiction throughout the world; and (vii) all registrations and

23

applications for registration of any of the foregoing.  Section 2.15 of the Disclosure Schedule lists all patent, copyright, domain names, trademark and service mark registrations or applications for such registrations owned by the members of the Dresser-Rand Group.  Except as would not have or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or as otherwise set forth in Section 2.15 of the Disclosure Schedule, (i) the members of the Dresser-Rand Group own or have the sole and exclusive right to use all Intellectual Property necessary to operate the Business as currently conducted ("Dresser-Rand Group Intellectual Property") free and clear of all Encumbrances, other than Permitted Encumbrances; (ii) to the Knowledge of the Sellers, the Dresser-Rand Group Intellectual Property, and the use thereof, does not infringe, and is not being infringed by, the Intellectual Property of any Person (including IR and its Affiliates); (iii) no suit, action, proceeding, judgment, order, injunction, stipulation or decree is pending, outstanding or threatened in writing that (a) challenges the validity or sole ownership of, or any right of any member of the Dresser-Rand Group to use, any Dresser-Rand Group Intellectual Property, (b) asserts that any aspect of the Business infringes or has otherwise violated any third party's Intellectual Property rights, or (c) asserts that any third party is infringing or otherwise violating the Dresser-Rand Group Intellectual Property; and (iv) the Dresser-Rand Group takes commercially reasonable actions to protect and maintain the Dresser-Rand Group Intellectual Property.

2.16   Contracts.

(a)  Section 2.16 of the Disclosure Schedule sets forth, as of the date of this Agreement (or the date noted in Section 2.16 of the Disclosure Schedule, as applicable), a complete list of each of the following contracts, instruments, leases, deeds and agreements to which any member of the Dresser-Rand Group is a party or by which any of them is bound other than contracts, instruments, leases, deeds and agreements to which other members of the Dresser-Rand Group are the only other parties (collectively, including the real property leases described on Section 2.19(a) of the Disclosure Schedule, the "Material Contracts"):

(i)  indentures, mortgages, loan agreements, letters of credit, surety bonds and foreign exchange forward contracts, in each case with a face amount in excess of two million dollars ($2,000,000), capital leases, security agreements or other agreements or commitments for the borrowing of money or the deferred purchase price of assets;

(ii)  purchase or sales orders and other contracts for the sales of goods and services by the Dresser-Rand Group, excluding any such orders or contracts not involving payments to the Dresser-Rand Group exceeding an aggregate of five million dollars ($5,000,000) in any instance;

(iii)  contracts involving the expenditure by the Dresser-Rand Group of more than three million dollars ($3,000,000) in any instance for the purchase of material, supplies, equipment or services;

24

excluding any thereof that are terminable by such member of the Dresser-Rand Group without penalty on not more than ninety (90) days notice or are related to owned or leased real property;

(iv)   contracts not otherwise described in this paragraph (a) that involve the expenditure by the Dresser-Rand Group of more than one million dollars ($1,000,000), excluding any thereof that are terminable by the Dresser-Rand Group without penalty on not more than ninety (90) days notice or are related to owned or leased real property;

(v)   guarantees of the obligations of third parties, excluding guarantees involving the potential expenditure by the Dresser-Rand Group of less than two hundred thousand dollars ($200,000) in any instance and one million dollars ($1,000,000) in the aggregate;

(vi)   agreements which restrict the Dresser-Rand Group from competing with any other specific Person or entity or from conducting its business in any geographic area;

(vii)   contracts or agreements (other than employment agreements or other Dresser-Rand Group Plans) with officers or other members of the executive leadership team of the Dresser-Rand Group;

(viii)   material license agreements (as licensor or licensee) with third parties (excluding end-user licenses granted to customers of the Dresser-Rand Group),

(ix)   agreements under which any member of the Dresser-Rand Group has licensed material Intellectual Property to or from any other Person (including Affiliates of the Dresser-Rand Group);

(x)   partnership, limited liability company, joint venture agreements or other agreements involving a sharing of profits or expenses by the Dresser-Rand Group;

(xi)   contracts relating to the acquisition of any business enterprise or the assets thereof since January 1, 2001; and

(xii)   exclusive distributor, dealer, sales representative or similar contracts.

(b)   True and correct copies (or, if oral, written summaries) of each of the Material Contracts (or, in respect of distributor, dealer and sales representative contracts, the applicable standard form therefor) and the Partnership's standard form of product warranty have been made available to the Buyers.

25

(c) Except as set forth in Section 2.16 of the Disclosure Schedule, each Material Contract is in full force and effect, and is a valid and binding agreement of the applicable member or members of the Dresser-Rand Group, enforceable against them in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing. Except as set forth in Section 2.16 of the Disclosure Schedule, no condition exists or event has occurred that (whether with or without notice or lapse of time or both) would constitute a material default by any member of the Dresser-Rand Group to any Material Contract.

(d) As of the date hereof, except as set forth in Section 2.16(d) of the Disclosure Schedule (which guarantees shall be released (without any further obligation or liability) on or prior to the Closing Date), there are no outstanding guarantees made by any member of the Dresser-Rand Group of any liabilities or obligations of IR or any of its Affiliates (other than members of the Dresser-Rand Group).

2.17    Environmental Matters.

(a) For purposes of this Agreement, the following terms shall have the following meanings:

"Environmental Claim" means any written notice, claim, demand, action, suit, complaint or proceeding by any Person, or investigation by any Governmental Authority, alleging liability or potential liability (including, without limitation, liability or potential liability for investigative costs, cleanup costs, governmental response costs, natural resource damages, property damages, personal injury, fines or penalties) under any Environmental Laws arising out of, based on or resulting from (a) the presence, or Release into the environment, of any Hazardous Material at any location, whether or not owned or operated by Dresser-Rand Group or any of its Subsidiaries or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"Environmental Laws" means all applicable foreign, federal, state, interstate, and local statutes, common law, regulations, ordinances, orders and decrees in effect on the Closing Date relating to pollution or protection of human health or safety (to the extent relating to exposure to Hazardous Materials) or the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata), including, without limitation, such laws and regulations relating to emissions, discharges, Releases or threatened Releases of Hazardous Materials, or otherwise relating to the manufacture, distribution, use, treatment, storage, disposal, or transport of Hazardous Materials, or the transfer of real property or other assets (as to such transfers, only with respect to environmental investigation or environmental remediation).

"Hazardous Materials" means all materials defined or regulated as "hazardous substances" or "hazardous wastes," pollutants, contaminants, wastes, or any

26

other term of similar import under any Environmental Law; including, without limitation, petroleum (including crude oil or any fraction thereof), friable asbestos, and polychlorinated biphenyls.

"Release" shall have the meaning provided in 42 U.S.C. section 9601(22), including threats thereof.  "Release" shall also include the matters excluded from the definition thereof in 42 U.S.C. sections 9601(22)(A), (B), (C) and (D).

(b) Except as set forth in Section 2.17 of the Disclosure Schedule, to the Knowledge of the Sellers as of the date of this Agreement (it being understood that, for purposes of this Section 2.17, such knowledge shall not include any knowledge based on documents or other information in Sellers' possession solely as a result of Buyers' due diligence):

(i)   The Business conducts, and since January 1, 2001 (other than noncompliance in the conduct of its operations that has been fully resolved) has, in all material respects, conducted its operations in compliance with all Environmental Laws;

(ii)   No member of the Dresser-Rand Group has received any Environmental Claim which remains unresolved or any unresolved written threat of an Environmental Claim, in each case against any member of the Dresser-Rand Group or against any person or entity whose liability for any Environmental Claim the Dresser Rand Group has or is asserted to have retained or assumed either contractually or by operation of law;

(iii)   No member of the Dresser-Rand Group has entered into, has agreed to, or is subject to any decree or order or other similar requirement of any governmental authority under any Environmental Laws;

(iv)   No member of the Dresser-Rand Group has Released Hazardous Materials into the environment in violation of Environmental Laws or in a manner that would reasonably be expected to result in liability under Environmental Laws, and no other Person has Released Hazardous Materials into the environment at any property currently owned or operated by any member of the Dresser-Rand Group in violation of Environmental Laws or in a manner that would reasonably be expected to result in liability under Environmental Laws;

(v)   No disposal or arranging for disposal of any Hazardous Materials has occurred at any offsite location in a manner and under circumstances  that would reasonably be expected to result in an Environmental Claim against any member of the Dresser Rand Group or against any person or entity whose liability for any Environmental Claim

27

Sellers, Dresser Rand Group or any of its Subsidiaries, has or is asserted to have retained or assumed either contractually or by operation of law; and

(vi)   The representations and warranties included in this Section 2.17 shall constitute the sole and exclusive representations and warranties of Sellers relating to any Environmental Laws or Hazardous Materials.

2.18   <u>Insurance</u>.  Section 2.18 of the Disclosure Schedule lists all insurance policies held in the names of the members of the Dresser-Rand Group covering the assets, employees, operations or businesses of the Dresser-Rand Group as of the date hereof, specifying the insurer, amount of coverage and type of insurance.  All such policies are in full force and effect, all premiums due thereon have been paid by the Dresser-Rand Group and the applicable member(s) of the Dresser-Rand Group have complied in all material respects with the provisions of such policies and have not received any notice from any of their insurance brokers or carriers that such broker or carrier has cancelled or terminated coverage or will not be willing or able to renew their existing coverage.  All insurance policies not held in the names of the members of the Dresser-Rand Group but which cover the assets, employees and operations of the Dresser-Rand Group as of the date hereof are in full force and effect and will remain in full force and effect until the Closing Date, at which time, subject to Section 6.25, coverage thereunder will be discontinued with respect to the Dresser-Rand Group.

2.19   <u>Real Property</u>.

(a)  <u>Leased Properties</u>.  Section 2.19(a) of the Disclosure Schedule sets forth a complete list and the location of all material real property leased or subleased by any member of the Dresser-Rand Group (the "<u>Leased Real Property</u>").  The Sellers have made available to the Buyers correct and complete copies of the leases and subleases (and all amendments, supplements, side letters, and other written agreements related thereto) covering the properties listed in Section 2.19(a) of the Disclosure Schedule (as amended to the date of this Agreement).  With respect to each lease and sublease and except as otherwise specified in Section 2.19(a) of the Disclosure Schedule or where the failure of any of the following to be true and correct would not have, or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(i)   (A) no member of the Dresser-Rand Group is in default beyond any applicable notice, grace or cure period and (B) no member of the Dresser-Rand Group has received a notice of default with respect to such lease or sublease;

(ii)   no member of the Dresser-Rand Group owes any brokerage commissions or finder's fees with respect to any lease or sublease, other than as is reflected in the calculation of Closing Net Working Capital Amount;

28

(iii)   a member of the Dresser-Rand Group has a valid and subsisting leasehold estate in and the right to quiet enjoyment of the Leased Real Property; and

(iv)   no such lease or sublease has been assigned, sublet, mortgaged, deeded in trust or otherwise encumbered by the Dresser-Rand Group.

(b) Owned Properties.  Section 2.19(b) of the Disclosure Schedule lists all real property owned by any member of the Dresser-Rand Group (the "Owned Real Property", and together with Leased Real Property, the "Real Property").  With respect to each such parcel of Owned Real Property listed in Section 2.19(b) of the Disclosure Schedule, except as otherwise specified in Section 2.19(b) of the Disclosure Schedule and except where the failure of any the following to be true and correct would not have, or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(i)   the identified owner has good and marketable title to the parcel of real property, free and clear of any Encumbrances, except for (A) liens for real estate taxes not yet due and payable, (B) installments of special assessments not yet delinquent, (C) easements, covenants, rights-of-way, claims, restrictions and other encumbrances of record, including, without limitation, the exceptions to title set forth in the title insurance commitments for the Owned Real Properties delivered by Sellers, (D) any state of facts which would be shown on a current, accurate survey or physical inspection of the Owned Real Properties and (E) zoning, building and other similar restrictions;.

(ii)   there are no pending or, to the Knowledge of the Sellers, threatened condemnation or other proceedings, disputes or lawsuits that would be reasonably expected to curtail or interfere with the use of the Owned Real Property; and

(iii)   there are no leases, subleases, licenses, concessions, or other agreements, granting to any party or parties the right of use or occupancy of any Owned Real Property or any portion thereof.

2.20   Product Liability and Product Warranty.

(a) Except as set forth in Section 2.20(a) of the Disclosure Schedule, no member of the Dresser-Rand Group has received written notice of any material pending claim against such member of the Dresser-Rand Group or any predecessor thereof, or involving the Business concerning personal injury or property damage (other than damage to the Products) arising from an alleged defect in design, manufacture, materials or workmanship, an alleged failure to exercise reasonable care in repair, service or maintenance, an alleged failure to warn, an alleged failure to provide

29

adequate warnings or an alleged noncompliance with applicable Laws, in each case in respect of any Products (as defined below) shipped prior to the Closing Date. As used in this Agreement, "Products" means any and all products shipped by any member of the Dresser-Rand Group or any predecessor thereof.

(b) The reserve for product warranty claims set forth in the Interim Balance Sheet was calculated in conformity with GAAP applied on a consistent basis with the 2003 Balance Sheet. Section 2.20(b) of the Disclosure Schedule sets forth the estimated aggregate annual cost to the Dresser-Rand Group of performing warranty obligations for customers for each of the three (3) preceding fiscal years and the current fiscal year through June 30, 2004.

2.21   No Brokers' or Other Fees. Except for Greenhill & Co., LLC, whose fees and expenses will be paid by the Sellers, no broker, finder or investment banker is entitled to any fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Sellers or any member of the Dresser-Rand Group.

2.22   Relations with Governments. To the Knowledge of the Seller, no member of the Dresser-Rand Group, nor any director, officer, agent or employee of the Dresser-Rand Group or any of its subsidiaries, has (a) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to political activity, (b) made any unlawful payment or unlawfully offered anything of value to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns or (c) violated any applicable export control, money laundering or anti-terrorism law or regulation, nor have any of them otherwise taken any action which would cause the Dresser-Rand Group or any of its subsidiaries to be in violation of the Foreign Corrupt Practices Act of 1977, as amended, any act enforced by the Office of Foreign Asset Control of the U.S. Department of Treasury, or any applicable law of similar effect.

2.23   No Other Representations or Warranties. Except for the representations and warranties contained in this Article II, neither of the Sellers nor any other Person or entity makes any other express or implied representation or warranty to Buyers.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF BUYERS

The Buyers, jointly and severally, hereby represent and warrant to the Sellers, as of the date of this Agreement, as follows:

3.1 Organization. Each Buyer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation. Each Buyer has all requisite corporate power and authority to own its assets and to carry on its

30

business as now being conducted and is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except jurisdictions in which the failure to be so qualified or licensed would not have or reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of the Buyers to consummate the transactions contemplated by this Agreement and the Transaction Agreements to which it is a party.

3.2 <u>Authorization, Etc.</u>  Each Buyer has full corporate power and authority to execute and deliver this Agreement and the Transaction Agreements to which it is a party and to carry out and consummate the transactions contemplated hereby to be carried out and consummated by it. This Agreement and the French Offer Letter have been duly and validly authorized and no other corporate or other action or proceeding is necessary to authorize the execution, delivery or performance of this Agreement and the French Offer Letter by FRC or any Buyer. This Agreement and the French Offer Letter have been duly and validly executed by FRC and, assuming this Agreement constitute the legal, valid and binding agreement of IR, constitute a legal, valid and binding agreement of FRC, enforceable against FRC in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

3.3 <u>No Approvals or Conflicts</u>.  The execution, delivery and performance by the Buyers of this Agreement and the French Offer Letter and the consummation by the Buyers of the transactions contemplated hereby will not (i) violate, conflict with or result in a breach by the Buyers of any provision of the certificates of incorporation or by laws of the Buyers, (ii) violate, conflict with or result in a breach of any provision of, or constitute a default by the Buyers (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, or result in the creation of any Encumbrance upon any of the Buyers' properties under, any material note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument or understanding to which the Buyers or any of their properties may be bound, (iii) violate or result in a breach in any material respect of any Law applicable to any Buyer or any of their respective properties, or (iv) except for applicable requirements of the HSR Act or any other Competition/Investment Law and, in each case, as set forth in Section 3.3 of the disclosure schedule being delivered by the Buyers to the Sellers simultaneously with the execution of this Agreement and forming a part of this Agreement (the "<u>Buyers' Disclosure Schedule</u>"), require any material order, consent, clearance, approval or authorization of, or notice to, or declaration, filing, application, qualification or registration with, any Governmental Authority.

3.4 <u>Financing</u>.  Attached hereto as Section 3.4(a) of the Buyers' Disclosure Schedule is a true and complete copy of the commitment letter, dated as of August 25, 2004 (the "<u>Debt Financing Commitment</u>"), between Buyer and Citicorp North

31

America, Inc., Citigroup Global Markets Inc. (together "Citigroup"), Morgan Stanley Senior Funding, Inc. ("Morgan Stanley"), UBS Loan Finance LLC and UBS Securities LLC (together, "UBS"), pursuant to which Citigroup, Morgan Stanley and UBS have agreed, subject to the conditions set forth therein, to lend the amount set forth in the Debt Financing Commitment to the Buyers for the purpose, among other things, of consummating the transactions contemplated by this Agreement (the "Debt Financing"). Attached hereto as Section 3.4(b) of the Buyers' Disclosure Schedule are true and complete copies of the commitment letters, dated as of August 25, 2004, between Buyer, First Reserve Fund IX, L.P. and First Reserve Fund X, L.P. (the "Equity Financing Commitment" and, together with the Debt Financing Commitment, the "Financing Commitments"), pursuant to which First Reserve Fund IX, L.P. and First Reserve Fund X, L.P. have committed, subject to the conditions set forth therein, to invest the amount set forth therein to purchase equity interests in FRC (the "Equity Financing" and, together with the Debt Financing, the "Financing"). None of the Financing Commitments has been amended or modified prior to the date of this Agreement, and the respective commitments contained in the Financing Commitments have not been withdrawn or rescinded in any respect. The Financing Commitments are in full force and effect. There are no conditions precedent or other contingencies related to the funding of the full amount of the Financing, other than as set forth in or contemplated by the Financing Commitments. Buyers have no reason as of the date hereof to believe that any of the conditions to the Financing contemplated by the Financing Commitments within the control of Buyers will not be satisfied or that the Financing will not be made available to Buyers on the Closing Date.

3.5 No Brokers' or Other Fees. Except as set forth in Section 3.5 of the Buyers' Disclosure Schedule, the fees and expenses in respect of which will be paid by the Buyers, no broker, finder or investment banker is entitled to any fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Buyers.

3.6 Unregistered Equity. Each Buyer acknowledges that it has been advised by the Sellers that the Acquired Interests have not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act"). Each Buyer is an accredited investor as that term is defined in Regulation D under the Securities Act. The Acquired Interests are being acquired by each Buyer for its own account for investment and without a view to resale.

3.7 No Other Representations or Warranties. Except for the representations and warranties contained in this Article III, neither of the Buyers nor any other Person or entity makes any other express or implied representation or warranty to Sellers.

ARTICLE IV

CONDITIONS TO SELLERS' OBLIGATION

32

The obligation of the Sellers to effect the Closing under this Agreement is subject to the satisfaction, at or prior to the Closing, of each of the following conditions, unless validly waived in writing by IR on behalf of the Sellers.

4.1 Representations and Warranties.

(a) The representations and warranties made by the Buyers in this Agreement shall be true, complete and correct in all respects (determined without regard to any materiality or material adverse effect qualifier therein) as of the Closing Date as though such representations and warranties were made on such date, except that any representations and warranties that are made as of a specified date shall be true, complete and correct in all respects (determined as aforesaid) as of such date, and except for such breaches of representations or warranties (determined as aforesaid) that would not have, or reasonably be expected to have, in the aggregate, a material adverse effect on the ability of the Buyers to consummate the transactions contemplated by this Agreement.

(b) The representations and warranties made by the Buyers in the first sentence of Section 3.1 (Organization) and in Section 3.2 (Authorization, Etc.) shall be true, complete and correct in all respects as of the Closing Date.

4.2 Performance. The Buyers shall have performed and complied in all material respects with all agreements and obligations required by this Agreement to be so performed or complied with by them prior to the Closing.

4.3 Officer's Certificate. FRC, on behalf of itself and the other Buyers, shall have delivered to the Sellers a certificate, dated as of the Closing Date and executed by an executive officer of FRC, certifying to the fulfillment of the conditions specified in Sections 4.1 and 4.2 hereof.

4.4 Consents and Approvals. Each governmental and other consent, approval, authorization, waiver, certificate, exemption, order, registration, declaration, clearance, filing or notice of, with or to any Person, or the expiration or termination of the waiting period under any Competition/Investment Law, in each case required to permit the consummation of any of the transactions contemplated hereby (each, a "Consent"), in each case listed in Section 4.4 of the Disclosure Schedule, shall have been obtained and all conditions relating to such Consents shall have been satisfied, including the completion of any sale, divestiture or disposition of assets or businesses as may be required under Section 6.3.

4.5 Injunctions. On the Closing Date there shall not be in effect any Law or any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority (each, a "Governmental Order") which restrains, prohibits or declares illegal the consummation of the transactions contemplated by this Agreement and no Governmental Authority of competent jurisdiction shall have instituted a Proceeding seeking to impose any such restraint or prohibition.

33

4.6 <u>Guarantees</u>.  The Buyers shall have delivered one or more substitute standby letters of credit or other guarantees (collectively, "<u>Guarantees</u>"), in form and substance satisfactory to the respective banks or other counterparties, to support the obligations of the Sellers under all standby letters of credit, guarantees, indemnity bonds and other credit support instruments heretofore issued by the Sellers and their Affiliates on behalf of any member of the Dresser-Rand Group, outstanding as of the Closing Date and notified by IR in writing to FRC at least five (5) business days prior to the Closing Date ("<u>Seller Credit Support Instruments</u>").  Such Guarantees shall be in an aggregate face amount at least equal to the aggregate face amount under the Seller Credit Support Instruments in U.S. dollars determined in accordance with Currency Conversion Rules.

ARTICLE V

CONDITIONS TO BUYERS' OBLIGATION

The obligation of the Buyers to effect the Closing under this Agreement is subject to the satisfaction, at or prior to the Closing, of each of the following conditions, unless validly waived in writing by FRC on behalf of the Buyers.

5.1 <u>Representations and Warranties</u>:

(a)  The representations and warranties made by the Sellers in this Agreement shall be true, complete and correct (determined without regard to any materiality or Material Adverse Effect qualifier therein) as of the Closing Date as though such representations and warranties were made on such date, except that any representations and warranties that are made as of a specified date shall be true, complete and correct in all respects (determined as aforesaid) as of such date, and except for such breaches of representations and warranties (determined as aforesaid) that would not have, or reasonably be expected to have, in the aggregate, a Material Adverse Effect.

(b)  The representations and warranties made by the Sellers in Section 2.1 (Organization of Certain Sellers), the first sentence of Section 2.3 (Ownership of Acquired Interests) and Section 2.4 (Authorization, Etc.), shall be true, complete and correct in all respects as of the Closing Date.

5.2 <u>Performance</u>.  The Sellers shall have performed and complied in all material respects with all agreements and obligations required by this Agreement to be so performed or complied with by the Sellers at or prior to the Closing.

5.3 <u>Officer's Certificate</u>.  IR, on behalf of itself and the other Sellers, shall have delivered to the Buyers a certificate, dated as of the Closing Date and executed by an executive officer of IR, certifying to the fulfillment of the conditions specified in Sections 5.1 and 5.2 hereof.

5.4 <u>Consents and Approvals</u>.  Each governmental and other Consent, in each case listed in Section 4.4 of the Disclosure Schedule, shall have been obtained and

34

all conditions relating to such Consents shall have been satisfied, including the completion of any sale, divestiture or disposition of assets or businesses as may be required under Section 6.3.

5.5 <u>Injunctions</u>. On the Closing Date there shall not be in effect any Law or Governmental Order which restrains, prohibits or declares illegal the consummation of the transactions contemplated by this Agreement and no Governmental Authority of competent jurisdiction shall have instituted a Proceeding seeking to impose any such restraint or prohibition.

5.6 <u>Satisfaction and Release of Encumbrances</u>. The Sellers shall have delivered to the Buyers, in form and substance reasonably satisfactory to the Buyers, evidence of the release of all Encumbrances on the Acquired Interests (other than (i) applicable transfer restrictions pursuant to federal, state or foreign securities or antitrust laws and (ii) those Encumbrances created by the Buyers) as well as UCC-3 Termination Statements, payoff letters and any other documentation in form and substance reasonably satisfactory to the Buyers evidencing the release of all such Encumbrances.

5.7 <u>Material Adverse Effect</u>. Since the date of this Agreement, there shall not have occurred any change, occurrence or development which has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.8 <u>French Offer Letter</u>. The French Offer Letter shall have been accepted by the relevant Seller.

5.9 <u>Interim Financials</u>. On or about 60 days prior to the Closing Date, IR shall have delivered to FRC copies of the unaudited combined balance sheet of the Dresser-Rand Group and the Business as of June 30, 2003 and 2004 and the related unaudited combined statements of income and cash flows for the six month periods ended June 30, 2003 and 2004 (the "<u>Six-Month Financial Statements</u>"), in each case which have been subject to SAS 100 Review (as so modified, the "<u>SAS Financial Statements</u>") by Sellers' independent accountants.

ARTICLE VI

COVENANTS AND AGREEMENTS

6.1 <u>Conduct of Business by Dresser-Rand Group</u>. Except (i) as otherwise expressly contemplated by this Agreement or (ii) as provided in Section 6.1 of the Disclosure Schedule, the Sellers, jointly and severally, covenant that without the consent of FRC, which consent shall not be unreasonably withheld or delayed, from and after the date of this Agreement and until the Closing Date the Sellers shall and shall cause the Dresser-Rand Group to:

35