# EXHIBIT 7

EDGAR Online

# DRESSER-RAND GROUP INC.

## FORM 10-K
### (Annual Report)

## Filed 03/14/14 for the Period Ending 12/31/13

| | |
|---|---|
| Address | PAUL CLARK DRIVE |
| | OLEAN, NY 14760 |
| Telephone | (716) 375-3000 |
| CIK | 0001316656 |
| Symbol | DRC |
| SIC Code | 3510 - Engines And Turbines |
| Industry | Misc. Capital Goods |
| Sector | Capital Goods |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com

© Copyright 2014, EDGAR Online, Inc. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**Form 10- K**

☐   **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
For the Fiscal Year Ended Dec ember  3 1 , 201 3

**or**

☐   **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
For the Transition Period from _____ to _____

Commission File Number: 001-32586

# DRESSER-RAND GROUP INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 20-1780492 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| West8 Tower, Suite 1000 10205 Westheimer Road Houston, TX, U.S.A. | 77042 |
| 112 Avenue Kleber Cedex 16, Paris, France | 75784 |
| (Addresses of principal executive offices) | (Zip Codes) |

(713) 354-6100 (Houston)
33 156 26 7171 (Paris)
(Registrant's telephone numbers, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**
(Title of class)
(Title of class)

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☐   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.  (Check one):

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | (Do not check if smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐   No ☐

The aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price of $ 59.98 per share at which the common equity was last sold, as of the last business day of the registrant's most recently completed second fiscal quarter was $ 4,471,977 , 324 .

The number of shares of common stock, $.01 par value, outstandi ng as of March 1 0, 2014 , was 76,476,205 .

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Definit ive Proxy Statement for its 2014 Annual Meeting of Stockholders (the "Proxy Statement") are incorporated by reference into Part III .

# TABLE OF CONTENTS

**Page**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 16 |
| Item 1B. | Unresolved Staff Comments | 25 |
| Item 2. | Properties | 25 |
| Item 3. | Legal Proceedings | 26 |
| Item 4. | Mine Safety Disclosures | 26 |
| | | 26 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters and Issuer Purchases of Equity Securities | 26 |
| Item 6. | Selected Financial Data | 28 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 30 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 48 |
| Item 8. | Financial Statements and Supplementary Data | 49 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 49 |
| Item 9A. | Controls and Procedures | 49 |
| Item 9B. | Other Information | 49 |

**PART III**

| | | |
|---|---|---|
| | | 49 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 49 |
| Item 11. | Executive Compensation | 50 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 50 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 50 |
| Item 14. | Principal Accounting Fees and Services | 50 |

**PART IV**

| | | |
|---|---|---|
| | | 51 |
| Item 15. | Exhibits, Financial Statements and Schedules | 51 |

## ITEM 1.  *BUSINESS ($ in millions)*

### Overview

Dresser-Rand Group Inc. is a Delaware corporation formed in October 2004. The common stock trades on the New York Stock Exchange under the symbol "DRC." Unless the context otherwise indicates, as used in this Form 10-K, (i) the terms "we," "our," "us," the "Company" and similar terms refer to Dresser-Rand Group Inc. and its consolidated subsidiaries and (ii) the term "Ingersoll Rand" refers to Ingersoll-Rand plc (NYSE: IR) and its predecessors.

We are among the largest global suppliers of custom-engineered rotating equipment solutions for long-life, critical applications in the oil, gas, chemical, petrochemical, process, power generation, military and other industries worldwide. Our equipment and service solutions are also used in energy infrastructure, including oil and gas, environmental solutions and power generation.

Our products and services are widely used in oil and gas applications that include hydrogen recycle, make-up, wet gas and other applications for the refining industry; cracked gas, propylene and ethylene compression for petrochemical facilities; ammonia syngas, refrigeration, and carbon dioxide compression for fertilizer production; a number of compression duties for chemical plants; gas gathering, export, lift and re-injection of natural gas or carbon dioxide ("$CO_2$") to meet regulatory requirements or for enhanced oil recovery in the upstream market; gas processing, main refrigeration compression and a variety of other duties required in the production of liquefied natural gas ("LNG"); gas processing duties, storage and pipeline transmission compression for the midstream market; synthetic fuels; and steam or gas turbine mechanical drives or power generation packages for floating production, storage and offloading ("FPSO") vessels and offshore platforms, as well as for a variety of compression and pumping applications in various segments of the oil and gas market. We are also a supplier of diesel and gas engines that provides customized energy solutions across worldwide energy infrastructure markets based upon reciprocating engine power systems technologies.

Our custom-engineered products are also used in other advanced applications in the environmental markets we serve. These applications use renewable energy sources, reduce carbon footprint, recover energy and/or increase energy efficiency. These products include, among others, compression technologies for carbon capture and sequestration ("CCS"); hot gas turbo-expanders for energy recovery in refineries and certain chemical facilities; co- and tri-generation combined heat and power ("CHP") packages for institutional and other clients; and a large number of steam turbine applications to generate power using steam produced by recovering exhaust heat from the main engines in ships, recovering heat from mining and metals production facilities and exhaust heat recovery from gas turbines in on-shore and off-shore sites. We also have experience in the design, construction and development of power generation and cogeneration plants and mini-hydroelectric plants, and the development and exploitation of wind farms and biomass, used oil and landfill gas, photovoltaic solar energy and farm waste processing. Other biomass and biogas applications for our steam turbine product line include gasification of municipal solid waste or incineration of wood, palm oil, sugar or pulp and paper residues to generate power. Our equipment is used for compressed air energy storage ("CAES") for utility sized power generation. A CAES plant makes use of our classes of axial compressors, centrifugal compressors, gas expanders, controls and rotating equipment system integration capabilities. These applications are environmentally-friendly and provide unique response features for grid management. Other general industrial markets served include steel and distributed power generation. We operate globally with manufacturing facilities in the United States ("U.S."), France, United Kingdom ("UK"), Germany, Spain, Norway, Brazil and India.

In addition to our products and services, we provide complete, turnkey compression and power generation solutions to our clients in the oil, gas and environmental markets we serve. These solutions typically incorporate one or more of our products and services into the compression or power generation facility, which may include process equipment, such as coolers, vessels, gas dehydration systems, process and utility piping and valves, process instrumentation, transformers and switch gears, and facility controls, as well as civil works and structures. We manage the complete project, including engineering, project controls, procurement, construction, installation, commissioning and start-up of the facility.

We provide a wide array of products and services to our worldwide client base in over 150 countries from our global locations in 18 U.S. states and 32 countries through our 73 sales offices, 49 service and support centers, including six engineering and research and development centers, and 14 manufacturing locations. Our clients include, among others, ADNOC, BP, Bumi Armada, Chevron, CNOOC, ConocoPhillips, Dow Chemical Company, ExxonMobil, Gazprom, LUKOIL, Marathon, MODEC, ONGC, PDVSA, Pemex, Petrobras, PetroChina, Petronas, Repsol, Royal Dutch Shell, SBM, Saudi Aramco, Statoil, Talisman and Total.

Our solutions-based service offering combines our industry-leading technology, extensive worldwide service center network, deep product expertise, project management capabilities and a culture of safety (which we believe to be industry-leading) and continuous improvement. This approach drives our growth as we offer integrated service solutions that help our clients lower the life cycle costs of their rotating equipment, minimize adverse environmental impact and maximize returns on their production and processing equipment. We believe our business model and alliance-based approach built on alliance and frame agreements align us with our clients who increasingly choose service providers that can help optimize performance over the entire life cycle of their equipment. Our alliance/frame agreement program encompasses the provision of new units and/or parts and services. We offer our clients a dedicated team, advanced business tools, a streamlined engineering and procurement process, and a life cycle approach to manufacturing, operating and maintaining their equipment, whether originally manufactured by us or by a third party. In many of our alliances, we are a preferred supplier of equipment and aftermarket parts and services to a client. Our alliances and frame agreements enable us to:

- lower clients' total cost of ownership and improve equipment performance;

- lower both our clients' and our transaction costs;

- develop a broad, continuing business-to-business relationship with our clients that often results in a substantial increase in the level of activity with those clients; and

- provide access to the entire organization, which enhances communications.

The markets in which we operate are large and fragmented. We estimate that in 2013, the worldwide aggregate annual value of new unit sales of the classes of equipment we manufacture was approximately $18 billion for critical applications in the oil, gas, chemical, petrochemical, process, power, military and other industries worldwide, as well as the environmental market space within energy infrastructure. The aftermarket parts and services needs of the installed base of turbo products, reciprocating compressors and steam turbines (both in-house and outsourced) was estimated at approximately $11 billion. In addition, we have aftermarket repair capability for gas turbines, an estimated market size of approximately $4 billion.

We believe that, in the long-term, we are well positioned to benefit from a variety of trends that should continue to drive demand for our products and services, including:

- the increased worldwide demand for energy resulting from population growth, economic growth and a rising middle class;

- the maturation of production fields worldwide, which requires increased use of compression equipment to offset depletion rates and extend the life of the fields as well as to bring new fields into production;

- the increase in demand for natural gas, which is driving growth in gas production, processing, storage and transmission infrastructure;

- regulatory and environmental initiatives, including clean fuel legislation, flaring regulations and stricter emissions controls worldwide;

- the interest in and government support for renewable energy sources such as wind, solar and wave, as well as environmentally focused solutions such as CHP, biomass, CAES and CCS;

- the aging installed base of equipment, which is increasing demand for aftermarket parts and services, revamps and upgrades; and

- the increased outsourcing of equipment maintenance and operations.

**Business Strategy**

In 2013, approximately 98% of our revenues were generated from energy infrastructure (oil, gas and environmental solutions). Additionally, 50% of our total combined revenues were generated by our new units segment and 50% by our aftermarket parts and services segment. We intend to continue to focus on the upstream, midstream, and downstream oil and gas markets, as well as the emerging alternative energy and environmental services markets with our rotating equipment products, services and solutions. Thus, we expect to capitalize on the expected long-term growth in equipment and services investment in these energy infrastructure markets.

Our new units segment, which is tied to energy infrastructure investments, is cyclical by nature. Our flexible manufacturing model, which fundamentally is our ability to flex our manufacturing capacity using our supply chain, minimizes the impact of cycles on our profitability. Our flexible manufacturing model allows us to accomplish the same amount of manufacturing in less space, by using our suppliers to flex our capacity up or down to address our manufacturing requirements. In periods of slowing demand, we reduce the amount of work outsourced and/or subcontracted to third-party suppliers, which enables us to reduce the effect on our operating margins.

4

Another important aspect of our business model is that our aftermarket parts and services segment is much less sensitive to business cycles than our new units segment. Our equipment is typically mission critical to the operating assets of our end user clients. Those assets run continuously and, therefore, generally require parts and servicing regardless of changes in economic activity, new equipment cycles or commodity prices. In 2013, this segment of our business represented approximately 71% of the Company's income from operations, excluding unallocated net expenses and the impact of the fixed asset impairment of our cogeneration facilities of $40.0, discussed in Note 25 to the consolidated financial statements included herein in  *Item 1 5 .   Exhibits, Financial Statements and Schedules* .  Revenues of the aftermarket segment have grown at about an 11% compounded annual rate over the last ten years.

Two other important characteristics of our business model are our strong value proposition and our relatively low capital intensity. Our value proposition is based on our clients' estimated total cost of ownership, which comprises selecting, purchasing, installing, bringing on-line, operating and maintaining our supplied long-lived equipment. For example, we developed an innovative compression solution for an application in the Pre-Salt fields offshore Brazil that made it possible for the client to eliminate multiple, high pressure $CO_2$ pumping systems and separate high pressure injection manifolds. This innovative solution was possible due to our centrifugal compressor technology. Our technology also increases the reliability of the complete system and reduces operating costs as there are fewer machines to operate and maintain because our equipment is often the highest efficiency solution for client applications. This class of equipment may run for 30 years or more. Over the life cycle of that equipment, the more efficient the equipment, the less energy it consumes to operate and the less $CO_2$ and other emissions emanate from the equipment driving our machines. Our equipment has design features that allow for ease of maintenance, which increases production over the equipment's service life. Accordingly, there is a quantifiable value proposition associated with what we build.

We have historically demonstrated the ability to run our business on an ongoing basis with relatively low levels of internally measured net working capital (defined as accounts receivable, inventories net of progress payments, and prepaid expenses less accounts payable and accruals and customer advances) and capital expenditures. For example, the average net working capital and capital expenditures were approximately 12.4% and 2.6%, respectively, of total revenues in the three year period ended December 31, 2013. For 2014, we expect our capital expenditures to be approximately 3% to 4% of total revenues. As a result of a change in client mix to a higher weighting of those national oil companies that typically require higher levels of net working capital, our more recent percentage of net working capital to revenue has been increasing, reaching up to 20% of revenue in certain periods.  The client mix going forward will largely influence our future level of net working capital employed.

### Key Strategic Objectives

With respect to our long-term business strategy, certain of our key strategic objectives are described below.

*Increase Sales of Aftermarket Parts and Services to the Existing Installed Base.* The substantial portion of the aftermarket parts and services needs of the existing installed base of equipment that we currently do not or only partially service represents a significant opportunity for growth. We believe the market has a general preference for original equipment manufacturers' ("OEMs") parts and services. We are continuing to implement globally a proactive approach to aftermarket parts and services sales that capitalizes on our knowledge of the installed base of our own and our competitors' equipment. We have assembled a significant amount of data on both Dresser-Rand's and our competitors' installed base of equipment. We have developed predictive models that help us identify and be proactive in securing aftermarket parts and services opportunities. We are expanding our service center network, which we believe is the largest in the industry for our class of equipment. Through our lean operating system, we have instilled a culture of operational and visual excellence. We believe our premium service level will result in continued growth of sales of aftermarket parts and services.

*Expand Aftermarket Parts and Services Business to Non-Dresser-Rand Equipment in our Class.* We believe the aftermarket parts and services market for non-Dresser-Rand equipment in our class represents a significant growth opportunity that we continue to pursue on a systematic basis. As a result of the knowledge and expertise derived from our long history and experience servicing the largest installed base in the industry, combined with our extensive and on-going investment in technology, we have a proven process of applying our technology and processes to improve the operating efficiency and performance of our competitors' supplied equipment. With the largest global network of full-capability service centers and field service support for our class of equipment, we are often in a position to provide quick response to clients and to offer local service. We believe these, along with our world class field service safety performance, are important service differentiators for our clients. By using intelligence gathered on the installed base of our competitors' equipment, we intend to capitalize on our knowledge, our broad network of service centers, our leading technology and our existing relationships with most major industry participants to grow our aftermarket parts and services solutions for such

5

non-Dresser-Rand equipment. We are able to identify technology upgrades that improve the performance of our clients' assets and to proactively suggest upgrade and revamp projects that clients may not have considered.

*Grow Alliances.* As a result of the need to improve their competitiveness in a global economy, oil and gas companies are frequently consolidating their supplier relationships and seeking alliances with suppliers, shifting from purchasing units and services on an individual transactional basi s to choosing long-term service and technology providers that can help them optimize asset performance over the entire service life of their equipment. W e continue to see a high level of interest among our clients in seeking alliances and/or frame agreements with us, and we have entered into agreements with more than 50 of our clients. We plan to leverage our market and technology leadership, global presence, and comprehensive range of products and services to continue to take advantage of this trend by pursuing new client alliances as well as strengthening our existing ones. We currently are the only alliance partner for compressors with Marathon. In addition to our alliance agreements, we are a preferred supplier to other clients, including BP, Chevron, ConocoPhillips, Denbury Resources, ExxonMobil, Fluor, Gaelectric, Kinder Morgan, LyondellBasell, TransCanada, PDVSA, Pemex, Petrobras, Phillips 66, Praxair, Repsol, Saudi Aramco, Statoil and Valero.

*Expand Our Performance-Based Long-Term Service Contracts.* We are growing our participation in the outsourced services market with our energy asset management and our long-term service contracts, which are designed to offer clients significant value through improved equipment performance, decreased life cycle cost and higher availability levels versus the traditional services and products approach. These contracts generally represent multiyear, recurring revenue opportunities for us that typically include a performance-based element to the service provided. We offer these contracts for most of the markets that we serve.

*Introduce New and Innovative Products and Technologies.* We believe we are an industry leader in introducing new, value-added technology. Product innovation has historically provided, and we believe will continue to provide, significant opportunities to increase revenues from both new units sales and upgrades to the installed base of equipment manufactured by us and other OEMs. Many of our products utilize innovative technology that lowers operating costs and increases reliability and performance. Examples of such technology offerings include the DATUM ® compressor platform, dry-gas seals, hydrodynamic and magnetic bearings and the 'only-in-class' integrated compression system ("ICS") which incorporates a new generation of liquid / gas separation technology (a rotary separator) inside the compressor casing located directly before the first stage of compression. We have introduced a complete line of remote-monitoring and control instrumentation that offers significant performance benefits to clients and enhances our operations and maintenance services offering. Further discussion about innovative products and technologies can be found below under *New Product Development.* We plan to continue developing innovative products, including new compressor platforms, which could further open up new markets to us. Under our Guascor ® engine product line, we have developed, and continue to develop, gas engines that operate on a wide range of fuels from natural gas (industrial and domestic quality natural gas) to different types of methane based gases, such as flare gas (associated gas), a variety of bio-gas types (landfill, sewage and biomethanization) and propane, syngas and dual fuel engines (running on diesel and natural gas).

*Improve Profitability.* We continually seek to improve our financial and operating performance through operational excellence initiatives, cost manufacturing footprint optimization and productivity improvements. Process efficiencies, cycle time reductions and cost improvements are being driven by greater worldwide collaboration across Dresser-Rand locations. We have Process Innovation teams removing waste using advanced lean manufacturing methodologies such as value stream mapping. A large portion of our finished products comes from purchased materials and we are extending our process innovation and lean methodologies to remove waste from our supply chain. We are focused on continuing to improve our cost position across our business, and we continue to believe there is substantial opportunity to further increase our productivity and reduce costs.

*Selectively Pursue Acquisitions.* We intend to continue our disciplined pursuit of acquisition opportunities that fit our business strategy. We will focus on acquisitions within the energy infrastructure sector that add new products or technologies to our portfolio, provide us with access to new markets or enhance our current product offering or service capabilities. Given our size and the large number of small companies in our industry and related industries, we believe many opportunities for strategic acquisitions remain.

6

**Products and Services**

We design, manufacture and market highly engineered rotating equipment and provide services to the worldwide oil, gas, petrochemical, power generation, environmental solutions and industrial process industries. We have two reportable segments based on the engineering and production processes, and the products and services provided by each segment, as follows:

1)  New units are predominately highly engineered solutions to new requests from clients. New units also include standardized equipment such as engines and single stage steam turbines. The segment includes engineering, manufacturing, project management, packaging, testing, sales and administrative support.

2)  Aftermarket parts and services consist of support solutions for the existing population of installed equipment and the operation and maintenance of several types of energy plants. The segment includes engineering, manufacturing, project management, installation, commissioning, start-up and other field services, repairs, overhauls, refurbishment, sales and administrative support.

The following charts show the proportion of our revenue generated by segment, destination and end market for the year ended December 31, 2013:



Revenues in the United States were approximately 28% of total revenues for the year ended December 31, 2013. Segment and destination revenues and related financial information for 2013, 2012, and 2011 can be found in Note 22 to the consolidated financial statements in Item 15 *Exhibits, Financial Statements and Schedules* of this Form 10-K.

*New Units*

We are a leading manufacturer of highly-engineered turbo and reciprocating compression equipment and steam turbines. We also manufacture power turbines; special-purpose gas turbines; hot gas expanders; gas and diesel engines; trip, trip throttle and non-return valves; magnetic bearings and control systems. Our new unit products are built to client specifications for long-life, critical applications. The following is a description of principal new unit products that we currently offer.

### Dresser-Rand Major Product Categories

| Product | Maximum Performance | Up Stream | Mid Stream | Down Stream | Petro Chemical | Chemical | Industrial | Power | Environmental |
|---|---|---|---|---|---|---|---|---|---|
| **Turbo Products** | | | | | | | | | |
| Centrifugal Compressors | up to 500k CFM | √ | √ | √ | √ | √ | √ | √ | √ |
| Gas Turbines & Power Turbines | up to 50+ MW | √ | √ | √ | √ | √ | √ | √ | √ |
| Power Recovery Expanders | up to 1600 °F | | | √ | √ | | | √ | √ |
| **Reciprocating Compressors** | | | | | | | | | |
| Process | up to 45k HP | √ | √ | √ | √ | √ | √ | | √ |
| Separable | up to 11k HP, 7500 psig | √ | √ | √ | | | | | √ |
| **Steam Turbines** | up to 85 MW | √ | √ | √ | √ | √ | √ | √ | √ |
| Engines | up to 1.5 MW | √ | √ | √ | √ | √ | √ | √ | √ |

*Results of Operations*

**Year ended December 31 , 2013, compare d to the year ended December 31 , 2012:**

| | Year Ended December 31, 2013 | % of Revenue | Year Ended December 31, 2012 | % of Revenue |
|---|---|---|---|---|
| **Consolidated Statement of Operations Data:** | | | | |
| Revenues | $ 3,032.6 | 100.0% | $ 2,736.4 | 100.0% |
| Cost of sales | 2,247.3 | 74.1 | 2,004.3 | 73.2 |
| Gross profit | 785.3 | 25.9 | 732.1 | 26.8 |
| Selling and administrative expenses | 385.5 | 12.7 | 365.8 | 13.4 |
| Research and development expenses | 38.8 | 1.3 | 30.4 | 1.1 |
| Fixed asset impairment of cogeneration facilities | 40.0 | 1.3 | - | 0.0 |
| Income from operations | 321.0 | 10.6 | 335.9 | 12.3 |
| Interest expense, net | (46.9) | (1.5) | (60.2) | (2.2) |
| Other expense, net | (16.6) | (0.5) | - | 0.0 |
| Income before income taxes | 257.5 | 8.5 | 275.7 | 10.1 |
| Provision for income taxes | 88.2 | 2.9 | 92.8 | 3.4 |
| Net income | 169.3 | 5.6 | 182.9 | 6.7 |
| Net income attributable to noncontrolling interest | (0.9) | (0.1) | (3.9) | (0.1) |
| Net income attributable to Dresser-Rand | $ 168.4 | 5.6% | $ 179.0 | 6.6% |
| Bookings | $ 2,941.4 | | $ 3,162.8 | |
| Backlog - ending | $ 2,849.0 | | $ 2,946.0 | |

*Revenues.* Revenues were $3,032.6 for the year ended December 31, 2013 , compared to $2,736.4 for the year ended December 31, 2012 , an increase of $296.2 or 10.8% . Generally, oil prices and other macroeconomic conditions that affect the oil and gas industry have an impact on our business over an extended period of time. On a quarterly or annual basis, however, there is typically not a direct correlation of short-term volatility in these factors to our periodic financial results. Fluctuations in revenues and bookings are generally due to variability in the timing and size of very large orders in the new units segment, which is typical in the oil and gas industry. This occurs because our equipment, in many cases, is used in very large capital projects that take years to plan and execute, and such projects do not occur on a regular or consistent basis due to their size, location , technical resources, client capital expenditure constraints and long-term relationship to global energy supply and demand. While a change in these factors at a macroeconomic level will tend to have a corresponding overall effect on our revenue, the timing of such effect on our quarterly or even annual revenues is not directly correlated because of the very long lead times required to evaluate the macroeconomic landscape and then plan , permit and execute the projects. Furthermore, the highly engineered nature of our worldwide products and services does not easily lend itself to measuring the impact of price, volume and mix on changes in our to tal revenues from year to year. Nevertheless, based on factors such as measures of labor hours and purchases from suppliers, revenues increased due to highe r volume during the year ended December 31, 2013  as a result of the timing issues discussed above . Price i ncreases in the aftermarket parts and services segment also contributed incremental revenues, albeit to a much lesser extent. These increases were partially off set by negative impacts from our six pig manure treatment facilities in Spain which we acquired in our acquisition of Guascor. The Spanish government published a draft regulation at the end of January 2014 that reflects a reduction in the tariffs of approximately 37%, which, if enacted, would be retroactive to July 2013. In connection with the draft regulation being issued, 2013 revenues are lower by approximately $23.7 as a result of the retroactive reduction of the tariffs which partially offsets the overall increase in revenues. An adverse translation impact of foreign currency f luctuations of approximately $28.5 , resulting from a stronger U.S. dollar, also partially offset the increase in reven ues.   The increase in revenue on extended scope projects, which are accounted for under the percentage of completion method of accounting, wa s $175.7 for the year ended December 31, 2013.

*Cost of sales.* Cost of sales was $2,247.3 for the year ended December 31, 2013 , compared to $2,004.3  for the year ended December 31, 2012 .  As a percentage of revenues, cost of sales 74.1% for the year ended December 31, 2013 , compared to 73.2% for the year en ded December 31, 2012 .  The increase in cost of sales as a percentage o f revenues from the year ended December 31, 2012 to the year ended December 31, 2013 was parti ally the result of a shift in mix from our aftermarket segment to our new units segment.  A shift in the mix of projects within the new units segment also contributed

to higher cost of sales as a percentage of reven es. The proposed change in the tariffs reflected in the draft Spanish regulation discussed above contributed approximately 0.5 % to the increase in cost of sales as a percentage of revenues. These factors were partially offset by improved operating leverage on fixed costs from higher volumes.

*Gross profit.*  Gross profit was $785.3 for the year ended December 31, 2013 , compared to $732.1 for the year ended December 31, 2012 .  As a percentage of revenues, gross profit was 25.9% for the year ended December 31, 2013 , compared to 26.8% for the year ended December 31, 2012 .  We experienced de creased gross profit as a percentage of revenues as a result of the factors discussed above.

*Selling and administrative expenses.*  Selling and administrative expenses were $385.5 for the year ended December 31, 2013 , compared to $365.8 for the year ended December 31, 2012 .  While we were able to achieve greater operating leverage on administrative cos ts, an increase in selling and administrative expenses was generally the result of increased selling activity and cost inflation.  A s a percentage of revenues, selling and administrative expenses decreased to 12.7% from 13.4% .

*Research and development expenses.*  Research and developme nt expenses for the year ended December 31, 2013 , were $38.8 compared to $30.4  for the year ended December 31, 2012 .    We continue to effectively execute our strategy to introduce new and innovative products and technologies with a focus on key new product development initiatives for DATUM®, DATUM® Integrated Compression System ("ICS"), subsea compression, LNG, steam turbines and reciprocating engines.  The increase in research and development expenses is related to strategic projects that are expected to be in demonstrat ion or launch phases during the next twelve months .  It is typical that projects entering this phase of development incur higher procurement and testing expenses when compared to design related activities that occur earlier in the devel opme nt lifecycle.

*Fixed asset impairment of cogeneration facilities.*  In view of the proposed change in the tariffs reflected in the draft Spanish regulation discussed above, we have decided to suspend the operations at our six pig manure treatment facilities, although discussions with the Spanish government are ongoing.

The draft regulation is a clarification of a law that was passed in 2013 , as the law did not have sufficient specificity to reasonably estimate the tariff at that time .  Sub sequently, as a result of the proposed tariff we believe an impairment triggering event occurred in 2013 and have recorded an impairment charge of $ 40.0 in 2013 to reduce the value of the property, plant and equipment.  At the time of the acquisition, we did not record any specific intangible assets related to the pig manure treatment facilities.

*Income from operations.*  Income from operations was $321.0 for the year ended December 31, 2013, compared to $335.9 for the year ended December 31, 2012 , a de crease of $14.9 or 4.4% .  As a percentage of revenues, income from operations for the year ended December 31, 2013, was 10.6% , compared to 12.3% for the year ended December 31, 2012.  The de crease in income from operations and income from operations as a percentage of revenues is the result of the factors discussed above.  The proposed change in tariffs reflected in the draft Spanish regulation reduced income from operations as a percenta ge of sales by approximately 0.6 %.  The fixed asset impairment charge reduced operating income as a percentage of sales by approximately 1.3%.

*Interest expense, net.*  Interest expense, net was $46.9 for the year ended December 31, 2013 , compared to $60.2 for the year ended December 31, 2012 .  Near the end of 2012, we settled a dispute with a former non-controlling equity holder of one of our sub sidiaries.  For the year ended December 31, 2012 , interest cost associated with the dispute was estimated and accrued at a higher interest rate than the interest rate ultimately agreed to be paid over the remaining term of the note .  In terest cost for the year ended December 31, 2013 , included the lo wer negotiated rate which lower ed interest expense.  In addition, as discussed in N ote 16 to the consolidated financial statements, included herein in  *Item 1 5, Exhibits, Financial Statements and Schedules* ,  Enviroil , an affiliate of the Company,  entered into a settlement agreement in September 2013, in which the counterparty agreed to waive sanctions, interest and other related costs that the counterparty had previously claimed, and the Company had previously accrued.  Accordingly, upon entering into the settlement agreement, the interest portion of this accrual was reversed in 2013 , resulting in a reduction in interest expense of $6.5.  The remaining component of the Enviroil settlement was paid by the sellers of Guascor directly to the counterparty pursuant to an indemnification agreement in the three months ended December 31, 2013.

*Other  expense, net.*  Other expense , net was $16.6 for the year ended December 31, 2013 , compared to other expense , net of $ 0.0 for the year ended December 31, 2012 .  Other expense , net, consists principally of net currency gains and losses, gains and losses on tradable emission allowances and earnings and losses on investments accounted for under the equity method of accounting.  The change in other expense , net is principally the result of losses on equity method investments and foreign currency f luctuations for the year ended December 31, 2013 .  Other expense, net was also impacted by the devaluation of the Venezuelan bolivar on February 8, 2013.  As a result of this devaluation, the Company recorded a non-

# EXHIBIT 8



**Ingersoll Rand Company**
Peter M. Donnelly
Associate General Counsel – Litigation
800 Beaty Street, Building E
Davidson, NC 28036 USA
Tel (704) 655-5508
peter.donnelly@irco.com

May 24, 2014

**VIA ELETRONIC MAIL ONLY**
**E-MAIL ADDRESS: kreeb@hodgsonruss.com**

Kyle C. Reeb
Hodgson Russ LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040

**Re:**   *Yara Belle Plaine, Inc. v. Ingersoll-Rand Company; Dresser-Rand Company, a New York Partnership; Dresser Rand Group, Inc. and Dresser-Rand Canada Inc.*, Court of the Queen's Bench for Saskatchewan, Canada, Court File No. QBG No. 1561 of 2013

Dear Mr. Reeb:

Your letters to Jeffrey Sandler concerning the above-referenced lawsuit have been forwarded to me. In those letters, you outline your clients' position that they believe they are entitled to receive from Ingersoll Rand defense and indemnification against all claims that Yara Belle Plaine, Inc. ("Yara Belle) has alleged in the lawsuit.

I am sure you appreciate that the lawsuit is in its preliminary stages, and that insufficient information exists at this time from which a reasonable person could decide if your clients' position is correct. In addition, you presumably know Yara Belle has made claims of liability for independent acts or omissions by your clients, which would serve to defeat any defense or indemnification to which your clients might otherwise be entitled to receive.

Although Ingersoll Rand is unable to agree to defend and indemnify your clients at this time, it is willing to revisit this topic as it continues its investigation into the root cause of the accident that is the basis of the lawsuit. If your clients are concerned about satisfying any statute of limitations, Ingersoll Rand is prepared to enter into a mutually acceptable tolling agreement to address that concern.

Very truly yours,

Peter M. Donnelly

cc:   Alan Rudakoff
      Jeffrey Sandler

*Ingersoll Rand Family of Brands*

   

# EXHIBIT 9



Robert L. Katz
Senior Vice President and General Counsel
**Ingersoll Rand Company**
800 Beaty Street, Building E
Davidson, NC 28036 USA
Tel (704) 655-5700
www.ingersollrand.com

August 12, 2014

<u>VIA OVERNIGHT DELIVERY</u>
Tom Denison, Esq.
Anne E. Gold, Esq.
First Reserve Corporation
One Lafayette Place
Greenwich, Connecticut 06830

Howard Ellin, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036

Re:    Notice of Indemnification Obligation
       *Yara Belle Plaine Inc. v. Ingersoll-Rand Company et al*

Dear Mr. Denison, Ms. Gold and Mr. Ellin:

Reference is made to the enclosed Equity Purchase Agreement, dated August 25, 2004 (the "Agreement), by and among FRC Acquisitions LLC on behalf of itself and the other Buyers named therein (the "Buyers") and Ingersoll-Rand Company Limited on behalf of itself and the other Sellers named therein ("Ingersoll-Rand" or "Sellers").

In accordance with Section 9.6 of the Agreement, notice is hereby given to you, as representative for all the Buyers under the Agreement, of the Buyers' obligation to defend, indemnify, and hold harmless Ingersoll-Rand with respect to the matters addressed in or related to the enclosed complaint styled *Yara Belle Plaine Inc. v. Ingersoll-Rand Company, Dresser-Rand Company, Dresser-Rand Group, and Dresser-Rand Canada Inc.* (the "Lawsuit"). We note, in addition, that Ingersoll-Rand previously requested Dresser-Rand to defend and indemnify Ingersoll-Rand under the Agreement, as discussed below.

The Lawsuit asserts various claims against Ingersoll-Rand and Dresser-Rand Group, Inc., Dresser-Rand Company, and Dresser-Rand Canada, Inc. related to the alleged failure of a model E-516 Nitric Acid Expander (the "Expander") and resultant fire and alleged damage to the Yara Belle Plaine Inc. nitric acid plant in Saskatchewan. The Lawsuit alleges that the Expander was originally manufactured by either Ingersoll-Rand or Dresser-Rand, and that Dresser-Rand serviced, maintained and repaired the Expander until August 21, 2012, when the Expander allegedly failed.

*Ingersoll Rand Family of Brands*

    

Tom Denison, Esq.
Anne E. Gold, Esq.
Howard Ellin, Esq.                                    -2-

Pursuant to Section 8.1(b) of the Agreement, the Buyers are obligated to defend and indemnify Ingersoll-Rand as follows:

> Section 8.1(b). <u>Indemnification by the Buyers</u>.  Subject to the limits set forth in this Section 8.1, the Buyers jointly and severally agree to indemnify, defend and hold the Sellers and their respective agents and representatives . . . harmless from and in respect of any and all Losses that they may incur arising . . . (ii) as a result of the conduct of business of any member of the Dresser-Rand Group after the Closing Date;

Pursuant to Section 8.1(e) of the Agreement, notice is further given of the Buyers' right to participate in, assume the defense of, and select counsel for Ingersoll-Rand's defense of the Lawsuit. Under the Agreement, the Buyers should notify Ingersoll-Rand of their intent to assume the defense, which we will expect no later than August 22, 2014.  In the meantime, Ingersoll-Rand will take all necessary action to preserve its defenses in the Lawsuit.

We note that Ingersoll-Rand has been having discussions about the Lawsuit with in-house counsel at Dresser-Rand since February 2014, including a discussion about the obligations of the parties under the indemnification provisions of the Agreement.  In fact, I had direct discussions with Mark F. Mai, Vice President, Secretary and General Counsel for Dresser-Rand, about the indemnification obligations that we believe are owed to Ingersoll-Rand under the Agreement, in light of Dresser-Rand's activities (not involving Ingersoll-Rand) in servicing the Expander for several years leading up to the incident, including one month before the alleged failure in August 2012.  Ingersoll-Rand has made clear in those discussions that we believe we are entitled to indemnification for the Lawsuit under Section 8.1(b) of the Agreement.

In accordance with the above and any other applicable provisions of the Agreement, Ingersoll-Rand hereby demands that the Buyers assume the defense of, indemnify, and hold Ingersoll-Rand harmless for any costs, attorneys' fees, damages, or other losses that Ingersoll-Rand may incur, directly or indirectly, in connection with any liability asserted in or related to the Lawsuit.

Ingersoll-Rand expressly reserves all rights, defenses and remedies under the Agreement, at law or in equity, and nothing herein shall be construed as a waiver of any such rights, defenses or remedies.

Very truly yours,

Robert L. Katz
Senior Vice President and General Counsel

RLK/tls

2



$12^{30}$

**Form 12-3**

(Subrule 12-3(1))

COURT FILE
NUMBER                Q.B.G. No. 1561 of 2013

COURT OF QUEEN'S BENCH FOR SASKATCHEWAN

JUDICIAL CENTRE      REGINA

PLAINTIFF(S)         YARA BELLE PLAINE INC.

DEFENDANT(S)         INGERSOLL-RAND COMPANY; DRESSER-
                     RAND COMPANY, A NEW YORK
                     PARTNERSHIP; DRESSER RAND GROUP,
                     INC.: AND DRESSER-RAND CANADA INC.

<u>ACKNOWLEDGEMENT OF SERVICE</u>

You are asked to fill out and sign this form without delay, and return it by fax to:

>   MacPHERSON LESLIE & TYERMAN LLP
>   Attention:  LEONARD D. ANDRYCHUK
>   Fax: (306) 352-5250

    **If you fail to return this signed and completed Acknowledgement of Service without delay, you may not receive notice of any further proceedings or any documents may be personally served on you and you will be required to pay the costs of service.**

I ACKNOWLEDGE SERVICE on me of a copy of the following document(s):

1.   Statement of Claim of Yara-Belle Plaine Inc. dated August 20, 2013.

_____
*(signature)*

_____
*(date of service)*

**Address for service and contact information of party being served:**

    Name of party:

    Name of person accepting
    service:

1359254v1

Address for service:          _____
                              *(set out the street address)*
                              _____

Telephone number:            _____

Fax number (*if any*):        _____

E-mail address (*if any*):    _____

---

**NOTICE**

(1) You must include an address in Saskatchewan where documents may be mailed to or left for you if you wish to receive notice of subsequent proceedings in this matter.

(2) It is optional to include your fax number and e-mail address. If you include your fax number or e-mail address, documents may be served on you by fax or electronic transmission.

(3) The address, fax number or e-mail address that you give on this form will be used to serve you with documents until you serve on the other parties and file with the court written notice of a new address for service.

---

This document was delivered by:

MacPherson Leslie & Tyerman LLP
Lawyers
1500-1874 Scarth Street
Regina, SK  S4P 4E9

whose address for service is same as above.

Lawyer in charge of file:       LEONARD D. ANDRYCHUK
Telephone number:              (306) 347-8000
Fax number:                    (306) 352-5250

2

1359254v1

**FORM 3-9**
(Rule 3-9)

COURT FILE NUMBER  *Q13C1561/13*

COURT OF QUEEN'S BENCH FOR SASKATCHEWAN

JUDICIAL CENTRE            REGINA

PLAINTIFF(S)              YARA BELLE PLAINE INC.

DEFENDANT(S)             INGERSOLL-RAND COMPANY; DRESSER-RAND
                          COMPANY, A NEW YORK PARTNERSHIP;
                          DRESSER RAND GROUP, INC.; AND DRESSER-
                          RAND CANADA, INC.

### NOTICE TO DEFENDANT

1.   The plaintiff may enter judgment in accordance with this Statement of Claim or the judgment that may be granted pursuant to *The Queen's Bench Rules* unless, in accordance with paragraph 2, you:

   (a)   serve a Statement of Defence on the plaintiff; and

   (b)   file a copy of it in the office of the local registrar of the Court for the judicial centre named above.

2.   The Statement of Defence must be served and filed within the following period of days after you are served with the Statement of Claim (excluding the day of service):

   (a)   20 days if you were served in Saskatchewan;

   (b)   30 days if you were served elsewhere in Canada or in the United States of America;

   (c)   40 days if you were served outside Canada and the United States of America.

3.   In many cases a defendant may have the trial of the action held at a judicial centre other than the one at which the Statement of Claim is issued. Every defendant should consult a lawyer as to his or her rights.

4.   This Statement of Claim is to be served within 6 months from the date on which it is issued.

5.   This Statement of Claim is issued at the above-named judicial centre on the 2ᵈ day of August, 2013.

W. Seed
Dy. Local Registrar

_____
Local Registrar

## STATEMENT OF CLAIM

1.   The Plaintiff, Yara Belle Plaine Inc. ("Yara") is a body corporate registered pursuant to the laws of Saskatchewan with an office in the City of Regina, in the Province of Saskatchewan

2.   The Defendant Ingersoll-Rand Company is a body corporate incorporated pursuant to the laws of the state of New Jersey in the United States of America.  Ingersoll-Rand Company's agent/Service of process is the Corporation Trust Company, located at 820 Bear Tavern Rd, in the City of West Trenton in the State of New Jersey.

3.   The Defendant, Dresser Rand Group, Inc. is a body corporate incorporated pursuant to the laws of the state of Delaware, in the United States of America.  Dresser Rand Group, Inc.'s agent is the Corporation Trust Company located at 1209 Orange Street in the City of Wilmington in the State of Delaware.

4.   The Defendant Dresser-Rand Company, a New York Partnership is a partnership located in the State of New York in the United States of America.

5.   The Defendant Dresser-Rand Canada, Inc. is a body corporate incorporated pursuant to the provisions of the *Canada Business Corporations Act,* with an office in the City of Calgary, in the Province of Alberta.

6.   Unless named specifically herein, the Defendants are hereafter referred to collectively as "Dresser Rand".

7.   Yara owns and operates a nitrogen fertilizer plant located near the Town of Belle Plaine, in the Province of Saskatchewan.  Yara was formerly known as Saskferco Products Inc.. Any reference to a Saskferco entity herein may be taken as a reference to Yara.

8.   On or about October 4, 2002, Yara purchased a nitric acid plant from Louisiana Chemical Equipment Co., L.L.C. ("LEC") including a model E-516 Nitric Acid Expander bearing serial number 2956  (the "Expander"), which included two rotors hereinafter referred to as Rotor A and Rotor B.  The Expander, including the rotors, was originally manufactured by Ingersoll-Rand Company or, alternatively by Dresser Rand.

9.   Subsequent to the purchase of the Expander, Yara retained Dresser-Rand Canada, Inc., to disassemble, overhaul and reassemble the Expander as well at its rotor and spare rotor assembly. Dresser-Rand Canada, Inc. subsequently performed work on the Expander and rotors in or about February and March of 2004 and returned the Expander to Yara.

10.    Yara subsequently put the Expander with Rotor A into service in the nitric acid plant at its nitrogen fertilizer plant and operated the Expander without issue between 2004 and 2009.  In 2009, Rotor A was scheduled for regular maintenance and repair.  The spare rotor, Rotor B, was then put into service in the Expander while Rotor A was being inspected and repaired by Dresser-Rand Canada, Inc.

11.    Prior to completing any repairs on Rotor A, Dresser-Rand Canada, Inc. prepared an Inspection and Repair Proposal dated December 22, 2009 (the "Rotor A Proposal").  The Rotor A Proposal was prepared following two inspection reports, each prepared by Dresser Rand Canada, Inc. dated July 27, 2009 and November 2, 2009.   The November 2, 2009 report noted specifically that:

(a)    The first stage disk assembly wheel was okay to reuse; and

(b)    The second stage disk assembly wheel was okay to reuse.

12.    Yara accepted the Rotor A Proposal and issued a purchase order on or about January 13, 2010 in respect of the work.  The work on Rotor A was completed and Rotor A was returned to Yara on or about September 29, 2010 where it was stored as a spare.

13.    On January 20, 2012, Dresser-Rand Canada, Inc. issued an Inspection and Repair Proposal to overhaul the Expander in July 2012 as part of a planned Yara shut down, which proposal was accepted by Yara.  During the course of the overhaul, Rotor B was switched out and Rotor A was reinstalled in the Expander.  The Expander went back into service at the end of July 2012.

14.    Following the reinstallation of Rotor A, the Expander functioned without incident until August 21, 2012 at which time it experienced a catastrophic failure which resulted in a fire and extensive damage to Yara's facility.

15.    The failure occurred in the second stage disc of Rotor A and was the result of inter granular cracking commonly known as stress relaxation cracking ("SRC").

16.    The Expander was manufactured in or about 1971 and the first two discs of the rotors in the Expander were constructed of a steel alloy known as "A286", using a single aged heat treatment process.  Following a series of failures of material made of single aged heat treated A286 and similar alloys as a result of SRC in the 1970 and 1980's, Ingersoll-Rand Company, or alternatively Dresser Rand, changed its manufacturing process for its expanders to use a double aged heat treatment.

17.     Ingersoll-Rand Company and Dresser Rand therefore knew, from at least the 1980's, that the single aged heat treated A286 material used in the first and second stage discs of the Expander was prone to failure by SRC when operated in the conditions characteristic of many industrial operations, including that of Yara's nitric acid plant.

**Breach of the duty to warn**

18.     Yara says that the original manufacturer, Ingersoll-Rand Company, or alternatively, Dresser Rand by reason of the fact that it manufactured the Expander, owed a duty of care to Yara, as the end user, to warn Yara of dangers inherent in the operation of the Expander and of the defects inherent in using single aged A286 steel in the Expander.

19.     Yara says that Dresser-Rand Canada., Inc. owed a duty of care to Yara to warn Yara of dangers inherent in the operation of the Expander and of the defects inherent in using single aged A286 steel in the Expander.

20.     Yara says that the risk of SRC was a risk which was known or ought to have been known by Dresser Rand and that Dresser Rand failed to provide any, or alternatively any adequate warning of the risk of failure by SRC of the Expander to Yara.

21.     The risk posed by SRC was exacerbated by the fact that the first two discs of Rotor A were constructed of single aged A286 steel, a defect known or which ought to have been known to each of the Dresser Rand defendants and that as such, the Dresser Rand defendants were under a heightened duty to warn Yara of the danger posed by the continued use of the Expander.

22.     Yara says further that Ingersoll-Rand Company, Dresser-Rand Canada, Inc. and or alternatively Dresser Rand knew or ought to have known of the conditions under which the Expander would be operated and was therefore under a heightened duty to warn Yara of the risks inherent in the operation of the Expander.

23.     The fact is that the Dresser Rand defendants failed to give any, or alternatively any adequate warning, of the increased risk posed by the manufacture of the Expander using single aged A286 steel and the failure to disclose or warn of those risks constitutes a breach of the duty of care owed to Yara as the end user of the product.

24.     Yara says that if the dangers associated with single aged A268 steel had been disclosed to Yara, it would have taken sufficient steps such that the Expander could be operated without undue risk.

25.   Yara says that the breach of the duty to warn specified herein by each of the Dresser Rand defendants caused Yara's injury and that the same was reasonably foreseeable. In particular, it was reasonably foreseeable that the catastrophic failure of the Expander would result in an explosion and/or fire and would result in both physical property damage and business interruption losses.

26.   Yara alternatively says that the breach of the duty to warn specified herein by each of the Dresser Rand defendants materially contributed to Yara's loss.

27.   Yara says that as a result of the breach of the duty to warn, Yara has suffered significant property damage in an amount to be proven at trial but estimated to be in excess of $13,000,000.

28.   Yara says that as a result of the breach of the duty to warn, Yara has suffered business interruption losses in an amount to be proven at trial but which are estimated to be in excess of $19,000,000.

**Negligence of Dresser-Rand Canada, Inc.**

29.   In the alternative, Yara says that Dresser-Rand Canada, Inc. owed a duty of care to Yara in the course of inspecting, recommending a repair and completing repairs and/or service to the Expander.

30.   Yara says that Dresser-Rand Canada., Inc. breached its duty of care in inspecting the Expander and its rotors by failing to recommend the replacement of the rotors with double aged heat treatment A286 or other alloys suitable for the operation of the Expander or to recommend testing that would determine the presence of SRC in the rotors.

31.   Yara says further that Dresser-Rand Canada, Inc. negligently repaired or serviced Rotor A of the Expander. Particulars of such negligence include the failure of Dresser-Rand Canada, Inc. to properly test for and to detect the presence of SRC in the rotors.

32.   As a result of Dresser Rand Canada, Inc.'s negligence, Yara suffered damage and loss in an amount to be proven in trial but which is estimated at paragraphs 32 and 33 hereof.

**Breach of Contract**

33.   Alternatively, Yara says that Dresser Rand Canada, Inc., breached its contract with Yara by failing to complete the inspection, recommending a repair, and completing the repairs and/or service to the Expander in a good and workmanlike manner.

34.   As a result of Dresser Rand's negligence, Yara suffered damage and loss in an amount to be proven at trial but which is estimated at paragraphs 32 and 33 hereof.

35.   The Plaintiff therefore claims the following relief against the Dresser Rand Defendants

(a)   Judgment in an amount to be proven at trial;

(b)   Interest pursuant to the terms of *the Pre-judgment Interest Act*;

(c)   The costs of this action on a solicitor-client basis; and

(d)   Such further and other relief as this Honourable Court may allow;

Dated at the City of Regina, in the Province of Saskatchewan this 20 day of August, 2013

MacPherson Leslie & Tyerman LLP

Per: _____

Counsel for the Plaintiff, Yara Belle Plaine Inc.

## CONTACT INFORMATION AND ADDRESS FOR SERVICE

**If prepared by a lawyer for the party:**

| | |
|---|---|
| Name of firm: | MacPherson Leslie & Tyerman LLP |
| Name of lawyer in charge of file: | Leonard D. Andrychuk |
| Address of legal firms: | 1500 - 1874 Scarth Street<br>Regina, Saskatchewan  S4P 4E9 |
| Telephone number: | (306) 347-8000 |
| Fax number (*if any*): | (306) 352-5250 |
| E-mail address (*if any*): | LAndrychuk@mlt.com |

# EXHIBIT 10

# Filed Under Seal

# EXHIBIT 11

**DRESSER-RAND.**

September 21, 2014

## Dresser-Rand Signs Agreement To Sell To Siemens For Approximately $7.6 Billion In An All Cash Transaction

**- The agreement provides for an $83 per share price with additional per share cash consideration of $0.55 that shall be applied on the first day of each month starting March 1, 2015, until the closing occurs**
**- The base price provides a 37.4% premium over the unaffected share price**
**- Combines two highly complementary businesses to create a leading world-class supplier to the oil and gas industry**
**- Unique value proposition offers clear client benefits including an enhanced product portfolio and wide range of mission critical rotating equipment and aftermarket solutions**
**- Dresser-Rand to become the platform for oil and gas equipment solutions within Siemens**

### Board Adopts A One-Year Shareholders Rights Plan

HOUSTON, Sept. 21, 2014 /PRNewswire/ -- Dresser-Rand Group Inc. ("Dresser-Rand" or the "Company") (NYSE: DRC), a global supplier of rotating equipment and aftermarket parts and services, today announced that it has entered into a definitive merger agreement with Siemens under which Siemens will acquire all of the outstanding shares of Dresser-Rand common stock for $83.00 per share in cash.  The transaction is valued at approximately $7.6 billion, including the assumption of debt.  The price represents a premium of 37.4 percent over Dresser-Rand's closing share price of $60.42 on July 16, 2014, the day before speculation in the press appeared regarding interest in Dresser-Rand. Additional per share cash consideration of $0.55 shall be applied on the first day of each month starting March 1, 2015, until the closing occurs.

Siemens intends to operate Dresser-Rand as the company's oil and gas business retaining the Dresser-Rand brand name and its executive leadership team. In addition, Siemens intends to maintain a significant presence in Houston, which will be the headquarters location of the oil and gas business of Siemens.

"As the premium brand in the global energy infrastructure markets, Dresser-Rand is a perfect fit for the Siemens portfolio. The combined activities will create a world-class provider for the growing oil and gas markets. With this Dresser-Rand will become 'The oil and gas' company within Siemens and fit right into our Siemens Vision 2020," said Joe Kaeser, President and CEO of Siemens AG.

"After a thorough and competitive process, we are pleased to have reached this agreement with Siemens as it maximizes value and delivers significant benefits to all Dresser-Rand stakeholders," said Vincent R. Volpe Jr., Dresser-Rand's President and CEO. "Dresser-Rand shareholders will receive immediate and certain all-cash consideration for their shares at an attractive premium to the Company's unaffected share price."

Mr. Volpe added, "Given the vision Siemens has for Dresser-Rand as its oil and gas company, and its expressed wishes to build Dresser-Rand's product and service portfolio with some of the existing Siemens offerings that have previously been marketed separately into the oil and gas space, it is clear that this is a transaction that should create value for clients, as well as for both sets of shareholders, that would not have otherwise been achieved had Dresser-Rand not become part of the Siemens group. We are excited about the opportunity to continue on our journey to become the premier supplier of high speed rotating equipment and solutions for this industry and believe that the enhancements in offerings available to us in the form of the existing products and services from the Siemens group will serve as an accelerator for technological innovation, profitable growth and extended opportunities for our employees and the communities around the globe in which we operate. Simply stated, we see this as a unique opportunity to better serve our clients, employees and shareholders and are pleased to have Dresser-Rand placed in the central role for Siemens as it develops its position in oil and gas."

"Our aim is to become the leading rotating equipment and process system integrator for the oil and gas industry.  Dresser-Rand has strong presence in oil and gas, a reputation for technology leadership and innovation, and a talented and experienced leadership team.  Our intention is to leverage these strengths by maintaining the existing company and brand name and selectively moving complementary products and services from the existing Siemens portfolio into Dresser-Rand enabling us to offer a much broader range of products, services and solutions to meet our customers' needs," said Lisa Davis, member of the Managing Board of Siemens AG.

**Conditions and Approvals**

The transaction is expected to close in the summer of 2015 and is subject to Dresser-Rand shareholder approval, regulatory approval in the U.S., Europe and certain other jurisdictions, and other customary closing conditions.  Under the terms of the merger agreement, Siemens has committed to take all necessary steps from a regulatory perspective to ensure that the transaction will be completed.

Morgan Stanley & Co. LLC and Zaoui & Co. acted as financial advisors to Dresser-Rand. Wachtell, Lipton, Rosen & Katz, and Gibson, Dunn & Crutcher LLP, served as legal counsel to Dresser-Rand.

**One-Year Stockholder Rights Plan**

The Company's Board of Directors has adopted a limited duration Shareholder Rights Plan.  The Plan is designed to assist the Board of Directors in maximizing shareholder value in connection with the sale of the Company.  The Plan will not in any way prevent or restrict any person from making a superior proposal pursuant to the terms of the Merger Agreement.

Pursuant to the Plan, the Board of Directors declared a dividend of one preferred stock purchase right (each a "Right" and collectively, the "Rights") on each outstanding share of the Company's common stock as of the close of business on October 2, 2014 (the "Record Date"). Each Right, once exercisable, will entitle shareholders to buy one one-hundredth of a share of a new series of junior participating preferred stock at a purchase price of $300.00 per Right, subject to adjustment.

The Rights will be exercisable only if a person or group of affiliated or associated persons (other than Siemens or any of its affiliates or associates acting pursuant to the Merger Agreement) acquires beneficial ownership of 10% or more of the Company's common stock. The Plan provides that the ownership of shareholders that beneficially own 10% or more of the Company's common stock on the date of adoption of the Plan will be grandfathered, but the Rights would become exercisable if at any time any such shareholder increases its ownership percentage by 1% or more. Derivative interests in the Company's common stock, such as swap arrangements, regardless of whether such arrangements carry with them the right to control voting or disposition of the underlying securities, are also considered beneficial ownership of the underlying common stock for purposes of the Plan.

Additional details about Rights Plan will be included in a Form 8-K to be filed by the Dresser-Rand with the U.S. Securities and Exchange Commission.

**About Dresser-Rand**

Dresser-Rand is among the largest suppliers of rotating equipment solutions to the worldwide oil, gas, petrochemical, and process industries.  The Company operates manufacturing facilities in the United States, France, United Kingdom, Spain, Germany, Norway, India, and Brazil, and maintains a network of 49 service and support centers (including 6 engineering and R&D centers) covering more than 150 countries.

**About Siemens AG**

a global powerhouse in electronics and electrical engineering, operating in the fields of industry, energy and healthcare as well as providing infrastructure solutions, primarily for cities and metropolitan areas. For over 165 years, Siemens has stood for technological excellence, innovation, quality, reliability and internationality. The company is one of the world's largest providers of environmental technologies. Around 43 percent of its total revenue stems from green products and solutions. In fiscal 2013, which ended on September 30, 2013, revenue from continuing operations totaled €74.4 billion and income from continuing operations €4.2 billion. At the end of September 2013, Siemens had around 362,000 employees worldwide on the basis of continuing operations. Further information is available on the Internet at www.siemens.com.

**Forward Looking Statements**

This news release may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  Forward-looking statements include, without limitation, the Company's plans, objectives, goals, strategies, future events, future bookings, revenues, or performance, capital expenditures, financing needs, plans, or intentions relating to acquisitions, business trends, executive compensation, and other information that is not historical information.  The words "anticipates", "believes", "expects", "intends", "appears", "outlook", and similar expressions identify such forward-looking statements. Although the Company believes that such statements are based on reasonable assumptions, these forward-looking statements are subject to numerous factors, risks, and uncertainties that could cause actual outcomes and results to be materially different from those projected.  These factors, risks, and uncertainties include, among others, the following: economic or industry downturns; the variability of bookings due to volatile market conditions, subjectivity clients exercise in placing orders, and timing of large orders; volatility and disruption of the credit markets; its inability to generate cash and access capital on reasonable terms and conditions; its inability to implement its business strategy; its ability to comply with local content requirements; delivery delays by third party suppliers; cost overruns and fixed-price contracts; its ability to implement potential tax strategies; competition in its markets; failure to complete or achieve the expected benefits from any acquisitions, joint ventures or strategic

investments; economic, political, currency and other risks associated with international sales and operations; fluctuations in currencies and volatility in exchange rates; loss of senior management; environmental compliance costs and liabilities; failure to maintain safety performance acceptable to its clients; failure to negotiate new collective bargaining agreements; a failure or breach of its information system security; unexpected product claims and regulations; infringement on its intellectual property or infringement on others' intellectual property; its pension expenses and funding requirements; difficulty in implementing an information management system; and the Company's brand name may be confused with others.  These and other risks are discussed in detail in the Company's filings with the Securities and Exchange Commission at www.sec.gov.  Actual results, performance, or achievements could differ materially from those expressed in, or implied by, the forward-looking statements.  The Company can give no assurances that any of the events anticipated by the forward-looking statements will occur or, if any of them does, what impact they will have on results of operations and financial condition.  The Company undertakes no obligation to update or revise forward-looking statements, which may be made to reflect events or circumstances that arise after the date made or to reflect the occurrence of unanticipated events, except as required by applicable law.  For information about Dresser-Rand, go to its website at www.dresser-rand.com.

**DRC-FIN**

SOURCE Dresser-Rand Group Inc.

News Provided by Acquire Media

# EXHIBIT 12

# In The Matter Of:

*DRESSER-RAND COMPANY, v.*

*INGERSOLL RAND COMPANY,*

---

*October 28, 2014*

---

*Southern District Court Reporters*

Original File EASRDREC.txt

Min-U-Script® with Word Index

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,

October 28, 2014

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DRESSER-RAND COMPANY,
     DRESSER-RAND CANADA, INC.,
 4   DRESSER-RAND GROUP, INC.

 5                   Plaintiffs,

 6        v.                        14 Civ. 7222 (KPF)

 7   INGERSOLL RAND COMPANY,
     INGERSOLL RAND COMPANY LIMITED,
 8                                  Conference
                 Defendants.
 9
     ------------------------------x
10                                  New York, N.Y.
                                    October 28, 2014
11   Before:                        2:00 p.m.

12
          HON. KATHERINE POLK FAILLA
13
                                    District Judge
14

15

16        APPEARANCES

17
     ROETZEL & ANDRESS LPA
18        Attorneys for Plaintiffs
     BY:  THOMAS L. ROSENBERG
19
     HODGSON RUSS LLP
20        Attorneys for Plaintiffs
     BY:  MARGARET M. CMIELEWSKI
21
     DAVID J. GRENELL
22        Assistant General Counsel
          Dresser-Rand Company
23
     SIMPSON THACHER & BARTLETT LLP
24        Attorneys for Defendants
     BY:  LYNN K. NEUNER
25        NOAH M. LEIBOWITZ
```

1        (Case called)
2        MR. ROSENBERG: Good afternoon, your Honor.  For the
3   plaintiffs, Thomas Rosenberg.  To my right is Margaret
4   Cmielewski, and to my left is in-house counsel David Grenell.
5        THE COURT: Good afternoon, all of you.
6        MS. NEUNER: Good afternoon, Judge Failla.  Lynn
7   Neuner from Simpson Thacher & Bartlett representing the
8   Ingersoll-Rand entities.  With me is my partner Noah Leibowitz.
9   We also have with us here from North Carolina Mr. Pete
10   Donnelly, in-house counsel at Ingersoll-Rand.
11        THE COURT: Good afternoon.  Did you say North
12   Carolina?  At a different time in my life I grew up in northern
13   New Jersey, and I understood that Ingersoll-Rand's headquarters
14   to be up in the Montvale area.
15        MR. DONNELLY: That is true up until the 1970s or so,
16   when it moved down Davidson, North Carolina.
17        THE COURT: Welcome.  Thank you all for coming in
18   today.  This might otherwise serve as an initial pretrial
19   conference inasmuch as it is our chance to all get together and
20   talk about the issues in this case, but it is also a pre-motion
21   conference based on the submissions that I received, first from
22   the defense and then from the plaintiffs.
23        Mr. Rosenberg, I will start with you nonetheless.  I
24   have read the complaint and tried very hard to make my way
25   through the agreement in question.  I had with greater success

1   made my way through the parties' submissions with respect to
2   their positions.  If there are things that you would like to
3   call my attention to at this time, I would like to hear from
4   you.
5        MR. ROSENBERG: Yes, your Honor, I shall.  Thank you.
6        The equity purchase agreement is a complicated
7   document that was entered into between the parties, Dresser-
8   Rand's predecessor in interest and Ingersoll-Rand, in
9   connection with various obligations flowing from one to
10   another.  We now are challenged with having to apply those
11   obligations to a lawsuit that has been filed up in Saskatchewan
12   where Yara Belle has initiated litigation against Ingersoll-
13   Rand and Dresser-Rand.  These two companies, Ingersoll-Rand and
14   Dresser-Rand, decided that their disputes would be determined
15   in the New York courts.  That was the decision they made, and
16   that is what we are asking this Court to apply.
17        Having said that, there are really two issues before
18   us.  One is the defense obligation, one is the indemnity
19   obligation.  We have spent a lot of time looking at this.  We
20   have spent a lot of time analyzing both the legal issues and
21   the practical issues of how we proceed.  I believe where we are
22   today with this is we are seeking a declaratory judgment action
23   on both the defense obligations and the indemnity obligations.
24        THE COURT: When you say "we"?
25        MR. ROSENBERG: Dresser-Rand, I apologize.  Dresser-

1   Rand is seeking a determination from this Court on the defense
2   obligation and the indemnity obligation.
3        Briefly on the defense obligation, section 8.1(e) of
4   the equity purchase agreement provides the notice and
5   opportunity to defend.  It says opportunity, it doesn't say
6   duty.  It says opportunity in that it gives two options to the
7   indemnifying party, Ingersoll-Rand.  That is, they can either
8   pick up the defense or, if they don't pick up the defense and
9   there is an indemnity obligation, they owe the defense legal
10   fees.
11        The defense issue is based on the allegations of the
12   complaint, analogous to the insurance world.  The complaint
13   that Yara Belle filed creates a defense obligation.  It may not
14   create an indemnity obligation, but it clearly creates a
15   defense obligation based on the allegations.  That's what we
16   are asking this Court to determine, that there is a defense
17   obligation.
18        If there is a defense obligation based on the
19   allegations that Yara Belle has asserted, then Ingersoll-Rand
20   has elected not to employ its own counsel.  But we bring in
21   section 8.1(f) of the agreement that says they are to pay the
22   legal fees periodically as incurred.  That would be the legal
23   fees of our defense counsel up in the Canadian action.  That is
24   the defense issue before this Court.
25        THE COURT: Following on that, your view is I ought

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,

October 28, 2014

---

Easrdrec                                                                Page 5

1 not get behind the allegations or determine the veracity or
2 think about how a jury might resolve them.  I simply should
3 look at the allegations in the Canadian lawsuit, see that if
4 they are taken as true, they would arguably allege something
5 that is indemnifiable, and therefore that implicates the
6 defense obligation but not the indemnity claims?
7          MR. ROSENBERG: Yes, your Honor, absolutely, very
8 analogous to insurance.  If the allegations give rise to the
9 possibility of an indemnity obligation, then Ingersoll-Rand has
10 to pick up the defense.
11          THE COURT: Let me ask you this question, sir.  I was
12 going to ask Ms. Neuner this, but I will ask you first, and
13 then she will know it is coming.  The concern that I have is
14 wanting to avoid the possibility of, if you will, stepping on
15 the toes of the Canadian court.  Similarly, I want to be
16 careful that I am not impermissibly or inappropriately creating
17 a risk of inconsistent judgments.  I understand your argument
18 to me to be, sir, that I need not worry about that now, because
19 I must take the allegations as true for purposes of determining
20 the duty to defend.
21          MR. ROSENBERG: Yes, your Honor, only limited to the
22 duty to defend separate from the indemnity obligation.
23          THE COURT: Are you seeking indemnity at this point?
24          MR. ROSENBERG: Yes.
25          THE COURT: OK.

---

Easrdrec                                                                Page 6

1          MR. ROSENBERG: However, however, the Court is a
2 hundred percent correct, that gets us into the troubled area of
3 stepping on the toes of the Canadian case.  It gets us into the
4 challenge of inconsistent determinations.  It raises a lot of
5 practical issues, which there is a solution to.
6          The problem is that these two parties entered into a
7 contract that said that obligation is going to be decided in
8 New York.  I believe the solution to that, though, is that what
9 the contract really says is the New York court determines
10 whether an indemnity obligation based on what happens
11 in the Canadian court.
12          THE COURT: Right now not much has happened in the
13 Canadian court.
14          MR. ROSENBERG: It is moving slowly.  I can report on
15 the schedule so that the Court is clearly aware of that.  We
16 are in constant contact with counsel up in Saskatchewan.
17          What happens in the Canadian court is the Canadian
18 court is going to determine basically who is liable for the
19 fire and resulting damages that occurred at the Yara Belle
20 plant, be it Ingersoll-Rand or Dresser-Rand, and they are also
21 going to determine what we would call cross-claim issues.  They
22 call it a little different up in the Canadian system.  But they
23 would determine cross-claim issues.
24          Once that determination is made on the indemnity,
25 then, unless one party voluntarily acknowledges the obligation

---

Easrdrec                                                                Page 7

1 and compensates the other, it comes back to this Court for this
2 Court to say, based on what happened in Canada, if you two
3 can't agree on indemnity, it's this Court's role to determine
4 whether there is an indemnity obligation.
5          Therefore, the defense obligation is ripe.  The
6 indemnity obligation I think we need to wait and see what
7 happens in Canada.
8          THE COURT: I want to understand how that works out.
9 I'm not sure that there is a practical difference between the
10 two of.  You will explain to me where I'm misperceiving the
11 facts.
12          The idea of the duty to defend is that you would reach
13 back to Ingersoll-Rand and say under the agreement you have the
14 right of first refusal, as it were, to defend this.  But
15 doesn't that, too -- well, you're telling me it doesn't because
16 I just have to go on the facts.
17          If the duty to indemnify requires more than simply
18 analysis of the pleadings, by allowing the duty to defend or
19 finding a duty to defend in this case, have I not effectively
20 found a duty to indemnify?  Because on these facts, on this
21 agreement, the choice is either they can do it themselves or
22 they can pay you back for doing it, correct?
23          MR. ROSENBERG: Yes, your Honor, to your last comment.
24          THE COURT: OK.
25          MR. ROSENBERG: The distinction here is that the duty

---

Easrdrec                                                                Page 8

1 to defend and the duty to indemnify are different.  The duty to
2 defend is based on the allegations that have been raised in the
3 Yara Belle complaint.  The duty to indemnify is based upon the
4 finding in the Canadian court.  An indemnification obligation
5 only exists if in fact --
6          THE COURT: Fair enough.  I think I get this.  The
7 duty to defend encompasses basically the attorney's fees right
8 now and not necessarily any judgment at some later date,
9 whereas the duty to indemnify includes, if damages are
10 assessed, that plus the costs of defending?
11          MR. ROSENBERG: Correct.
12          THE COURT: I understand, thank you.  I needed that
13 clarification.
14          MR. ROSENBERG: As the Yara Belle complaint indicates,
15 the plaintiff's claim is roughly $32 million.  The indemnity
16 issue clearly is premature.  The defense issue, because of how
17 large that claim is, is ripe, and that is I think what needs to
18 be determined at first.
19          I will say, with all respect to both the Court and
20 opposing counsel, that is a little different from what we pled
21 in the complaint.  We clearly pled in the complaint that the
22 duty to indemnify has to be determined now.  We spent a lot of
23 time with Ms. Neuner's arguments.  We spent a lot of time
24 looking at that.  We are in agreement that it is premature to
25 decide the duty to indemnify now.

---

**DRESSER-RAND COMPANY, v.**
**INGERSOLL RAND COMPANY,**

**October 28, 2014**

| Easrdrec | Page 9 |
|---|---|

1    THE COURT: While you are in agreement, I want to hear
2  a little bit more about this.  My sense from looking at the
3  pleadings and the papers in this case was that, maybe I'm wrong
4  here, the parties were in discussions before your complaint was
5  filed.  There was an effort to resolve this dispute short of
6  litigation, correct?
7    MR. ROSENBERG: Yes, absolutely.
8    THE COURT: On what other things are the parties in
9  agreement?  Anything?  What I would like to know is how many
10 issues do I really need to decide?  I guess I'm grateful to you
11 for this.  You have come forward and said, I've looked at their
12 arguments, and I now agree with a portion of them, and
13 therefore this is our view on this.  Is there anything else as
14 to which the parties are in agreement at this time?
15    MR. ROSENBERG: I don't know.
16    THE COURT: I guess we will find out from the
17 arguments.  Fair enough.  I appreciate that, sir.  That was a
18 very broad question.  I think I really want to know, were you
19 close to resolving this case?
20    MR. ROSENBERG: No, never on the indemnity issue.
21 Never on the indemnity issue.  The parties entered a tolling
22 agreement.  The reason they entered into a tolling agreement,
23 which I also think, in all candor to the Court, is probably not
24 at issue at this point, our Canadian counsel made an argument
25 that the case should have been heard in Alberta, not

| Easrdrec | Page 10 |
|---|---|

1  Saskatchewan.  I'm not exactly sure why, but he did.  There
2  were certain defenses that were running in Alberta that were
3  not running under Saskatchewan law.  In order to preserve those
4  defenses, we entered into the tolling agreement.
5    They filed what we would consider a motion either to
6  dismiss or change venue from Saskatchewan to Alberta.  The
7  court in Canada denied that.  Under the Saskatchewan procedure,
8  I think the tolling agreement really becomes irrelevant.  So,
9  the case is in Saskatchewan.
10    I did indicate to the Court I would say a little bit
11 about the schedule as to the Canadian case.  They are in the
12 process now of what we would call exchanging documents.  They
13 have made a demand for articulation of damages, which is a
14 formal process in that court.  Yara Belle has not yet responded
15 to either one of them.
16    The answer is, obviously, a little bit different.  You
17 just submit your defenses.  I don't think that has been filed
18 yet.  They have some time to do so.  I think that is going to
19 be filed in November.  Whether we assert a cross-claim against
20 Ingersoll-Rand is really dependent upon what happens today, but
21 I expect that will occur.
22    THE COURT: Thank you very much.  I might get back to
23 you in a few minutes.
24    Ms. Neuner, will I be hearing from you or from your
25 co-counsel on this?

| Easrdrec | Page 11 |
|---|---|

1    MS. NEUNER: Your Honor, I will present for Ingersoll-
2  Rand.
3    THE COURT: Very good.  Let me ask you this.  It may
4  be that in light of what Mr. Rosenberg has said, some of the
5  things you are going to tell me may have to be modified because
6  you now understand he may be making slightly different
7  arguments.  I want to ask you a preliminary question, and then
8  I want to ask you about your argument.
9    What was a little bit surprising to me, but this just
10 may be my own lack of experience in this particular area, is
11 that it sounded like both sides wanted me to decide the issue
12 and neither side wanted me to stay the matter.  That was a
13 surprise to me.  Do you want me to decide the defense issue?
14    MS. NEUNER: No, your Honor.
15    THE COURT: OK.  What I understood from your letter
16 was you want me to find that this is not an indemnifiable
17 event.  Correct?
18    MS. NEUNER: Your Honor, think the thrust of our
19 motion to dismiss is that the entire action is premature.  We
20 do not yet have a justiciable case or controversy, because the
21 Canadian action has not determined the basis upon which any
22 loss has been imposed.  Do you want me to unpack that?
23    THE COURT: Please.  As you do so, let me have you
24 keep in mind one case.  There is a Second Circuit case known as
25 Associated Indemnity v. Fairchild.  It stands for the

| Easrdrec | Page 12 |
|---|---|

1  proposition, in a case involving insurance coverage, which I
2  think is slightly different from what we have here, that the
3  determination of coverage and the determination of whether
4  something is indemnifiable under an insurance contract is a
5  determination that can be made while the action as to which the
6  indemnity claim is being sought is ongoing.  There is that.  I
7  checked, and that actually gets cited with some frequency.
8    The question to you was whether there is something
9  about this contract case, because this is not an insurance
10 case, that renders the analysis different.
11    MS. NEUNER: Your Honor, you are spot-on with all your
12 intuitions.  Let me start by saying I think that in today's
13 conference we are making good progress.  I, too, am grateful to
14 Mr. Rosenberg for the candor with which he has approached his
15 representations today.
16    As I understand it, what we now have from Dresser-Rand
17 is an admission that any request about an indemnification of a
18 final judgment up in the northern area of Canada, Saskatchewan,
19 is premature.  We absolutely agree with that.  The reason why
20 is that one cannot know if Dresser-Rand is going to be found
21 liable in Saskatchewan, if Ingersoll-Rand is going to be found
22 liable in Saskatchewan, if both are, if there is going to be an
23 apportionment of fault, or whether there is going to be a
24 defense verdict.  So, literally as to any final judgment, there
25 is no determination as to the basis for that loss being imposed

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,

October 28, 2014

| Easrdrec | Page 13 |
|---|---|

1 at this point in time.
2      Now what I think we need to tackle is the question of
3 this defense.  First let me say this.  There is a very
4 important philosophical and legal distinction between a
5 contractual duty to indemnify and an insurance policy.  I do a
6 lot of insurance coverage work.  I am absolutely certain that
7 New York law has decided no more than 300 times that a duty to
8 defend is broader for an insurance policy than a duty to
9 indemnify.
10      In New York they call it either the four corners rule
11 or the eight corners rule.  You would take, as the judge, the
12 four corners of the underlying complaint, here the six-page
13 Yara Belle claims, complaint, put it side by side with the four
14 corners of that policy, and you would search for, as the fact
15 determiner, is there any possible claim for coverage within
16 this Yara Belle complaint that would fit within the corners of
17 the policy, and if so, the insurer has a duty to defend.
18      Why?  Because it's liability insurance.  Part of those
19 premiums were for the protection that when an insurer receives
20 the third-party claims, they will have the peace of mind that
21 the insurer is going to step forward and pay their defense
22 costs.
23      Let's contrast that with the contractual obligation to
24 indemnify, which is what we have here.  The context is that
25 this was a purchase agreement between a private equity group,

| Easrdrec | Page 14 |
|---|---|

1 First Reserve, and Ingersoll-Rand, a diversified strategic
2 company engaged in heavy industrial machinery manufacturing and
3 distribution.
4      As part of the normal merger and acquisition
5 representations and covenants, you have section 8 indemni-
6 fication obligations.  This is not an insurance policy.  In
7 fact, it is quite clear, and you have already picked up on
8 this, that the defense discussion is about an opportunity to
9 defend a products liability loss.  It is not an obligation.
10 And Mr. Rosenberg characterized this correctly.
11      In this situation where Dresser-Rand is making the
12 request for a indemnity to Ingersoll-Rand, Ingersoll-Rand, if
13 it believes that it is responsible for this alleged loss, can,
14 at its election, you said the right of first refusal, come
15 forward, say I'm going to assert a defense, I'm going to
16 appoint Canadian counsel of my selection, I'm going to control
17 the strategic decision-making, where we are going to fight
18 this, whether we are going to settle it.  Why?  Because
19 Ingersoll-Rand has a determination up front that it is going to
20 be liable for any loss in the end, so it might as well control
21 the picture as it gets down the Canadian litigation track.
22      However, in this particular situation we do not have a
23 determination by Ingersoll-Rand that is in fact on the hook for
24 the indemnity.  Why is that?  Because when you look at this
25 Yara Belle complaint, there are three causes of action.  Two of

| Easrdrec | Page 15 |
|---|---|

1 the three, your Honor, are solely against Dresser-Rand, one for
2 negligence on Dresser-Rand Canada's part and the second for
3 breach of contract by Dresser-Rand Canada.  Why is that?
4 Because Dresser-Rand Canada was the sole entity that was
5 servicing this expander from 2004 to the time of its failure in
6 August of 2012.
7      The third claim in the complaint is asserted against
8 both Ingersoll-Rand and the Dresser-Rand entities, and that is
9 essentially a duty to warn.  You could read this to say that
10 Ingersoll-Rand is being sued solely for Ingersoll-Rand's
11 actions and alleged duty to warn about the expander's
12 components, and Dresser-Rand is being sued for Dresser-Rand's
13 actions and alleged duty to warn about the components in this
14 expander.
15      So, in some ways, because the complaint is six pages
16 and is fairly ambiguous, you could say that both entities are
17 being sued for their own individual acts, not Dresser-Rand
18 being sued for Ingersoll-Rand and vice versa.  It is simply too
19 early to tell the true theories of the liability there.
20      But when you go into the EPA, this merger document
21 that was put together ten years ago by my firm and Skadden, you
22 see that the products liability loss has a very important
23 distinction.  It says that for a products liability loss, there
24 is an exception in the definition -- your Honor, I'm at
25 9.10(g) -- an exception for acts or omissions following the

| Easrdrec | Page 16 |
|---|---|

1 closing.  This means that Ingersoll-Rand was saying that
2 following the closing, if there were acts or omissions by
3 Dresser-Rand with respect to the machinery, Ingersoll-Rand was
4 not making that an indemnified claim.  It literally was
5 excluded in the definition.
6      THE COURT: Your argument is not that Ingersoll-Rand
7 no longer had a duty to warn after the closing.  You're saying
8 that it had its duty to warn and Dresser-Rand had its duty to
9 warn, but Dresser-Rand was not able post-closing to receive
10 indemnity for any violations of the duty to warn?  That's the
11 argument your now making to me?
12      MS. NEUNER: Yes, your Honor.
13      THE COURT: OK.
14      MS. NEUNER: And to the extent Dresser-Rand misper-
15 formed, didn't do a good job in its eight years of servicing of
16 its expander, and if that is the reason for the failure and the
17 fire, that's Dresser-Rand's post-closing acts or omissions for
18 which it is responsible.  It is not even within the definition
19 of an indemnifiable claim.
20      Let me point out to you one other provision, if I
21 could, in the EPA that shores up this thinking.  I wouldn't
22 want there to be any misconception that Ingersoll-Rand's
23 indemnity is so broad that it actually would capture post-
24 closing negligence by Dresser-Rand.  The point I would bring
25 you to, your Honor, is 8.1 subpart (b).  This is the reciprocal

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,

October 28, 2014

| Easrdrec | Page 17 |
| --- | --- |

1 indemnification.
2     Ingersoll-Rand, when it was selling off Dresser-Rand,
3 said we are going to give you, First Reserve, a duty to
4 indemnify for things preclosing, but when there are things
5 post-closing, if Ingersoll-Rand gets named in that lawsuit,
6 Ingersoll-Rand wants protection.
7     The buyers, First Reserve, gave an indemnity back to
8 Ingersoll-Rand. Here it specifically says that the indemnity
9 for Ingersoll-Rand, our clients, includes any losses as a
10 result of the conduct of business of any member of the
11 Dresser-Rand group after the closing date. That is Roman (ii)
12 under 8.1.
13     THE COURT: If you had really good distance vision,
14 you would see that I underlined it in mine. I guess the
15 question is, why is Ingersoll-Rand not seeking indemnification?
16 Or are they?
17     MS. NEUNER: Your Honor, great question. The
18 indemnity here that you see is from the seller. The seller is
19 First Reserve. First Reserve acquired Dresser-Rand in 2004 and
20 then spun off Dresser-Rand in 2007 in an IPO. We actually have
21 been trying to track down whether this ongoing indemnification
22 obligation in this EPA was transferred from First Reserve to
23 Dresser-Rand at the time of the spin-off. We have asked Mr.
24 Rosenberg for that information, and it has not yet been
25 forthcoming.

| Easrdrec | Page 18 |
| --- | --- |

1     It is very, very, very obvious that what you will have
2 here at the end of the day are cross-claims for indemni-
3 fication. In fact, in Canada, Canadian counsel for Ingersoll-
4 Rand will be putting in its notice of defense and its statement
5 of cross-claim against Dresser-Rand in the Saskatchewan action
6 in the next week. So, the Canadian action will in fact have
7 Ingersoll-Rand's cross-claims against Dresser-Rand before Madam
8 Justice Pritchard, who is the ultimate decision make there.
9     I think you have rightly determined the risk of
10 proceeding forward with this case, which is stepping on the
11 toes of Madam Justice Pritchard and coming to an inconsistent
12 determination. It could very well be that the ultimate loss,
13 if any, that is borne by Dresser-Rand will be as a result of
14 its own acts and omissions after the closing of this merger, in
15 which case Ingersoll-Rand never, never, never had an indemnity
16 obligation.
17     The key to this, and I think the barest point of
18 dispute between the parties, is that our contractual
19 indemnification obligation is the same whether the loss that is
20 being sought is defense invoices or resulting judgment. There
21 is no separate duty to defend that is broader than the duty to
22 indemnify.
23     When you said, if I decided a defense obligation,
24 wouldn't I in fact be deciding an indemnity obligation, you are
25 absolutely right. It's a section 8, which is about

| Easrdrec | Page 19 |
| --- | --- |

1 indemnities. Yes, there is this provision which Mr. Rosenberg
2 and I have talked about, which is 8.1(f), which talks about
3 real-time reimbursement of defense fees as they are incurred.
4 But, your Honor, I will point you to the language at the very
5 start that says, "This applies where an indemnified party shall
6 be entitled to indemnification."
7     That is our central dispute. We do not believe at
8 this point that Dresser-Rand is entitled to indemnification.
9     THE COURT: Let me ask you this, Ms. Neuner, at the
10 risk of seeming like I'm beating a dead horse or at the risk of
11 seeming that I simply don't understand what is going on here.
12 Are you contemplating a motion in which you ask me to stand
13 down and do nothing until the Canadian courts make some
14 determination here, or are you asking me to make a
15 determination on the four corners or the eight corners, however
16 you would like to look at it, that there can be no
17 indemnifiable event in light of the pleadings?
18     Both you and Mr. Rosenberg are telling me I can look
19 at the pleadings. I think that's what you are saying. He is
20 saying I look at them and I must find a duty to defend. You
21 are saying I look at them and I can only come to the conclusion
22 that it is a nonindemnifiable event.
23     MS. NEUNER: Your Honor, I would pull back from there.
24 I'm not going to ask you to actually make a declaratory
25 judgment in our favor. What I would say is this. I think it

| Easrdrec | Page 20 |
| --- | --- |

1 is appropriate to dismiss the case at this point because it is
2 nonjusticiable because there are simply not enough facts
3 developed in the Canadian action to determine the basis upon
4 which loss, which is a capitalized term in the EPA, is being
5 incurred. I could ask you to stay it, but I don't think that
6 is wise in terms of your own docket, because the Canadian
7 action could go on for years.
8     THE COURT: I'll say this. If that is the only thing
9 you are concerned about, I have the ability to basically just
10 add a number to the docket and it goes into a suspense docket.
11 Don't worry about me. That should not be the issue.
12     MS. NEUNER: OK.
13     THE COURT: And I am genuinely interested in the
14 issues involved in this case. So don't worry that I would be
15 happy to get it off my docket, no.
16     I want to be sure that if I have enough information in
17 front of me and should be deciding the issue, that I do, and I
18 can do that in a way that does not offend or friends to the
19 north. Similarly, if I should not be because of the position
20 of that, that's what I would like to know.
21     We are here today on a pre-motion conference, which to
22 me suggests that a motion is forthcoming. I think it is coming
23 from you.
24     MS. NEUNER: Yes.
25     THE COURT: I would like to know what it is. Let's go

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,

October 28, 2014

| Easrdrec | Page 21 |
|---|---|

1 that far.

2       MS. NEUNER: Your Honor, ours is a motion to dismiss
3 for a lack of a justiciable case or controversy.

4       THE COURT: All right.

5       MS. NEUNER: I have said this to Mr. Rosenberg.  If at
6 the end of the Canadian action liability is imposed on Dresser-
7 Rand for the full amount sought of $32 million and Madam
8 Justice Pritchard makes a finding that it is 100 percent the
9 fault of Ingersoll-Rand, at that point we would have a basis to
10 say this fits within an indemnifiable loss.  Then, honestly,
11 you wouldn't be seeing us, because the parties would be able to
12 work that out.

13       You could put it on the suspense calendar for five
14 years, but it may be that at the end of the Canadian action
15 there is again not a justiciable controversy, because the
16 parties have come to their own conclusion.

17       Suppose the converse were true.  Suppose Madam Justice
18 Pritchard said the judgment is imposed a hundred percent on
19 Ingersoll-Rand but the fault happened July 2012, a month before
20 the fire, because Dresser-Rand somehow made a mistake in the
21 final servicing.

22       Then we would have justiciable claim for indemnity and
23 it may turn out that it is Dresser-Rand who owes that.  If they
24 wouldn't agree to pay, then yes, we do agree that New York is
25 the right forum under the EPA, because we have a concrete

| Easrdrec | Page 22 |
|---|---|

1 dispute at that point for an entitled indemnifiable loss.

2       THE COURT: Let me ask this.  I want to make sure I'm
3 not getting this wrong.  I am looking at the plaintiff's
4 response, and it is on the third page.  There is some
5 discussion about the benefits of having both parties in the
6 Canadian case.  I think it has been clarified for me today that
7 regardless of how this particular dispute is resolved,
8 Ingersoll-Rand is in that Canadian action any way you look at
9 it.  Correct?

10       MS. NEUNER: Absolutely, your Honor, and the cross-
11 claim will be in that Canadian action.

12       THE COURT: To the extent the concern would be that
13 both parties need to be up in Canada to figure out how to
14 resolve this perhaps in a way short of five years of
15 litigation, you are talking about you're both in anyway.

16       MS. NEUNER: Yes, your Honor.

17       THE COURT: I understand that.  Is there anything
18 else?  Then I would like to hear back from Mr. Rosenberg.

19       MS. NEUNER: Your Honor, the only other point that we
20 have that went unaddressed in the opposition letter was the
21 very real argument that we would put into our motion to dismiss
22 that of the amount of loss that Yara Belle seeks, 13 million of
23 it is for property damage for the facility, 19 million, which
24 is roughly two-thirds, is for business interruption losses.

25       You will note in the EPA at 8.1(g) that the parties

| Easrdrec | Page 23 |
|---|---|

1 specifically contracted that the indemnity would not apply to
2 special damages.  New York law is very clear that business
3 interruption losses are special damages or consequential
4 damages or lost profits.  Canadian law literally defines
5 business interruption losses as lost profits.

6       We have a dispute about 19 million that isn't even
7 within definition of an indemnifiable loss.  I say that to you
8 because it is part of our motion to dismiss, and I want to give
9 Mr. Rosenberg a fair chance to respond.

10       THE COURT: I appreciate that.

11       MS. NEUNER: Thank you.

12       THE COURT: Mr. Rosenberg, anything you would like to
13 respond to Ms. Neuner?

14       MR. ROSENBERG: Yes, your Honor.  I'll take them kind
15 of in reverse order.

16       Starting with the business interruption loss, that is
17 a prime example of something that is decided in the New York
18 court, not the Canadian court, as far as the indemnity
19 obligations of each other.  That is something that whether or
20 not New York law applies, the court and the parties determined
21 we are going to let New York law apply, we are going to let
22 that dispute be decided here.  It gives a basis for why we have
23 this case here today.

24       The resolution issue.  The Court brought up
25 resolution.  I actually think there is nothing we can do about

| Easrdrec | Page 24 |
|---|---|

1 it, but the issue of resolution up in Canada is going to be
2 extremely difficult under the circumstances, because I think
3 both parties believe they are the smaller payor and the other
4 party is the primary payor.  That is going so make that very
5 difficult when we are talking about so much money.

6       THE COURT: Your argument is not really an argument
7 that I can use, but what you are saying is that as a practical
8 matter, if you were both aligned inasmuch as one of you is
9 covering the costs of the other, you would have perhaps more of
10 an interest to work with each other to see how it can be
11 resolved.

12       MR. ROSENBERG: Exactly.  This is going to be very
13 difficult.  I can imagine the two the gentlemen getting in a
14 room saying I'm the minor party, you're the minor party, etc.
15 It's difficult.

16       Also, why is there a justiciable controversy here?  We
17 all can surmise or speculate as to what the Canadian court can
18 do.  But the Canadian court can also in its determinations
19 leave us in a position of having interim interpretation by this
20 Court to determine the indemnity obligation.

21       Yes, they may say Ingersoll-Rand is entirely at fault,
22 they may say Dresser-Rand is entirely at fault, but they could
23 do a host of other things.  That is why it is this Court that
24 interprets that decision to determine the indemnity obligations
25 and makes this a justiciable controversy.

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,

October 28, 2014

1    THE COURT: I understand.  But I think Ms. Neuner's
2  point, and I am neither agreeing nor disagreeing with it, is
3  yes, someday we will have to do that if we can't come to an
4  agreement, but for now it is too soon, is what she is saying.
5    MR. ROSENBERG: On the indemnity issue, even though in
6  our letter we have cited numerous cases, including the
7  Associated Indemnity case and the Rosen v. Mega Bloks case,
8  which indicates that contractual indemnity obligations is
9  really not a major distinction from the insurance indemnity
10  obligations, what we are saying is yes, separate the indemnity
11  from the defense.
12    The indemnity this case needs to maintain jurisdiction
13  over and interpret what happens up there whenever it happens.
14  The defense obligation is distinguishable.  The defense
15  obligation is in fact a justiciable matter that needs to be
16  determined now based on, as that case law indicates, the
17  allegations in the complaint right now.  It could not be in,
18  our opinion, clearer.
19    Ms. Neuner indicated the various causes of action.
20  Yes, the Yara Belle complaint is very succinct in that regard.
21  There are three causes of action.  The second and third cause
22  of action are clearly claims limited to the conduct of Dresser-
23  Rand.  We don't believe those claims have merit.
24    But also that is going to get us into an interpret-
25  ation of the arising out of language in that product liability

1  definition that is set forth in the EPA.  It is our contention
2  that that still arises out of Ingersoll-Rand's efforts of
3  putting it into the stream of commerce.
4    THE COURT: I'm just asking you to slow down a little
5  bit, sir, for the reporter.
6    MR. ROSENBERG: I am a New Yorker by heart.
7    Those second and third causes of action do arise out
8  of Ingersoll-Rand's efforts of putting them in the stream of
9  the commerce.  We have a disagreement over the merits of those
10  claims, and I understand that's going to be decided elsewhere.
11    8.1(b), the indemnity due from Dresser-Rand to
12  Ingersoll-Rand, Ms. Neuner and I will have discussions about
13  the notice issue.  That is not before this Court.  That will
14  get resolved.  That is not a problem.  But I don't think that
15  is pertinent to what this Court needs to decide.
16    This Court needs to look at the other provisions of
17  8.1 that create the indemnity obligation.  I believe what this
18  Court needs to do is maintain jurisdiction over that, to
19  determine what happens in Canada.  The defense obligation is
20  ripe, and this Court needs to determine the defense obligation
21  based on the allegations in the complaint at this time.
22    THE COURT: Thank you.
23    Ms. Neuner, one quick follow-up question based on what
24  Mr. Rosenberg was saying.  If this were not the actual
25  situation where there is a contract between the parties, if

1  this were an insurer-insured situation, would you agree that
2  the duty to defend could be determined simply based on the
3  pleadings in the Canadian court?
4    MS. NEUNER: Yes, your Honor, because that is New York
5  law, yes.
6    THE COURT: It seems to me that one difference between
7  the parties is that you see Associated Indemnity Corporation
8  and things of that type and understand it and limit it to the
9  insurance context and not to this contractual context.
10    MS. NEUNER: Absolutely, your Honor, because that is
11  the law.
12    THE COURT: You both have told me what you believe the
13  law is.  I understand.  As much as I thought that we could
14  possibly resolve this short of a motion, I really didn't think
15  that was going to happen.  It doesn't seem that that is the
16  case.  While I appreciate very much the nuances that Mr.
17  Rosenberg has announced today, there are still some things that
18  do need to get resolved.  So, a motion is in the offing.
19    Let me look at the calendar.  I am ware that there are
20  holidays coming up.  My hope is to try and wreck as few of them
21  as possible for people.  Ms. Neuner, would you be able to
22  submit something on the 1st of December?
23    MS. NEUNER: Yes, your Honor.
24    THE COURT: Mr. Rosenberg, would you be able to submit
25  a response on the 5th of January or the 7th of January?

1    MR. ROSENBERG: That's fine, your Honor.
2    THE COURT: 7th of January, all right.  Then, Ms.
3  Neuner, that would make your response due the 21st of January,
4  your reply.
5    MS. NEUNER: Very good, your Honor.
6    THE COURT: I will ask the parties a couple of things.
7  Number one, please get a copy of today's transcript.  I don't
8  need it tomorrow, but I would like to see it in advance of the
9  parties' briefing.  There were a lot of very interesting points
10  made today, and I wish to study up on them before I actually
11  get the papers.
12    Secondly, I don't think on these facts that we need
13  extensions of the page limits.  I think you can get your
14  arguments in as need be.
15    Number three, and this is just perhaps too much to
16  ask, but I'm going to anyway.  If there is out there a more
17  legible copy of the purchase agreement, I would love to see it.
18  I have been able to get things downloaded from ECF, but at this
19  point it's been scanned and it is just not as good.  If it
20  exists, I would like to have it, but it is not urgent.
21    MS. NEUNER: OK.  We can work together.
22    MR. ROSENBERG: We can stipulate to the key language
23  of 8, 9.
24    MS. NEUNER: We will work together to make sure you
25  get one delivered directly to chambers that is a good and

**DRESSER-RAND COMPANY, v.**
**INGERSOLL RAND COMPANY,**                                         October 28, 2014

| Easrdrec | Page 29 |
|---|---|

 1  legible copy.
 2         THE COURT: Thank you.  I appreciate that indulgence.
 3         I believe that is all of the issues on my list.  Hold
 4  on one second, please.
 5         I will tell you, although this is a little bit of a
 6  formality, I believe our calendar lists an initial pretrial
 7  conference for the 19th of November.  We will adjourn that.
 8  What I will do is issue a scheduling order in the next day or
 9  so that has the dates we have just been talking about and also
10  adjourns the pretrial conference for the 19th.  Obviously, it
11  is less important now that we have had this conference.
12         Mr. Rosenberg, is there anything else that you want to
13  call to my attention?
14         MR. ROSENBERG: No, your Honor.  Thank you.
15         THE COURT: Ms. Cmielewski, you are allowed to speak
16  as well.
17         MS. CMIELEWSKI: I have nothing to add.  Mr. Rosenberg
18  here did a wonderful job.
19         THE COURT: Ms. Neuner, same thing, anything else?
20         MS. NEUNER: No, your Honor.  Thank you for your time.
21         THE COURT: Mr. Leibowitz, anything from you, sir?
22         MR. LEIBOWITZ: Nothing, thank you.
23         THE COURT: I feel if people are going to sit at
24  counsel table, they ought to have an opportunity to speak.  Mr.
25  Grenell?

| Easrdrec | Page 30 |
|---|---|

 1         MR. GRENELL: Nothing.  Thank you, your Honor.
 2         THE COURT: Thank you all for bringing these issues to
 3  light today and thank you for the attention that you have been
 4  paying to the documents and the law in this case.  I'm serious
 5  when I say these are very interesting issues.
 6         (Adjourned)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,

October 28, 2014

**$**

**$32 (2)**
8:15;21:7

**A**

**ability (1)**
20:9
**able (5)**
16:9;21:11;27:21,24;
28:18
**absolutely (7)**
5:7;9:7;12:19;13:6;
18:25;22:10;27:10
**acknowledges (1)**
6:25
**acquired (1)**
17:19
**acquisition (1)**
14:4
**action (18)**
3:22;4:23;11:19,21;
12:5;14:25;18:5,6;
20:3,7;21:6,14;22:8,
11;25:19,21,22;26:7
**actions (2)**
15:11,13
**acts (5)**
15:17,25;16:2,17;
18:14
**actual (1)**
26:24
**actually (6)**
12:7;16:23;17:20;
19:24;23:25;28:10
**add (2)**
20:10;29:17
**adjourn (1)**
29:7
**Adjourned (1)**
30:6
**adjourns (1)**
29:10
**admission (1)**
12:17
**advance (1)**
28:8
**afternoon (4)**
2:2,5,6,11
**again (1)**
21:15
**against (6)**
3:12;10:19;15:1,7;
18:5,7
**ago (1)**
15:21
**agree (6)**
7:3;9:12;12:19;
21:24,24;27:1
**agreeing (1)**
25:2

**agreement (17)**
2:25;3:6;4:4,21;7:13,
21;8:24;9:1,9,14,22,22;
10:4,8;13:25;25:4;
28:17
**Alberta (3)**
9:25;10:2,6
**aligned (1)**
24:8
**allegations (10)**
4:11,15,19;5:1,3,8,
19;8:2;25:17;26:21
**allege (1)**
5:4
**alleged (3)**
14:13;15:11,13
**allowed (1)**
29:15
**allowing (1)**
7:18
**although (1)**
29:5
**ambiguous (1)**
15:16
**amount (2)**
21:7;22:22
**analogous (2)**
4:12;5:8
**analysis (2)**
7:18;12:10
**analyzing (1)**
3:20
**announced (1)**
27:17
**apologize (1)**
3:25
**applies (2)**
19:5;23:20
**apply (4)**
3:10,16;23:1,21
**appoint (1)**
14:16
**apportionment (1)**
12:23
**appreciate (4)**
9:17;23:10;27:16;
29:2
**approached (1)**
12:14
**appropriate (1)**
20:1
**area (4)**
2:14;6:2;11:10;
12:18
**arguably (1)**
5:4
**argument (8)**
5:17;9:24;11:8;16:6,
11;22:21;24:6,6
**arguments (5)**
8:23;9:12,17;11:7;
28:14
**arise (1)**

26:7
**arises (1)**
26:2
**arising (1)**
25:25
**articulation (1)**
10:13
**assert (2)**
10:19;14:15
**asserted (2)**
4:19;15:7
**assessed (1)**
8:10
**Associated (3)**
11:25;25:7;27:7
**ation (1)**
25:25
**attention (3)**
3:3;29:13;30:3
**attorney's (1)**
8:7
**August (1)**
15:6
**avoid (1)**
5:14
**aware (1)**
6:15

**B**

**back (7)**
7:1,13,22;10:22;
17:7;19:23;22:18
**barest (1)**
18:17
**Bartlett (1)**
2:7
**based (12)**
2:21;4:11,15,18;
6:10;7:2;8:2,3;25:16;
26:21,23;27:2
**basically (3)**
6:18;8:7;20:9
**basis (5)**
11:21;12:25;20:3;
21:9;23:22
**beating (1)**
19:10
**becomes (1)**
10:8
**behind (1)**
5:1
**believes (1)**
14:13
**Belle (12)**
3:12;4:13,19;6:19;
8:3,14;10:14;13:13,16;
14:25;22:22;25:20
**benefits (1)**
22:5
**bit (6)**
9:2;10:10,16;11:9;
26:5;29:5

**Bloks (1)**
25:7
**borne (1)**
18:13
**both (14)**
3:20,23;8:19;11:11;
12:22;15:8,16;19:18;
22:5,13,15;24:3,8;
27:12
**breach (1)**
15:3
**briefing (1)**
28:9
**Briefly (1)**
4:3
**bring (2)**
4:20;16:24
**bringing (1)**
30:2
**broad (2)**
9:18;16:23
**broader (2)**
13:8;18:21
**brought (1)**
23:24
**business (5)**
17:10;22:24;23:2,5,
16
**buyers (1)**
17:7

**C**

**calendar (3)**
21:13;27:19;29:6
**call (6)**
3:3;6:21,22;10:12;
13:10;29:13
**called (1)**
2:1
**can (20)**
4:7;6:14;7:21,22;
12:5;14:13;19:16,18,
21;20:18;23:25;24:7,
10,13,17,17,18;28:13,
21,22
**Canada (10)**
7:2,7;10:7;12:18;
15:3,4;18:3;22:13;
24:1;26:19
**Canada's (1)**
15:2
**Canadian (30)**
4:23;5:3,15;6:3,11,
13,17,17,22;8:4;9:24;
10:11;11:21;14:16,21;
18:3,6;19:13;20:3,6;
21:6,14;22:6,8,11;23:4,
18;24:17,18;27:3
**candor (2)**
9:23;12:14
**capitalized (1)**
20:4

**capture (1)**
16:23
**careful (1)**
5:16
**Carolina (3)**
2:9,12,16
**Case (28)**
2:1,20;6:3;7:19;9:3,
19,25;10:9,11;11:20,
24,24;12:1,9,10;18:10,
15;20:1,14;21:3;22:6;
23:23;25:7,7,12,16;
27:16;30:4
**cases (1)**
25:6
**cause (1)**
25:21
**causes (4)**
14:25;25:19,21;26:7
**central (1)**
19:7
**certain (2)**
10:2;13:6
**challenge (1)**
6:4
**challenged (1)**
3:10
**chambers (1)**
28:25
**chance (2)**
2:19;23:9
**change (1)**
10:6
**characterized (1)**
14:10
**checked (1)**
12:7
**choice (1)**
7:21
**Circuit (1)**
11:24
**circumstances (1)**
24:2
**cited (2)**
12:7;25:6
**claim (9)**
8:15,17;12:6;13:15;
15:7;16:4,19;21:22;
22:11
**claims (6)**
5:6;13:13,20;25:22,
23;26:10
**clarification (1)**
8:13
**clarified (1)**
22:6
**clear (2)**
14:7;23:2
**clearer (1)**
25:18
**clearly (5)**
4:14;6:15;8:16,21;
25:22

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,

October 28, 2014

**clients (1)**
17:9
**close (1)**
9:19
**closing (6)**
16:1,7,24;17:11;
18:14
**Cmielewski (3)**
2:4;29:15,17
**co-counsel (1)**
10:25
**coming (5)**
2:17;5:13;18:11;
20:22;27:20
**comment (1)**
7:23
**commerce (2)**
26:3,9
**companies (1)**
3:13
**company (1)**
14:2
**compensates (1)**
7:1
**complaint (17)**
2:24;4:12,12;8:3,14,
21,21;9:4;13:12,13,16;
14:25;15:7,15;25:17,
20;26:21
**complicated (1)**
3:6
**components (2)**
15:12,13
**concern (2)**
5:13;22:12
**concerned (1)**
20:9
**conclusion (2)**
19:21;21:16
**concrete (1)**
21:25
**conduct (2)**
17:10;25:22
**conference (7)**
2:19,21;12:13;20:21;
29:7,10,11
**connection (1)**
3:9
**consequential (1)**
23:3
**consider (1)**
10:5
**constant (1)**
6:16
**contact (1)**
6:16
**contemplating (1)**
19:12
**contention (1)**
26:1
**context (3)**
13:24;27:9,9
**contract (6)**

**COURT (82)**
2:5,11,17;3:16,24;
4:1,16,24,25;5:11,15,
23,25;6:1,9,11,12,13,
15,17,18;7:1,2,8,24;
8:4,6,12,19;9:1,8,16,
23;10:7,10,14,22;11:3,
15,23;16:6,13;17:13;
19:9;20:8,13,25;21:4;
22:2,12,17;23:10,12,
18,18,20,24;24:6,17,
18,20,23;25:1;26:4,13,
15,16,18,20,22;27:3,6,
12,24;28:2,6;29:2,15,
19,21,23;30:2
**courts (2)**
3:15;19:13
**Court's (1)**
7:3
**covenants (1)**
14:5
**coverage (4)**
12:1,3;13:6,15
**covering (1)**
24:9
**create (2)**
4:14;26:17
**creates (2)**
4:13,14
**creating (1)**

**5:16**
**cross- (1)**
22:10
**cross-claim (4)**
6:21,23;10:19;18:5
**cross-claims (2)**
18:2,7

# D

**damage (1)**
22:23
**damages (6)**
6:19;8:9;10:13;23:2,
3,4
**date (2)**
8:8;17:11
**dates (1)**
29:9
**David (1)**
2:4
**Davidson (1)**
2:16
**day (2)**
18:2;29:8
**dead (1)**
19:10
**December (1)**
27:22
**decide (5)**
8:25;9:10;11:11,13;
26:15
**decided (7)**
3:14;6:7;13:7;18:23;
23:17,22;26:10
**deciding (2)**
18:24;20:17
**decision (3)**
3:15;18:8;24:24
**decision-making (1)**
14:17
**declaratory (2)**
3:22;19:24
**defend (16)**
4:5;5:20,22;7:12,14,
18,19;8:1,2,7;13:8,17;
14:9;18:21;19:20;27:2
**defending (1)**
8:10
**defense (34)**
2:22;3:18,23;4:1,3,8,
8,9,11,13,15,16,18,23,
24;5:6,10;7:5;8:16;
11:13;12:24;13:3,21;
14:8,15;18:4,20,23;
19:3;25:11,14,14;
26:19,20
**defenses (3)**
10:2,4,17
**defines (1)**
23:4
**definition (5)**
15:24;16:5,18;23:7;

**26:1**
**delivered (1)**
28:25
**demand (1)**
10:13
**denied (1)**
10:7
**dependent (1)**
10:20
**determination (11)**
4:1;6:24;12:3,3,5,25;
14:19,23;18:12;19:14,
15
**determinations (2)**
6:4;24:18
**determine (11)**
4:16;5:1;6:18,21,23;
7:3;20:3;24:20,24;
26:19,20
**determined (8)**
3:14;8:18,22;11:21;
18:9;23:20;25:16;27:2
**determiner (1)**
13:15
**determines (1)**
6:9
**determining (1)**
5:19
**developed (1)**
20:3
**difference (2)**
7:9;27:6
**different (8)**
2:12;6:22;8:1,20;
10:16;11:6;12:2,10
**difficult (4)**
24:2,5,13,15
**directly (1)**
28:25
**disagreeing (1)**
25:2
**disagreement (1)**
26:9
**discussion (2)**
14:8;22:5
**discussions (2)**
9:4;26:12
**dismiss (6)**
10:6;11:19;20:1;
21:2;22:21;23:8
**dispute (7)**
9:5;18:18;19:7;22:1,
7;23:6,22
**disputes (1)**
3:14
**distance (1)**
17:13
**distinction (4)**
7:25;13:4;15:23;
25:9
**distinguishable (1)**
25:14
**distribution (1)**

**14:3**
**diversified (1)**
14:1
**docket (4)**
20:6,10,10,15
**document (2)**
3:7;15:20
**documents (2)**
10:12;30:4
**Donnelly (2)**
2:10,15
**down (5)**
2:16;14:21;17:21;
19:13;26:4
**downloaded (1)**
28:18
**Dresser- (4)**
3:7,25;21:6;25:22
**Dresser-Rand (32)**
3:13,14,25;6:20;
12:16,20;14:11;15:1,2,
3,4,8,12,17;16:3,8,9,14,
24;17:2,11,19,20,23;
18:5,7,13;19:8;21:20,
23;24:22;26:11
**Dresser-Rand's (2)**
15:12;16:17
**due (2)**
26:11;28:3
**duty (32)**
4:6;5:20,22;7:12,17,
18,19,20,25;8:1,1,3,7,9,
22,25;13:5,7,8,17;15:9,
11,13;16:7,8,8,10;17:3;
18:21,21;19:20;27:2

# E

**early (1)**
15:19
**ECF (1)**
28:18
**effectively (1)**
7:19
**effort (1)**
9:5
**efforts (2)**
26:2,8
**eight (3)**
13:11;16:15;19:15
**either (5)**
4:7;7:21;10:5,15;
13:10
**elected (1)**
4:20
**election (1)**
14:14
**else (4)**
9:13;22:18;29:12,19
**elsewhere (1)**
26:10
**employ (1)**
4:20

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,

October 28, 2014

encompasses (1)
  8:7
end (4)
  14:20;18:2;21:6,14
engaged (1)
  14:2
enough (4)
  8:6;9:17;20:2,16
entered (5)
  3:7;6:6;9:21,22;10:4
entire (1)
  11:19
entirely (2)
  24:21,22
entities (3)
  2:8;15:8,16
entitled (3)
  19:6,8;22:1
entity (1)
  15:4
EPA (7)
  15:20;16:21;17:22;
  20:4;21:25;22:25;26:1
equity (5)
  3:6;4:4;13:25
essentially (1)
  15:9
etc (1)
  24:14
even (3)
  16:18;23:6;25:5
event (3)
  11:17;19:17,22
exactly (2)
  10:1;24:12
example (1)
  23:17
exception (2)
  15:24,25
exchanging (1)
  10:12
excluded (1)
  16:5
exists (2)
  8:5;28:20
expander (3)
  15:5,14;16:16
expander's (1)
  15:11
expect (1)
  10:21
experience (1)
  11:10
explain (1)
  7:10
extensions (1)
  28:13
extent (2)
  16:14;22:12
extremely (1)
  24:2

**F**

facility (1)
  22:23
fact (8)
  8:5;13:14;14:7,23;
  18:3,6,24;25:15
facts (5)
  7:11,16,20;20:2;
  28:12
Failla (1)
  2:6
failure (2)
  15:5;16:16
Fair (3)
  8:6;9:17;23:9
Fairchild (1)
  11:25
fairly (1)
  15:16
far (2)
  21:1;23:18
fault (5)
  12:23;21:9,19;24:21,
  22
favor (1)
  19:25
feel (1)
  29:23
fees (5)
  4:10,22,23;8:7;19:3
few (2)
  10:23;27:20
fication (2)
  14:6;18:3
fight (1)
  14:17
figure (1)
  22:13
filed (6)
  3:11;4:13;9:5;10:5,
  17,19
final (3)
  12:18,24;21:21
find (3)
  9:16;11:16;19:20
finding (3)
  7:19;8:4;21:8
fine (1)
  28:1
fire (3)
  6:19;16:17;21:20
firm (1)
  15:21
first (12)
  2:21;5:12;7:14;8:18;
  13:3;14:1,14;17:3,7,19,
  19,22
fit (1)
  13:16
fits (1)
  21:10

five (2)
  21:13;22:14
flowing (1)
  3:9
Following (3)
  4:25;15:25;16:2
follow-up (1)
  26:23
formal (1)
  10:14
formality (1)
  29:6
formed (1)
  16:15
forth (1)
  26:1
forthcoming (2)
  17:25;20:22
forum (1)
  21:25
forward (4)
  9:11;13:21;14:15;
  18:10
found (3)
  7:20;12:20,21
four (4)
  13:10,12,13;19:15
frequency (1)
  12:7
friends (1)
  20:18
front (2)
  14:19;20:17
full (1)
  21:7

**G**

gave (1)
  17:7
gentlemen (1)
  24:13
genuinely (1)
  20:13
gets (5)
  6:2,3;12:7;14:21;
  17:5
gives (2)
  4:6;23:22
goes (1)
  20:10
Good (11)
  2:2,5,6,11;11:3;
  12:13;16:15;17:13;
  28:5,19,25
grateful (1)
  9:10;12:13
great (1)
  17:17
greater (1)
  2:25
Grenell (3)
  2:4;29:25;30:1

grew (1)
  2:12
group (2)
  13:25;17:11
guess (3)
  9:10,16;17:14

**H**

happen (1)
  27:15
happened (3)
  6:12;7:2;21:19
happens (7)
  6:10,17;7:7;10:20;
  25:13,13;26:19
happy (1)
  20:15
hard (1)
  2:24
headquarters (1)
  2:13
hear (3)
  3:3;9:1;22:18
heard (1)
  9:25
hearing (1)
  10:24
heart (1)
  26:6
heavy (1)
  14:2
Hold (1)
  29:3
holidays (1)
  27:20
honestly (1)
  21:10
Honor (29)
  2:2;3:5;5:7,21;7:23;
  11:1,14,18;12:11;15:1,
  24;16:12,25;17:17;
  19:4,23;21:2;22:10,16,
  19;23:14;27:4,10,23;
  28:1,5;29:14,20;30:1
hook (1)
  14:23
hope (1)
  27:20
horse (1)
  19:10
host (1)
  24:23
hundred (2)
  6:2;21:18

**I**

idea (1)
  7:12
ii (1)
  17:11
imagine (1)

24:13
immense (1)
  24:19
impermissibly (1)
  5:16
implicates (1)
  5:5
important (3)
  13:4;15:22;29:11
imposed (4)
  11:22;12:25;21:6,18
inappropriately (1)
  5:16
inasmuch (2)
  2:19;24:8
includes (2)
  8:9;17:9
including (1)
  25:6
inconsistent (3)
  5:17;6:4;18:11
incurred (3)
  4:22;19:3;20:5
indemni- (2)
  14:5;18:2
indemnifiable (8)
  5:5;11:16;12:4;
  16:19;19:17;21:10;
  22:1;23:7
indemnification (8)
  8:4;12:17;17:1,15,
  21;18:19;19:6,8
indemnified (2)
  16:4;19:5
indemnify (12)
  7:17,20;8:1,3,9,22,
  25;13:5,9,24;17:4;
  18:22
indemnifying (1)
  4:7
indemnities (1)
  19:1
indemnity (42)
  3:18,23;4:2,9,14;5:6,
  9,22,23;6:10,24;7:3,4,
  6;8:15;9:20,21;11:25;
  12:6;14:12,24;16:10,
  23;17:7,8,18;18:15,24;
  21:22;23:1,18;24:20,
  24;25:5,7,8,9,10,12;
  26:11,17;27:7
indicate (1)
  10:10
indicated (1)
  25:19
indicates (3)
  8:14;25:8,16
individual (1)
  15:17
indulgence (1)
  29:2
industrial (1)
  14:2

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,                                                                          October 28, 2014

**information (2)**
  17:24;20:16
**Ingersoll- (3)**
  3:12;11:1;18:3
**Ingersoll-Rand (34)**
  2:8,10;3:8,13;4:7,19;
  5:9;6:20;7:13;10:20;
  12:21;14:1,12,12,19,
  23;15:8,10,18;16:1,3,6;
  17:2,5,6,8,9,15;18:15;
  21:9,19;22:8;24:21;
  26:12
**Ingersoll-Rand's (6)**
  2:13;15:10;16:22;
  18:7;26:2,8
**in-house (2)**
  2:4,10
**initial (2)**
  2:18;29:6
**initiated (1)**
  3:12
**insurance (12)**
  4:12;5:8;12:1,4,9;
  13:5,6,8,18;14:6;25:9;
  27:9
**insurer (3)**
  13:17,19,21
**insurer-insured (1)**
  27:1
**interest (2)**
  3:8;24:10
**interested (1)**
  20:13
**interesting (2)**
  28:9;30:5
**interpret (1)**
  25:13
**interpret- (1)**
  25:24
**interpretation (1)**
  24:19
**interprets (1)**
  24:24
**interruption (4)**
  22:24;23:3,5,16
**into (11)**
  3:7;6:2,3,6;9:22;
  10:4;15:20;20:10;
  22:21;25:24;26:3
**intuitions (1)**
  12:12
**invoices (1)**
  18:20
**involved (1)**
  20:14
**involving (1)**
  12:1
**IPO (1)**
  17:20
**irrelevant (1)**
  10:8
**issue (16)**
  4:11,24;8:16,16;

  9:20,21,24;11:11,13;
  20:11,17;23:24;24:1;
  25:5;26:13;29:8
**issues (12)**
  2:20;3:17,20,21;6:5,
  21,23;9:10;20:14;29:3;
  30:2,5

**J**

**January (4)**
  27:25,25;28:2,3
**Jersey (1)**
  2:13
**job (2)**
  16:15;29:18
**Judge (2)**
  2:6;13:11
**judgment (7)**
  3:22;8:8;12:18,24;
  18:20;19:25;21:18
**judgments (1)**
  5:17
**July (1)**
  21:19
**jurisdiction (2)**
  25:12;26:18
**jury (1)**
  5:2
**Justice (4)**
  18:8,11;21:8,17
**justiciable (7)**
  11:20;21:3,15,22;
  24:16,25;25:15

**K**

**keep (1)**
  11:24
**key (2)**
  18:17;28:22
**kind (1)**
  23:14
**known (1)**
  11:24

**L**

**lack (2)**
  11:10;21:3
**language (1)**
  19:4;25:25;28:22
**large (1)**
  8:17
**last (1)**
  7:23
**later (1)**
  8:8
**law (11)**
  10:3;13:7;23:2,4,20,
  21;25:16;27:5,11,13;
  30:4
**lawsuit (3)**

  3:11;5:3;17:5
**leave (1)**
  24:19
**left (1)**
  2:4
**legal (5)**
  3:20;4:9,22,22;13:4
**legible (2)**
  28:17;29:1
**Leibowitz (3)**
  2:8;29:21,22
**less (1)**
  29:11
**letter (3)**
  11:15;22:20;25:6
**liability (7)**
  13:18;14:9;15:19,22,
  23;21:6;25:25
**liable (4)**
  6:18;12:21,22;14:20
**life (1)**
  2:12
**light (3)**
  11:4;19:17;30:3
**limit (1)**
  27:8
**limited (2)**
  5:21;25:22
**limits (1)**
  28:13
**list (1)**
  29:3
**lists (1)**
  29:6
**literally (3)**
  12:24;16:4;23:4
**litigation (4)**
  3:12;9:6;14:21;
  22:15
**little (8)**
  6:22;8:20;9:2;10:10,
  16;11:9;26:4;29:5
**longer (1)**
  16:7
**look (9)**
  5:3;14:24;19:16,18,
  20,21;22:8;26:16;
  27:19
**looked (1)**
  9:11
**looking (4)**
  3:19;8:24;9:2;22:3
**loss (15)**
  11:22;12:25;14:9,13,
  20;15:22,23;18:12,19;
  20:4;21:10;22:1,22;
  23:7,16
**losses (4)**
  17:9;22:24;23:3,5
**lost (2)**
  23:4,5
**lot (7)**
  3:19,20;6:4;8:22,23;

  13:6;28:9
**love (1)**
  28:17
**Lynn (1)**
  2:6

**M**

**machinery (2)**
  14:2;16:3
**Madam (2)**
  18:7,11;21:7,17
**maintain (2)**
  25:12;26:18
**major (1)**
  25:9
**makes (2)**
  21:8;24:25
**making (5)**
  11:6;12:13;14:11;
  16:4,11
**manufacturing (1)**
  14:2
**many (1)**
  9:9
**Margaret (1)**
  2:3
**matter (3)**
  11:12;24:8;25:15
**may (9)**
  4:13;11:3,5,6,10;
  21:14,23;24:21,22
**maybe (1)**
  9:3
**means (1)**
  16:1
**Mega (1)**
  25:7
**member (1)**
  17:10
**merger (3)**
  14:4;15:20;18:14
**merit (1)**
  25:23
**merits (1)**
  26:9
**might (4)**
  2:18;5:2;10:22;
  14:20
**million (5)**
  8:15;21:7;22:22,23;
  23:6
**mind (2)**
  11:24;13:20
**mine (1)**
  17:14
**minor (2)**
  24:14,14
**minutes (1)**
  10:23
**misconception (1)**
  16:22
**misper- (1)**

  16:14
**misperceiving (1)**
  7:10
**mistake (1)**
  21:20
**modified (1)**
  11:5
**money (1)**
  24:5
**month (1)**
  21:19
**Montvale (1)**
  2:14
**more (5)**
  7:17;9:2;13:7;24:9;
  28:16
**motion (9)**
  10:5;11:19;19:12;
  20:22;21:2;22:21;23:8;
  27:14,18
**moved (1)**
  2:16
**moving (1)**
  6:14
**much (6)**
  6:12;10:22;24:5;
  27:13,16;28:15
**must (2)**
  5:19;19:20

**N**

**named (1)**
  17:5
**necessarily (1)**
  8:8
**need (9)**
  5:18;7:6;9:10;13:2;
  22:13;27:18;28:8,12,
  14
**needed (1)**
  8:12
**needs (7)**
  8:17;25:12,15;26:15,
  16,18,20
**negligence (2)**
  15:2;16:24
**neither (2)**
  11:12;25:2
**NEUNER (35)**
  2:6,7;5:12;10:24;
  11:1,14,18;12:11;
  16:12,14;17:17;19:9,
  23;20:12,24;21:2,5;
  22:10,16,19;23:11,13;
  25:19;26:12,23;27:4,
  10,21,23;28:3,5,21,24;
  29:19,20
**Neuner's (2)**
  8:23;25:1
**New (13)**
  2:13;3:15;6:8,9;13:7,
  10;21:24;23:2,17,20,

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,                                                                October 28, 2014

21;26:6;27:4

**next (2)**
18:6;29:8
**Noah (1)**
2:8
**nonetheless (1)**
2:23
**nonindemnifiable (1)**
19:22
**nonjusticiable (1)**
20:2
**nor (1)**
25:2
**normal (1)**
14:4
**North (4)**
2:9,11,16;20:19
**northern (2)**
2:12;12:18
**note (1)**
22:25
**notice (3)**
4:4;18:4;26:13
**November (2)**
10:19;29:7
**nuances (1)**
27:16
**number (3)**
20:10;28:7,15
**numerous (1)**
25:6

## O

**obligation (34)**
3:18,19;4:2,2,3,9,13,
14,15,17,18:5:6,9,22;
6:7,10,25;7:4,5,6;8:4;
13:23;14:9;17:22;
18:16,19,23,24;24:20;
25:14,15;26:17,19,20
**obligations (9)**
3:9,11,23,23;14:6;
23:19;24:24;25:8,10
**obvious (1)**
18:1
**obviously (2)**
10:16;29:10
**occur (1)**
10:21
**occurred (1)**
6:19
**off (3)**
17:2,20;20:15
**offend (1)**
20:18
**offing (1)**
27:18
**OK (6)**
5:25;7:24;11:15;
16:13;20:12;28:21
**omissions (4)**
15:25;16:2,17;18:14

**Once (1)**
6:24
**one (15)**
3:9,18,18;6:25;
10:15;11:24;12:20;
15:1;16:20;24:8;26:23;
27:6;28:7,25;29:4
**ongoing (2)**
12:6;17:21
**only (5)**
5:21;8:5;19:21;20:8;
22:19
**opinion (1)**
25:18
**opportunity (5)**
4:5,5,6;14:8;29:24
**opposing (1)**
8:20
**opposition (1)**
22:20
**options (1)**
4:6
**order (3)**
10:3;23:15;29:8
**otherwise (1)**
2:18
**ought (2)**
4:25;29:24
**ours (1)**
21:2
**out (10)**
7:8;9:16;16:20;
21:12,23;22:13;25:25;
26:2,7;28:16
**over (3)**
25:13;26:9,18
**owe (1)**
4:9
**owes (1)**
21:23
**own (6)**
4:20;11:10;15:17;
18:14;20:6;21:16

## P

**page (2)**
22:4;28:13
**pages (1)**
15:15
**papers (2)**
9:3;28:11
**Part (4)**
13:18;14:4;15:2;
23:8
**particular (3)**
11:10;14:22;22:7
**parties (17)**
3:7;6:6;9:4,8,14,21;
18:18;21:11,16;22:5,
13,25;23:20;24:3;
26:25;27:7;28:6
**parties' (2)**

3:1;28:9
**partner (1)**
2:8
**party (6)**
4:7;6:25;19:5;24:4,
14,14
**pay (4)**
4:21;7:22;13:21;
21:24
**paying (1)**
30:4
**payor (2)**
24:3,4
**peace (1)**
13:20
**people (2)**
27:21;29:23
**percent (3)**
6:2;21:8,18
**perhaps (3)**
22:14;24:9;28:15
**periodically (1)**
4:22
**pertinent (1)**
26:15
**Pete (1)**
2:9
**philosophical (1)**
13:4
**pick (3)**
4:8,8;5:10
**picked (1)**
14:7
**picture (1)**
14:21
**plaintiffs (2)**
2:3,22
**plaintiff's (2)**
8:15;22:3
**plant (1)**
6:20
**pleadings (5)**
7:18;9:3;19:17,19;
27:3
**Please (3)**
11:23;28:7;29:4
**pled (2)**
8:20,21
**plus (1)**
8:10
**point (14)**
5:23;9:24;13:1;
16:20,24;18:17;19:4,8;
20:1;21:9;22:1,19;
25:2;28:19
**points (1)**
28:9
**policy (5)**
13:5,8,14,17;14:6
**portion (1)**
9:12
**position (2)**
20:19;24:19

**positions (1)**
3:2
**possibility (2)**
5:9,14
**possible (2)**
13:15;27:21
**possibly (1)**
27:14
**post- (1)**
16:23
**post-closing (3)**
16:9,17;17:5
**practical (4)**
3:21;6:5;7:9;24:7
**preclosing (1)**
17:4
**predecessor (1)**
3:8
**preliminary (1)**
11:7
**premature (4)**
8:16,24;11:19;12:19
**premiums (1)**
13:19
**pre-motion (2)**
2:20;20:21
**present (1)**
11:1
**preserve (1)**
10:3
**pretrial (3)**
2:18;29:6,10
**primary (1)**
24:4
**prime (1)**
23:17
**Pritchard (4)**
18:8,11;21:8,18
**private (1)**
13:25
**probably (1)**
9:23
**problem (2)**
6:6;26:14
**procedure (1)**
10:7
**proceed (1)**
3:21
**proceeding (1)**
18:10
**process (2)**
10:12,14
**product (1)**
25:25
**products (3)**
14:9;15:22,23
**profits (2)**
23:4,5
**progress (1)**
12:13
**property (1)**
22:23
**proposition (1)**

12:1
**protection (2)**
13:19;17:6
**provides (1)**
4:4
**provision (2)**
16:20;19:1
**provisions (1)**
26:16
**pull (1)**
19:23
**purchase (4)**
3:6;4:4;13:25;28:17
**purposes (1)**
5:19
**put (4)**
13:13;15:21;21:13;
22:21
**putting (3)**
18:4;26:3,8

## Q

**quick (1)**
26:23
**quite (1)**
14:7

## R

**raised (1)**
8:2
**raises (1)**
6:4
**Rand (6)**
3:13;4:1;11:2;18:4;
21:7;25:23
**Rand's (1)**
3:8
**reach (1)**
7:12
**read (2)**
2:24;15:9
**real (1)**
22:21
**really (10)**
3:17;6:9;9:10,18;
10:8,20;17:13;24:6;
25:9;27:14
**real-time (1)**
19:3
**reason (3)**
9:22;12:19;16:16
**receive (1)**
16:9
**received (1)**
2:21
**receives (1)**
13:19
**reciprocal (1)**
16:25
**refusal (2)**
7:14;14:14

DRESSER-RAND COMPANY, v.
INGERSOLL RAND COMPANY,

October 28, 2014

**regard (1)**
    25:20
**regardless (1)**
    22:7
**reimbursement (1)**
    19:3
**renders (1)**
    12:10
**reply (1)**
    28:4
**report (1)**
    6:14
**reporter (1)**
    26:5
**representations (2)**
    12:15;14:5
**representing (1)**
    2:7
**request (2)**
    12:17;14:12
**requires (1)**
    7:17
**Reserve (6)**
    14:1;17:3,7,19,19,22
**resolution (3)**
    23:24,25;24:1
**resolve (4)**
    5:2;9:5;22:14;27:14
**resolved (4)**
    22:7;24:11;26:14;
    27:18
**resolving (1)**
    9:19
**respect (3)**
    3:1;8:19;16:3
**respond (2)**
    23:9,13
**responded (1)**
    10:14
**response (3)**
    22:4;27:25;28:3
**responsible (2)**
    14:13;16:18
**result (2)**
    17:10;18:13
**resulting (2)**
    6:19;18:20
**reverse (1)**
    23:15
**right (10)**
    2:3;6:12;7:14;8:7;
    14:14;18:25;21:4,25;
    25:17;28:2
**rightly (1)**
    18:9
**ripe (3)**
    7:5;8:17;26:20
**rise (1)**
    5:8
**risk (4)**
    5:17;18:9;19:10,10
**role (1)**
    7:3

**Roman (1)**
    17:11
**room (1)**
    24:14
**Rosen (1)**
    25:7
**ROSENBERG (39)**
    2:2,3,23;3:5,25;5:7,
    21,24;6:1,14;7:23,25;
    8:11,14;9:7,15,20;
    11:4;12:14;14:10;
    17:24;19:1,18;21:5;
    22:18;23:9,12,14;
    24:12;25:5;26:6,24;
    27:17,24;28:1,22;
    29:12,14,17
**roughly (2)**
    8:15;22:24
**rule (2)**
    13:10,11
**running (2)**
    10:2,3

**S**

**same (2)**
    18:19;29:19
**Saskatchewan (11)**
    3:11;6:16;10:1,3,6,7,
    9;12:18,21,22;18:5
**saying (6)**
    12:12;16:1,7;19:19,
    20,21;24:7,14;25:4,10;
    26:24
**scanned (1)**
    28:19
**schedule (2)**
    6:15;10:11
**scheduling (1)**
    29:8
**search (1)**
    13:14
**Second (5)**
    11:24;15:2;25:21;
    26:7;29:4
**Secondly (1)**
    28:12
**section (4)**
    4:3,21;14:5;18:25
**seeing (1)**
    21:11
**seeking (4)**
    3:22;4:1;5:23;17:15
**seeks (1)**
    22:22
**seem (1)**
    27:15
**seeming (2)**
    19:10,11
**seems (1)**
    27:6
**selection (1)**
    14:16

**seller (2)**
    17:18,18
**selling (1)**
    17:2
**sense (1)**
    9:2
**separate (3)**
    5:22;18:21;25:10
**serious (1)**
    30:4
**serve (1)**
    2:18
**servicing (3)**
    15:5;16:15;21:21
**set (1)**
    26:1
**settle (1)**
    14:18
**shall (2)**
    3:5;19:5
**shores (1)**
    16:21
**short (3)**
    9:5;22:14;27:14
**side (3)**
    11:12;13:13,13
**sides (1)**
    11:11
**Similarly (2)**
    5:15;20:19
**simply (6)**
    5:2;7:17;15:18;
    19:11;20:2;27:2
**Simpson (1)**
    2:7
**sit (1)**
    29:23
**situation (4)**
    14:11,22;26:25;27:1
**six (1)**
    15:15
**six-page (1)**
    13:12
**Skadden (1)**
    15:21
**slightly (2)**
    11:6;12:2
**slow (1)**
    26:4
**slowly (1)**
    6:14
**smaller (1)**
    24:3
**sole (1)**
    15:4
**solely (2)**
    15:1,10
**solution (2)**
    6:5,8
**someday (1)**
    25:3
**somehow (1)**
    21:20

**soon (1)**
    25:4
**sought (3)**
    12:6;18:20;21:7
**sounded (1)**
    11:11
**speak (2)**
    29:15,24
**special (2)**
    23:2,3
**specifically (2)**
    17:8;23:1
**speculate (1)**
    24:17
**spent (4)**
    3:19,20;8:22,23
**spin-off (1)**
    17:23
**spot-on (1)**
    12:11
**spun (1)**
    17:20
**stand (1)**
    19:12
**stands (1)**
    11:25
**start (3)**
    2:23;12:12;19:5
**Starting (1)**
    23:16
**statement (1)**
    18:4
**stay (2)**
    11:12;20:5
**step (1)**
    13:21
**stepping (3)**
    5:14;6:3;18:10
**still (2)**
    26:2;27:17
**stipulate (1)**
    28:22
**strategic (2)**
    14:1,17
**stream (2)**
    26:3,8
**study (1)**
    28:10
**submissions (2)**
    2:21;3:1
**submit (3)**
    10:17;27:22,24
**subpart (1)**
    16:25
**success (1)**
    2:25
**succinct (1)**
    25:20
**sued (4)**
    15:10,12,17,18
**suggests (1)**
    20:22
**Suppose (2)**

**21:17,17**
**sure (5)**
    7:9;10:1;20:16;22:2;
    28:24
**surmise (1)**
    24:17
**surprise (1)**
    11:13
**surprising (1)**
    11:9
**suspense (2)**
    20:10;21:13
**system (1)**
    6:22

**T**

**table (1)**
    29:24
**tackle (1)**
    13:2
**talk (1)**
    2:20
**talked (1)**
    19:2
**talking (3)**
    22:15;24:5;29:9
**talks (1)**
    19:2
**telling (2)**
    7:15;19:18
**ten (1)**
    15:21
**term (1)**
    20:4
**terms (1)**
    20:6
**Thacher (1)**
    2:7
**theories (1)**
    15:19
**therefore (3)**
    5:5;7:5;9:13
**thinking (1)**
    16:21
**third (4)**
    15:7;22:4;25:21;
    26:7
**third-party (1)**
    13:20
**Thomas (1)**
    2:3
**though (2)**
    6:8;25:5
**thought (1)**
    27:13
**three (4)**
    14:25;15:1;25:21;
    28:15
**thrust (1)**
    11:18
**times (2)**
    13:7

**DRESSER-RAND COMPANY, v.**
**INGERSOLL RAND COMPANY,**

October 28, 2014

**today (10)**
2:18;3:22;10:20;
12:15;20:21;22:6;
23:23;27:17;28:10;
30:3
**today's (2)**
12:12;28:7
**toes (3)**
5:15;6:3;18:11
**together (4)**
2:19;15:21;28:21,24
**told (1)**
27:12
**tolling (4)**
9:21,22;10:4,8
**tomorrow (1)**
28:8
**track (2)**
14:21;17:21
**transcript (1)**
28:7
**transferred (1)**
17:22
**tried (1)**
2:24
**troubled (1)**
6:2
**true (5)**
2:15;5:4,19;15:19;
21:17
**try (1)**
27:20
**trying (1)**
17:21
**turn (1)**
21:23
**two (8)**
3:13,17;4:6;6:6;7:2,
10;14:25;24:13
**two-thirds (1)**
22:24
**type (1)**
27:8

**U**

**ultimate (2)**
18:8,12
**unaddressed (1)**
22:20
**under (7)**
7:13;10:3,7;12:4;
17:12;21:25;24:2
**underlined (1)**
17:14
**underlying (1)**
13:12
**understood (2)**
2:13;11:15
**unless (1)**
6:25
**unpack (1)**
11:22

**up (20)**
2:12,14,15;3:11;4:8,
8,23;5:10;6:16,22;
12:18;14:7,19;16:21;
22:13;23:24;24:1;
25:13;27:20;28:10
**upon (4)**
8:3;10:20;11:21;
20:3
**urgent (1)**
28:20
**use (1)**
24:7

**V**

**various (2)**
3:9;25:19
**venue (1)**
10:6
**veracity (1)**
5:1
**verdict (1)**
12:24
**versa (1)**
15:18
**vice (1)**
15:18
**view (2)**
4:25;9:13
**violations (1)**
16:10
**vision (1)**
17:13
**voluntarily (1)**
6:25

**W**

**wait (1)**
7:6
**wants (1)**
17:6
**ware (1)**
27:19
**warn (7)**
15:9,11,13;16:7,8,9,
10
**way (5)**
2:24;3:1;20:18;22:8,
14
**ways (1)**
15:15
**week (1)**
18:6
**Welcome (1)**
2:17
**whenever (1)**
25:13
**whereas (1)**
8:9
**wise (1)**
20:6

**wish (1)**
28:10
**within (5)**
13:15,16;16:18;
21:10;23:7
**wonderful (1)**
29:18
**work (5)**
13:6;21:12;24:10;
28:21,24
**works (1)**
7:8
**world (1)**
4:12
**worry (3)**
5:18;20:11,14
**wreck (1)**
27:20
**wrong (2)**
9:3;22:3

**Y**

**Yara (12)**
3:12;4:13,19;6:19;
8:3,14;10:14;13:13,16;
14:25;22:22;25:20
**years (5)**
15:21;16:15;20:7;
21:14;22:14
**York (11)**
3:15;6:8,9;13:7,10;
21:24;23:2,17,20,21;
27:4
**Yorker (1)**
26:6

**1**

**100 (1)**
21:8
**13 (1)**
22:22
**19 (2)**
22:23;23:6
**1970s (1)**
2:15
**19th (2)**
29:7,10
**1st (1)**
27:22

**2**

**2004 (2)**
15:5;17:19
**2007 (1)**
17:20
**2012 (2)**
15:6;21:19
**21st (1)**
28:3

**3**

**300 (1)**
13:7

**5**

**5th (1)**
27:25

**7**

**7th (2)**
27:25;28:2

**8**

**8 (3)**
14:5;18:25;28:23
**8.1 (3)**
16:25;17:12;26:17
**8.1b (1)**
26:11
**8.1e (1)**
4:3
**8.1f (2)**
4:21;19:2
**8.1g (1)**
22:25

**9**

**9 (1)**
28:23
**9.10g (1)**
15:25